## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| DURA AUTOMOTIVE SYSTEMS, INC., | ) | Case No. 06-_____(____) |
| et al.,[1] | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |

## DEBTORS' MOTION FOR (A) AUTHORITY TO CONTINUE USE OF EXISTING CASH MANAGEMENT SYSTEM, BANK ACCOUNTS, BUSINESS FORMS AND INVESTMENT GUIDELINES; (B) GRANTING POSTPETITION INTERCOMPANY CLAIMS ADMINISTRATIVE STATUS; AND (C) AUTHORITY TO CONTINUE INTERCOMPANY ARRANGEMENTS AND HISTORICAL PRACTICES

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") file this motion (the "Motion") for entry of an order under sections 363, 364, 1107, and 1108 of the Bankruptcy Code (defined below) (a) authorizing the Debtors to continue use of their existing cash management system, bank accounts, business forms, and investment guidelines; (b) granting postpetition intercompany claims administrative status; and (c) authorizing the

---

[1] The Debtors in these proceedings are: Adwest Electronics Inc., Atwood Automotive, Inc., Atwood Mobile Products, Inc., Automotive Aviation Partners, LLC, Creation Group Holdings, Inc., Creation Group Transportation, Inc., Creation Group, Inc., Creation Windows, Inc., Creation Windows, LLC, Dura Aircraft Operating Company, LLC, Dura Automotive Canada ULC, Dura Automotive Systems (Canada), Ltd., Dura Automotive Systems Cable Operations, Inc., Dura Automotive Systems of Indiana, Inc., Dura Automotive Systems, Inc., Dura Brake Systems, L.L.C., Dura Cables North LLC, Dura Cables South LLC, Dura Canada LP, Dura Fremont L.L.C., Dura Gladwin L.L.C., Dura Global Technologies, Inc., Dura G.P., Dura Holdings Canada LP, Dura Holdings ULC, Dura Mancelona L.L.C., Dura Ontario, Inc., Dura Operating Canada LP, Dura Operating Corp., Dura Services L.L.C., Dura Shifter L.L.C., Dura Spicebright, Inc., Kemberly, Inc., Kemberly, LLC, Mark I Molded Plastics of Tennessee, Inc., Patent Licensing Clearinghouse L.L.C., Spec-Temp, Inc., Trident Automotive Canada Co., Trident Automotive, L.L.C., Trident Automotive, L.P., Trident Automotive Limited, and Universal Tool & Stamping Company, Inc.

Debtors to continue intercompany arrangements and historical practices.[2]   In support of this Motion, the Debtors respectfully state as follows:[3]

**JURISDICTION**

1.      This Court has jurisdiction over this Motion under 28 U.S.C. § § 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).   Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a), 363, 364, 507, 1107 and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "Bankruptcy Code").

**BACKGROUND**

3.      On October 30, 2006 (the "Commencement Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Reorganization Cases").   The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No trustee, examiner or statutory committee has yet been appointed in these Reorganization Cases.

**RELIEF REQUESTED**

4.      The Debtors' businesses and financial affairs (and those of their wholly-owned, non-debtor foreign subsidiaries), carried out over several continents, are exceedingly complex, requiring the collection, disbursement and movement of funds through numerous bank accounts.

---

[2]   Forms of the proposed interim and final orders are collectively attached hereto as Exhibit A.

[3]   Additional facts and circumstances supporting this Motion are set forth in the Affidavit of Keith Marchiando, Chief Financial Officer of Dura Automotive Systems, Inc., in Support of First Day Motions (the "First Day Affidavit"), filed contemporaneously herewith.

K&E 11363671 27

The Office of the United States Trustee ("UST") has established certain operating guidelines for debtors-in-possession relating to cash management systems. These guidelines require debtors, among other things, to establish one debtor-in-possession account for all estate monies required for the payment of taxes (including payroll taxes), to close all existing bank accounts and open new debtor-in-possession accounts, to maintain a separate debtor-in-possession account for cash collateral, and to obtain checks that bear the designation "debtor-in-possession" and reference the bankruptcy case number and type of account on such checks. Enforcement of these guidelines in these Reorganization Cases, however, would severely disrupt, and likely cripple the Debtors' financial operations, and be antithetical to the stabilization of the Debtors' operations and to its all-important ability to maintain "business as usual."

5.     Accordingly, by this Motion, the Debtors request authority to continue to use their existing cash management system, bank accounts, business forms, and investment guidelines. The Debtors further request that administrative priority status be granted to certain of their intercompany claims and that they be allowed to continue certain intercompany arrangements and historical practices.

### A.     Description of the Debtors' Cash Management System.

6.     The Debtors and their non-debtor subsidiaries maintain separate cash management systems located in the United States, Canada, Mexico, Brazil, Europe and Asia. This Motion pertains to the Debtors' cash management systems maintained in the United States (the "U.S. Cash Management System") and Canada (the "Canadian Cash Management System" and collectively, the "Cash Management System"). The Cash Management System does not overlap with any of the non-debtor subsidiaries' cash management systems maintained in Mexico, Brazil, Europe or Asia. The Cash Management System consists of numerous accounts,

3

each of which is described in detail below and in the flowchart of the Cash Management System attached hereto as Exhibit B.

    a    Cash Collection and Concentration – U.S.

        i    *Concentration Accounts.* The focal point of the U.S. Cash Management System consists of three concentration accounts. The first account (the "BofA Concentration Account") is maintained at Bank of America, N.A. ("BofA") by Dura Automotive Systems, Inc. ("Dura"). The second account is maintained at LaSalle Bank Midwest N.A. ("LaSalle")[4] by Dura (the "LaSalle Concentration Account"). The third account is maintained at Harris Bank, N.A. ("Harris") by Atwood Mobile Products, Inc. ("AMP") (the "Harris Concentration Account").

        ii    *BofA Concentration Account.* The BofA Concentration Account is funded from ten lockbox accounts (collectively, the "BofA Lockboxes"). Customer Collections received via check are deposited into the BofA Lockboxes and then transferred to the BofA Concentration Account. Customer collections received via wire or ACH transaction are received directly into the BofA Concentration Account. A discretionary balance is kept in the BofA Concentration Account. At the end of each business day, if a balance in excess of the discretionary balance remains in the BofA Concentration Account, the excess balance either is transferred to the Directed Investment Account (as defined herein) or applied against the outstanding debt balance under the Fifth Amended and Restated Credit Agreement dated May 3, 2005 (the "Credit Agreement"), between Dura Operating Corp. and Dura Automotive Systems (Canada), Ltd. as borrowers and JPMorgan Chase Bank, N.A. as Administrative Agent (the "Prepetition Credit Facility").

        iii    *LaSalle Concentration Account.* On a daily basis, the Debtors initiate wire transfers from the BofA Concentration Account to the LaSalle Concentration Account. The LaSalle ZBAs (defined below) are funded automatically from the LaSalle Concentration Account. A de minimis

---

4    LaSalle Bank Midwest N.A. changed its name from Standard Federal Bank in the third quarter of 2005.

discretionary balance is kept in the LaSalle Concentration Account.

iv  *Harris Concentration Account.* AMP maintains one master account and ten lockboxes (collectively, the "AMP Lockboxes") with Harris. Customer collections received via check are deposited into the AMP Lockboxes and then transferred to the Harris Concentration Account. Customer collections received via wire or ACH transaction are received directly into the Harris Concentration Account. Each day the excess balance in the Harris Concentration Account is wired to the BofA Concentration Account. A de minimis discretionary balance is kept in the Harris Concentration Account.

v  *Prepetition Credit Facility.* Dura makes borrowing requests on the Credit Facility based on availability as determined by a borrowing base calculation. These borrowings are deposited into the BofA Concentration Account. The Debtors maintain a checking account in the name of Dura Operating Corp. with JPMorgan Chase Bank, N.A.

b  Disbursements – U.S.

i  *Bank of America Zero Balance Accounts.* The Debtors maintain seven zero balance accounts (the "BofA ZBAs") with BofA used for disbursements. The accounts are held in names as shown on Exhibit C. The BofA ZBAs are funded automatically from the BofA Concentration Account.

ii  *Master Payroll Account.* The Debtors maintain a master payroll zero balance account (the "Master Payroll Account") in Dura's name at BofA. The Master Payroll Account is used only for payroll check disbursements. Payroll taxes and direct deposit payroll are disbursed from a zero balance account held in the name of Dura Automotive Systems, Inc. (the "Dura Operating Account"). Both accounts are funded automatically from the BofA Concentration Account.

iii  *Flexible Spending Account.* The Debtors maintain a flexible spending checking account in Dura's name at BofA (the "Flexible Spending Account"). The Flexible Spending Account is funded as needed by the Debtors, and is used to fund third party reimbursement checks written by NGS

5

American, Inc. ("NGS"), a third party benefit administrator, for employee childcare and medical benefit flexible spending payments.

iv    *Medical ZBA.*    The Debtors maintain a zero balance account in Dura's name at BofA (the "Medical ZBA"). The Medical ZBA is funded automatically from the BofA Concentration Account, and is used to fund third party reimbursement checks written by NGS, for employee medical insurance reimbursement payments.

v    *LaSalle ZBAs.*    The Debtors maintain ten ZBAs used for disbursements with LaSalle in names as shown on Exhibit C. The LaSalle ZBAs are funded automatically from the LaSalle Concentration Account, which is funded via wire transfer from the BofA Concentration Account.

vi    *Scotiabank US Obligation Accounts.*    The Debtors maintain two checking accounts and a lockbox at Scotiabank ("Scotiabank") denominated in Canadian Dollars in the names as shown on Exhibit C (the "Scotiabank US Obligation Accounts"). These accounts are used by domestic Debtors to pay their Canadian suppliers in Canadian Dollars. The lockbox is currently unused.

c    Investment Accounts – U.S.

i    *Bank of America Directed Investment Account.*    The Debtors maintain an account for investing excess cash with BofA (the "BofA Directed Investment Account"). At the end of each business day, if a balance in excess of the discretionary balance remains in the BofA Concentration Account, the excess balance is either transferred to the BofA Directed Investment Account or applied against the Prepetition Credit Facility balance. Amounts that are deposited in the BofA Directed Investment Account are transferred to the BofA Concentration Account, as cash is needed. Under Section 6.04(a) of the Prepetition Credit Agreement, the Directed Investment Account may only invest in "Permitted Investments," as defined therein.

d    Cash Collection and Concentration – Canada.

i    *Concentration Accounts.*    The focal point of the cash management system in Canada (the "Canadian Cash Management System") consists of two concentration accounts. The first account (the "Scotiabank $CDN

Concentration Account") is maintained at Scotiabank by Dura Automotive Systems (Canada) Ltd. ("DAS Canada") and is denominated in Canadian Dollars. The second account (the "Scotiabank $US Concentration Account") is maintained at Scotiabank by DAS Canada and is denominated in United States Dollars (collectively, the "Scotiabank Concentration Accounts").

ii      *Scotiabank $CDN Concentration Account.* The Scotiabank $CDN Concentration Account is funded from three collection accounts. Two of the collection accounts are zero balance accounts and the third is a checking account (collectively, the "Scotiabank $CDN Collection Accounts"). Customer collections received via check are deposited into the $CDN Collection Accounts and then transferred to the Scotiabank $CDN Concentration Account. Customer collections received via wire or ACH transaction are received directly into the Scotiabank $CDN Concentration Account. A discretionary balance is kept in the Scotiabank $CDN Concentration Account. At the end of each business day, if the balance exceeds the discretionary balance, the excess balance is transferred to the Scotiabank $CDN Treasury Account (as defined herein).

iii     *Scotiabank $US Concentration Account.* The Scotiabank $US Concentration Account also is funded from three collection accounts. Two of the collection accounts are zero balance accounts and the third is a checking account (collectively, the "Scotiabank $US Collection Accounts"). Customer collections received via check are deposited into the $US Collection Accounts and then transferred to the Scotiabank $US Concentration Account. Customer collections received via wire or ACH transaction are received directly into the Scotiabank $US Concentration Account. A discretionary balance is kept in the Scotiabank $US Concentration Account. At the end of each business day, if the balance exceeds the discretionary balance, the excess balance is transferred to the Scotiabank $US Treasury Account (as defined herein).

e      Disbursements – Canada

i      *Scotiabank Disbursement Accounts.* The Debtors maintain four zero balance accounts (two denominated in Canadian Dollars and two denominated in United States Dollars) and two checking accounts (one denominated in Canadian

7

Dollars and one denominated in United States Dollars) used for disbursements with Scotiabank as shown on Exhibit C. The $CDN and $US zero balance accounts are funded automatically from the Scotiabank $CDN and $US Concentration Accounts, respectively. The $CDN and $US checking accounts are funded by wire transfer from the Scotiabank $CDN and $US Concentration Accounts, respectively.

ii      *Canadian Payroll Account.* The Debtors maintain a master payroll checking account (the "Canadian Payroll Account") at Scotiabank. The Canadian Payroll Account is used for payroll check disbursements, direct deposit payroll and payroll taxes. The Canadian Payroll Account is funded via wire transfer from the Scotiabank $CDN Concentration Account.

iii     *Dura Automotive Systems (Canada) ULC.* The Debtors maintain a checking account with Scotiabank (the "DAS ULC Account"). The DAS ULC account is funded via wire transfer from Trident Automotive, LP.

iv      *Dura Canada LP.* The Debtors maintain a checking account with Scotiabank in the name of DURA Canada LP (the "Dura Canada LP Account"). This account is presently inactive.

v       *Dura Automotive Systems (Canada) In Trust For Canadian Auto Workers Union Local 61.* The Debtors maintain a checking account for severance payments to members of the Canadian Auto Workers Union ("CAW") Local 61 in the name of Dura Automotive Systems (Canada) ITF CAW Local 61 which is funded via wire transfer from the Scotiabank $CDN Concentration Account.

vi      *Scotiabank US Obligation Accounts.* The Debtors maintain two checking accounts and a lockbox at Scotiabank, denominated in Canadian Dollars, in the names as shown on Exhibit C, as described previously.

f       Investment Accounts – Canada

i       *$CDN Treasury Account and $US Treasury Account.* The Debtors maintain two accounts for investing excess Canadian and United States cash balances with Scotiabank (the "Scotiabank $CDN Treasury Account" and the "Scotiabank $US Treasury Account,"

8

respectively) (collectively, the "Treasury Accounts," together with the BofA Directed Investment Account, the "Investment Accounts"). At the end of each business day, if a balance in excess of the discretionary balance remains in either Scotiabank Concentration Account, the excess balance is transferred to the Treasury Accounts, as appropriate. Amounts that are deposited in the Treasury Accounts are transferred to the Scotiabank Concentration Accounts, as cash is needed. Under Section 6.04(a) of the Prepetition Credit Agreement, the Treasury Accounts may only invest in "Permitted Investments," as defined therein.

**B.      Continuing the Debtors' Integrated Cash Management Is in the Best Interests of the Debtors' Estates and Creditors.**

7.      As stated, the UST generally requires a debtor-in-possession to close all prepetition bank accounts and open new debtor-in-possession bank accounts. In addition, the UST may require a debtor-in-possession to maintain separate accounts for cash collateral and taxes. However, in complex chapter 11 cases, such as here, courts in this District and other districts often waive these requirements, recognizing that they are often impractical and potentially detrimental to a debtor's postpetition business operations and restructuring efforts. See, e.g., In re J.L. French Automotive Castings, Inc., Case No. 06-10119 (MFW) (Bankr. D. Del. Mar. 9, 2006); In re Pliant Corporation, Case No. 06-10001 (MFW) (Bankr. D. Del. January 4, 2006) (MFW); In re Meridian Automotive Systems–Composite Operations, Inc., Case No. 05-11168 (MFW) (Bankr. D. Del. Apr. 27, 2005); In re Exide Techs., Case No. 02-11125 (JCA) (Bankr. D. Del. April 17, 2002); In re W. R. Grace & Co., Case No. 01-01139 (JCA) (Bankr. D. Del. April 2, 2001).

8.      The Debtors have utilized their Cash Management System substantially in its current structure for more than seven years as part of their ordinary, usual, and essential business practices. The Cash Management System resembles those commonly employed by corporate enterprises comparable to the Debtors in size and complexity. Large, complex multiple-entity

businesses tend to use such systems because of the numerous benefits they provide, including the ability to: (a) quickly create status reports on the location and amount of funds, allowing management to track and control corporate funds; (b) ensure cash availability; and (c) reduce administrative expenses by facilitating the movement of funds. These controls are particularly important here, given the significant amount of cash that flows through the Debtors' integrated Cash Management System.

9.       Given the corporate and financial structure of the Debtors and their non-debtor affiliates, it would be difficult for the Debtors to establish an entirely new system of accounts and new cash management system for each debtor entity. For example, as described in more detail below, if the Debtors had to open separate accounts as debtors-in-possession and rearrange their Cash Management System, it would necessitate opening numerous new accounts for collections, cash concentration and disbursements. The delays that would result from opening new accounts, revising cash management procedures and instructing customers to redirect payments would negatively impact the Debtors' ability to operate their businesses while pursuing these arrangements.

10.       Under these circumstances, maintaining the Debtors' Cash Management System is both essential and in the best interests of their respective estates and creditors.[5] Furthermore, preserving the "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with any substantial disruption in the Debtors' Cash Management System will facilitate the Debtors' reorganization efforts.

---

[5]   Of course, as they have historically, the Debtors will continue to maintain records with respect to transfers of cash, so that transactions can be ascertained, traced and recorded properly on applicable intercompany accounts.

11.    As mentioned above, bankruptcy courts routinely grant chapter 11 debtors with complex financial affairs authority to continue utilizing existing cash management systems and treat requests for such authority as a relatively "simple matter."[6]  In In re Charter Co., 778 F.2d 617 (11th Cir. 1985), for example, the Bankruptcy Court entered an order authorizing the debtor and forty-three (43) of its subsidiaries "to continue to consolidate the management of their cash as has been usual and customary in the past, and to transfer monies from affiliated entity to entity, including operating entities that are not debtors." Id. at 620.  The Eleventh Circuit Court of Appeals affirmed the district court decision denying a creditor's motion for leave to appeal the bankruptcy court's cash management order, holding that authorizing the debtors to utilize their prepetition "routine cash management system" was "entirely consistent" with applicable provisions of the Bankruptcy Code. Id. at 621.

12.    Likewise, in another context, this Court in the Columbia Gas chapter 11 case explained that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." In re Columbia Gas Sys., Inc., 136 B.R. 930, 934 (Bankr. D. Del. 1993), aff'd in part and rev'd in part, 997 F.2d 1039 (3d Cir. 1993), cert. denied sub nom Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp., 114 S. Ct. 1050 (1994).  The Third Circuit agreed, emphasizing that a requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient." Columbia

---

6    See, e.g., In re Nobex Corporation, Case No. 05-20050 (MFW) (Bankr. D. Del., Dec. 6, 2005); In re FLYi, Inc., Case No. 05-20011 (MFW) (Bankr. D. Del. Nov. 7, 2005); In re Venture Stores, Inc., Case No. 98-101 (RRM) (Bankr. D. Del. Jan 20, 1998); In re Levitz Furniture, Inc., Case No. 97-1842 (JJF) (Bankr. D. Del. Sept. 5, 1997); In re AstroPower, Inc., Case No. 04-10322 (MFW) (Bankr. D. Del. 2004); In re The Thaxton Group, Inc., Case No. 03-13183 (PJW) (Bankr. D. Del. 2003); In re Orion Refining Corp., Case No. 03-11483 (MFW) (Bankr. D. Del. 2003); In re Philip Services Corp., Case No. 99-2385 (MFW) (Bankr. D. Del. June 25, 1999); In re Favorite Brands Int'l Holding Corp., Case No. 99-726 (PJW) (Bankr. D. Del. Mar. 31, 1999)

Gas, 997 F.2d at 1061; see also, In re Southmark Corp., 49 F.3d 1111, 1114 (5th Cir. 1995) (cash management system allows debtor "to administer more efficiently and effectively its financial operations and assets").[7]

### C.    The Debtors Should Be Granted Authority to Maintain Their Existing Bank Accounts.

13.    As stated, the UST's guidelines require a chapter 11 debtor-in-possession to open new bank accounts (in certain financial institutions designated as authorized depositories by the UST) and close all existing accounts. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments and to help protect against the Debtor's inadvertent payment of prepetition claims.

14.    Before the Commencement Date, the Debtors, in the ordinary course of business, maintained approximately sixty-two operational accounts (collectively, the "Bank Accounts") with certain financial institutions (collectively, the "Banks"). Each of the Bank Accounts with the corresponding Bank is listed in Exhibit C attached hereto. Some of these Bank Accounts are located at Banks other than those designated as authorized depositories by the United States Trustee. The Debtors' main operating Bank Accounts are described in considerable detail above.

15.    If enforced in these Reorganization Cases, this requirement would cause enormous disruption in the Debtors' businesses and would impair their efforts to reorganize. Specifically, the Debtors would be subject to significant administrative burdens and expenses if they were required to close and reopen new accounts, execute new signatory cards and/or

---

[7]    The continued use of cash management systems has also been approved in other districts. See, e.g., In re Dana Corporation, Case No. 06-10354 (BRL) (Bankr. S.D.N.Y. March 29, 2006); In re Tower Automotive, Inc., Case No. 05-10578 (ALG) (Bankr. S.D.N.Y. 2005); In re The Carbide/Graphite Group, Inc., Case No. 01-2974448 (MBM) (Bankr. W.D. Pa. Sept. 27, 2001); In re Polymer Group, Inc., Case No. 02-05773 (JEW) (Bankr. D.S.C. July 1, 2002).

depository agreements, and create an entirely new manual system for issuing checks and paying postpetition obligations, as generally required by the UST.

16.    Maintaining the Bank Accounts would greatly facilitate the Debtors' "seamless transition" to postpetition operations. To avoid delays in paying debts incurred postpetition, and to ensure as smooth a transition into chapter 11 as possible, the Debtors should be permitted to continue to maintain the existing Bank Accounts and, if necessary, to open new accounts and close existing accounts in the normal course of business operations.

17.    In other large cases, this Court has waived the strict enforcement of bank account closing requirements and replaced them with an alternative procedure that provides the same protection. See, e.g., In re J.L. French Automotive Castings, Inc., Case No. 06 10119 (MFW) (Bankr. D. Del. Mar. 9, 2006); In re Pliant Corporation, Case No. 06-10001 (MFW) (Bankr. D. Del. January 4, 2006) (MFW); In re Nobex Corporation, Case No. 05-20050 (MFW) (Bankr. D. Del., Dec. 6, 2005); In re FLYi, Inc., Case No. 05-20011 (MFW) (Bankr. D. Del. Nov. 7, 2005); In re Meridian Automotive Systems–Composite Operations, Inc., Case No. 05-11168 (MFW) (Bankr. D. Del. Apr. 27, 2005); In re W. R. Grace & Co., Case No. 01-1139 (JKF) (Bankr. D. Del. Apr. 2, 2001); In re Trans World Airlines, Inc., Case No. 01-0056 (PJW) (Bankr. D. Del. Jan. 10, 2001); In re United Artists Theatre Co., Case No. 00-3514 (SLR) (Bankr. D. Del. Sept. 5, 2000); In re Harnischfeger Indus., Inc., Case No. 99-2171 (PJW) (Bankr. D. Del. June 7, 1999). To guard against improper transfers resulting from the postpetition honoring of prepetition checks, the Court can order the Debtors' banks, with some exceptions, not to honor any checks drawn on the Debtors' accounts before the Commencement Date.

18.    The Debtors represent that, if the relief requested herein is granted, they will implement appropriate mechanisms to ensure that no payments will be made on any debts

13

incurred by them before the Commencement Date, other than those authorized by this Court. Specifically, the Debtors have centralized their accounts payable systems, and implemented software restrictions, which prohibit payments to be issued without prior approval of the Debtors' treasury department. In turn, the Debtors' senior treasury personnel shall consult with the Debtors' advisors and bankruptcy counsel in connection with such approvals.

19.     Accordingly, the Debtors request that this Court waive the United States Trustee's bank account closing requirements and instead simply require the Debtors to implement appropriate mechanisms to ensure they will not inadvertently pay any prepetition obligations. The Debtors further request that the Bank Accounts be deemed debtor-in-possession accounts and that the Debtors be authorized to maintain and continue using these accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.

**D.     The Debtors Should Be Granted Authority to Use Existing Business Forms and Checks.**

20.     In the ordinary course of their businesses, the Debtors use a multitude of checks and other business forms. To minimize expenses to the estates, the Debtors request authority to continue to use all correspondence and business forms (including, but not limited to, letterhead, purchase orders, invoices, etc.) as such forms were in existence immediately before the Commencement Date, without reference to the Debtors' status as debtors-in-possession. The Debtors also request authorization to use their existing check stock, provided, however, that upon depletion of the Debtors' check stock and/or business forms stock, the Debtors will obtain new check stock and/or business forms stock reflecting their status as debtors-in-possession.

21.     By virtue of the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with whom the Debtors deal on a regular basis,

14

it is important that the Debtors be permitted to continue to use their existing checks and other business forms without alteration or change, except as requested herein. Indeed, because parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as a debtor-in-possession as a result of the large and highly publicized nature of these Reorganization Cases, changing business forms is unnecessary and unduly burdensome.

22.    In other large cases, this Court has allowed debtors to use their prepetition check forms without the "debtor-in-possession" label, at least until the debtors' existing check stock was depleted. See, e.g., In re J.L. French Automotive Castings, Inc., Case No. 06 10119 (MFW) (Bankr. D. Del. Mar. 9, 2006); In re Nobex Corporation, Case No. 05-20050 (MFW) (Bankr. D. Del., Dec. 6, 2005); In re FLYi, Inc., Case No. 05-20011 (MFW) (Bankr. D. Del. Nov. 7, 2005).[8]

### E.    The Debtors Should Be Authorized to Continue Using Debit, Wire and Automatic Clearing House Payments.

23.    The Debtors should be granted further relief from the United States Trustee Guidelines to the extent that they require the Debtors to make all disbursements by check. In particular, the United States Trustee's Guidelines require that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement.

24.    Considering the complexity of the Debtors' operations, it is necessary for the Debtors to conduct transactions by debit, wire or ACH payments and other similar methods, as

---

[8]    See also In re Meridian Automotive Systems–Composite Operations, Inc., Case No. 05-11168 (MFW) (Bankr. D. Del. Apr. 27, 2005); In re AstroPower, Inc., Case No. 04-10322 (MFW) (Bankr. D. Del. 2004); In re The Thaxton Group, Inc., Case No. 03-13183 (PJW) (Bankr. D. Del. 2003); In re Orion Refining Corp., Case No. 03-11483 (MFW) (Bankr. D. Del. 2003); In re Fleming Cos., Inc., Case No. 03-10945 (MFW) (Bankr. D. Del. 2003); In re Wherehouse Entm't, Inc., Case No. 03-10224 (PJW) (Bankr. D. Del. 2003); In re FAO, Inc., Case No. 03-10119 (LK) (Bankr. D. Del. 2003); In re Favorite Brands Int'l Holding Corp., Case No. 99-726 (PJW) (Bankr. D. Del. 1999); In re FPA Med. Mgmt., Inc., Case No. 98-1596 (PJW) (Bankr. D. Del. 1998); In re Venture Stores, Inc., Case No. 98-101 (RRM) (Bankr. D. Del. 1998); In re Levitz Furniture, Inc., Case No. 97-1842 (JJF) (Bankr. D. Del. 1997); In re Montgomery Ward Holding Corp., Case No. 97-1409 (PJW) (Bankr. D. Del. 1997).

discussed above. In addition, a portion of the Debtors' customer receipts is received through wire. To deny the Debtors the opportunity to conduct transactions by debit, wire or ACH payments or other similar methods would interfere with the Debtors' performance of their contracts and unnecessarily disrupt the Debtors' business operations, as well as create additional costs to the Debtors and their non-debtor affiliates.

**F.     The Debtors Should Be Authorized to Continue to Allow Third Party Benefit Administrators to Write Checks on the Debtors' Behalf.**

25.     In the ordinary course of business, the Debtors fund the Medical ZBA and the Flexible Spending Account for employee medical benefits. From these three accounts, benefit checks are written by third party administrators on the Debtors behalf (the "Check Writing Privileges"). If the Check Writing Privileges are interrupted it could result in a disruption of the Debtors' employee medical benefits, which could lead to a significant erosion of the Debtors' employees' morale. Because the Check Writing Privileges are carried out in the ordinary course of business, the Debtors do not believe their continuance requires Court approval. However, out of an abundance of caution the Debtors seek authority to continue the Check Writing Privileges in order to avoid interference with the Debtors' ability to pay medical benefits.

**G.     Cause Exists for Waiving the Investment and Deposit Guidelines of Section 345 of the Bankruptcy Code.**

26.     Prior to the Commencement Date, the Debtors invested excess cash in three Investment Accounts. The Debtors request authority to continue investing excess cash (the "Excess Funds") in accordance with their prepetition practices in the Investment Accounts. As noted above, per Section 6.04(a) of the Prepetition Credit Agreement, the Investment Accounts may only invest in "Permitted Investments," as defined in the Prepetition Credit Agreement.

27.     Bankruptcy Code § 345(a) of the authorizes deposit or investment of money of estates, such as cash, as "will yield the maximum reasonable net return on such money, taking

16

into account the safety of such deposit or investment." While § 345(b) generally requires that, with respect to investments other than investments "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," the estate must require a bond in favor of the United States secured by the undertaking of a U.S. Trustee-approved corporate surety, it allows the court to dispense with this limitation "for cause."

28.     The Debtors submit that cause exists in these Reorganization Cases for the Court to allow the Debtors to invest their Excess Funds in the Investment Account. Before the Commencement Date, the Debtors invested their cash with the primary goal of protection of principal and the secondary goal of maximizing yield and liquidity. The Debtors submit that the Investment Account provides sufficient protection for their cash and that it would be in the best interest of their estates and creditors for the Debtors to continue to follow this practice for investment of cash.

29.     Indeed, the yield on investments in the Investment Account is likely to be greater than mandatorily directing investment in government securities. Therefore, this strategy could result in substantially greater returns for the Debtors' estates over time. Moreover, a bond secured by undertaking of a corporate surety would likely be unduly expensive, assuming such a bond were available, and could offset much of the financial gain derived from investing in the Investment Account. The Debtors submit that their assets will be invested in a manner that preserves capital, provides liquidity, maintains appropriate diversifications and generates returns relative to prevailing market conditions.

17

30.    The Court's ability to excuse strict performance of the deposit and investment requirements of section 345(b) of the Bankruptcy Code "for cause" arises from the 1994 amendments to the Bankruptcy Code. The legislative history of that amendment provides:

> Section 345 of the Code governs investments of funds of bankruptcy estates. The purposes [sic] is to make sure that funds of a bankrupt that are obliged to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankruptcy estate. Under current law, all investments are required to be FDIC insured, collateralized or bonded. While this requirement is wise in the case of smaller debtors with limited funds that cannot afford a risky investment to be lost, it can work to needlessly handcuff larger, more sophisticated debtors. This section would amend the Code to allow the courts to approve investments other than those permitted by section 345(b) for just cause, thereby overruling In re Columbia Gas Systems, Inc., 33 F.3d 294 (3d Cir. 1994).

In re Service Merchandise Co., Inc., 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (quoting H.R. Rep. 103-834, 103rd Cong., 2nd Sess. 224 (Oct. 4, 1994); 140 Cong. Rec. H10767 (Oct. 4, 1994)).

31.    In determining whether the "for cause" standard has been met, the Court should consider a "totality of the circumstances," utilizing the following factors:

a    the sophistication of the debtor's business;

b    the size of the debtor's business operations;

c    the amount of the investments involved;

d    the bank ratings (Moody's and Standard and Poor) of the financial institutions where the debtor-in-possession funds are held;

e    the complexity of the case;

f    the safeguards in place within the debtor's own business of insuring the safety of the funds;

g    the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

h    the benefit to the debtor;

i    the harm, if any, to the estate; and

j the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

Service Merchandise, 240 B.R. at 896.

32. Here, the Debtors submit that the funds will not be sufficiently at risk to necessitate strict adherence to the requirements of § 345(b) . Moreover, if granted a waiver, the Debtors will not be required to incur the significant administrative difficulties and expenses relating to opening new accounts to ensure that all of its funds are fully insured or invested strictly in accordance with the restrictions established by § 345.

33. In other large chapter 11 cases, this Court has liberally construed the requirement of § 345(b) that a debtor-in-possession obtain a bond from any entity with which its money is deposited or invested. In those instances, this Court has waived the requirements of § 345(b) and replaced them with alternative procedures. See, e.g., In re J.L. French Automotive Castings, Inc., Case No. 06-10119 (MFW) (Bankr. D. Del. Mar. 9, 2006); In re Nobex Corporation, Case No. 05-20050 (MFW) (Bankr. D. Del., Dec. 6, 2005); In re Federal-Mogul Global, Inc., Case No. 01-10578 (RTL) (Bankr. D. Del. Oct. 4, 2001); In re ANC Rental Corp., Case No. 01-11200 (MFW) (Bankr. D. Del. Nov. 13, 2001).[9] Cause exists for a similar waiver in these cases.

**H.** **Description of the Debtors' Postpetition Intercompany Claims.**

34. The Debtors maintain business relationships with each other and non-debtor affiliates and, as a result, there are numerous intercompany claims that reflect intercompany receivables and payments made in the ordinary course of the Debtors' businesses (the "Intercompany Claims"), including, but not limited to:

---

[9] See also In re NationsRent, Inc., Case No. 01-11628 (PJW) (Bankr. D. Del. Dec. 18, 2001); In re FFC Holding, Inc., Case No. 01-2399 (Bankr. D. Del. July 18, 2001); In re W. R. Grace & Co., Case No. 01-1139 (JKF) (Bankr. D. Del. Apr. 2, 2001); In re Trans World Airlines, Inc., Case No. 01-0056 (PJW) (Bankr D. Del. Jan. 10, 2001); In re United Artists Theatre Co., Case No. 00-3514 (SLR) (Bankr. D. Del. Sept. 5, 2000); In re Harnischfeger Indus., Inc., Case No. 99-2171 (PJW) (Bankr. D. Del. June 7, 1999).

a *Accrued interest.* The Debtors and non-debtor affiliates owe interest between and among each other on outstanding Intercompany Claims. Such interest is charged monthly based on the net Intercompany Claims outstanding at the end of such month.

b *Administrative fees.* Certain Debtors are charged a percentage of their sales in exchange for marketing support from the Debtors.

c *Centrally-billed expenses.* In the ordinary course of business, the Debtors incur centrally billed expenses, such as insurance, premiums, payroll, 401k payments, benefits, payroll taxes, other taxes, (e.g., real estate, franchise sales, etc.), workman's compensation obligations, and technology equipment.

d *Intercompany loans.* In the ordinary course of business, the Debtors and non-debtor affiliates make loans between and among each other to fund operations and make acquisitions.

e *Royalties.* Royalties are charged either with reference to costs incurred or as a percentage of sales to certain Debtors and non-debtors for the use of technology and other intellectual property of the Debtors.

f *Trade receivables and trade payables.* In the ordinary course of business, and as a result of the Debtors' Cash Management System, certain Debtors receive checks and wire transfers from customers and fund payables on behalf of various other Debtors. The Debtors' intercompany accounts reflect the net position of both receipts and disbursements received or made on behalf of other Debtors.

The foregoing are examples of the business relationships between and among the Debtors and their non-debtor affiliates (the "Intercompany Arrangements").

35. Also, in many instances, the Debtors' funds are commingled throughout the Cash Management System. Accordingly, at any given time, there may be Intercompany Claims owing by one Debtor to another. These transactions are made between and among the Debtors and certain of their non-debtor affiliates in the ordinary course of the Debtors' businesses as part of their Cash Management System (the "Intercompany Transactions").[10] The Debtors maintain

---

[10] Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar to the Debtors', the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of § 363(c)(1) and, thus, do not require the Court's approval.

(Continued...)

records of all fund transfers and can ascertain, trace and account for Intercompany Transactions. The Debtors, moreover, will continue to maintain records of Intercompany Transactions. If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' detriment.

36.    To ensure each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors respectfully request that, pursuant to Bankruptcy Code § 503(b)(1) and 364(b) , all Intercompany Claims against a Debtor by another Debtor or a non-debtor affiliate arising after the Commencement Date, as a result of ordinary course Intercompany Transactions through the Cash Management System, be accorded administrative priority expense status. If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

37.    Administrative expense treatment for intercompany transactions, as requested here, has been granted in other comparable chapter 11 cases in this District and in other districts. See, e.g., In re J.L. French Automotive Castings, Inc., Case No. 06-10119 (MFW) (Bankr. D. Del. Mar. 9, 2006); In re Nobex Corporation, Case No. 05-20050 (MFW) (Bankr. D. Del., Dec. 6, 2005); In re FLYi, Inc., Case No. 05-20011 (MFW) (Bankr. D. Del. Nov. 7, 2005); In re Cornerstone Propane, L.P., Case No. 04-13856 (RDD) (Bankr. S.D.N.Y. June 3, 2004); In re NRG Energy, Inc., Case No. 03-13024 (PCB) (Bankr. S.D.N.Y. May 15, 2003); In re Global

---

Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis. Moreover, the continued performance of the ordinary course Intercompany Transactions is integral to ensure the Debtors' ability to operate their businesses as debtors-in-possession. Were the Debtors to obtain the services they currently receive pursuant to the Intercompany Transactions on an isolated per-company basis, aside from incurring excessive financial burdens in identifying appropriate providers of these services and entering into individual agreements for providing these services, the Debtors would be required to divert their attention from their restructuring efforts and the smooth transition into operating as debtors-in-possession.

21

Crossing, Ltd., Case No. 02-40188 (SMB) (Bankr. S.D.N.Y. Jan. 28, 2002); In re Enron Corp.,

Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. Dec. 3, 2001); In re Ogden New York Servs., Inc.,

Case No. 02-40826 (CB)(Bankr. S.D.N.Y. April 1, 2002); In re Worldcom, Inc., Case No. 02-

13533 (Bankr. S.D.N.Y. July 22, 2002); In re W. R. Grace & Co., Case No. 01-1139

(JKF) (Bankr. D. Del. Apr. 2, 2001); In re Trans World Airlines, Inc., Case No. 01-0056

(PJW) (Bankr. D. Del. Jan. 10, 2001); In re United Artists Theatre Co., Case No. 00-3514

(SLR) (Bankr. D. Del. Sept. 5, 2000); In re Harnischfeger Indus., Inc., Case No. 99-2171

(PJW) (Bankr. D. Del. June 7, 1999).

I.      **The Debtors Should Be Authorized to Continue Performing under the Intercompany Arrangements and Historical Practices.**

38.     As described above in ¶ 34, the Debtors and their non-debtor affiliates and

subsidiaries engage in certain usual and customary business practices in the ordinary course of

their businesses that govern the various intercompany relationships among the Debtors and non-

debtors, including, among other practices, incurring centrally-billed expenses, making and

receiving payments on behalf of each other, and making intercompany loans. The Debtors

believe that continued performance under the Intercompany Arrangements is not only important

to the successful restructuring of the Debtors' entities, but is absolutely integral to ensure the

Debtors' ability to operate their businesses as debtors-in-possession. Were the Debtors required

to obtain the services they currently receive under the Intercompany Arrangements on a per-

company basis, aside from incurring excessive financial burdens in identifying appropriate

providers of these services and entering into individual agreements for providing these services,

the Debtors would be required to divert their attention and efforts from ensuring a smooth

transition into the chapter 11 process and, ultimately, working towards a successful restructuring.

Moreover, as noted above, the services provided under the Intercompany Arrangements are ordinary course type tasks and functions.

39.    Thus, while the Debtors are not seeking to assume the Intercompany Arrangements as executory contracts at this time, the Debtors respectfully request the authority to continue performing under the Intercompany Arrangements in the ordinary course of business without need for further Court order.  Courts have routinely granted such authority in other complex multi-debtor chapter 11 cases for similar reasons.  See, e.g., In re Nobex Corporation, Case No. 05-20050 (MFW) (Bankr. D. Del., Dec. 6, 2005); In re FLYi, Inc., Case No. 05-20011 (MFW) (Bankr. D. Del. Nov. 7, 2005); In re W. R. Grace & Co., Case No. 01-1139 (JKF) (Bankr. D. Del. Apr. 2, 2001); In re Montgomery Ward Holding Corp., Case No. 97-1409 (PJW) (Bankr. D. Del. July 8, 1997); In re Mid-Valley, Inc., Case No. 03-35592 (JKF) (Bankr. W.D. Pa. Dec. 17, 2003) (interim order authorizing debtors to continue to engage in intercompany agreements in the ordinary course of business); In re Polymer Group, Inc., Case No. 02-05773 (JEW) (Bankr. D.S.C. July 1, 2002); In re Flagstar Holdings, Inc., Case No. 97-05431-B (JEW) (Bankr. D.S.C. July 15, 1997).  For the reasons discussed herein, the Court should authorize the Debtors to continue to perform under the Intercompany Arrangements.

## NO BRIEFING SCHEDULE REQUIRED

40.    The Debtors submit that this Motion does not present any novel issues of law requiring briefing.  Therefore, pursuant to Rule 7.1.2 of the Local Rules of Civil Practice and Procedure for the United States District Court for the District of Delaware (the "Local District Rules"), incorporated by reference into Rule 1001-1(b) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware, the

23

Debtors respectfully request that the Court set aside the briefing schedule set forth in Rule 7.1.2(a) of the Local District Rules.

## NOTICE

41.    No trustee, examiner or creditors' committee has been appointed in the Reorganization Cases. The Debtors have provided notice of this Motion to: (a) the United States Trustee for the District of Delaware; (b) those parties listed on the Consolidated List of Creditors Holding Largest Thirty Unsecured Claims Against the Debtors, as identified in their chapter 11 petitions; (c) counsel to the agent for the Debtors' postpetition secured lenders; (d) counsel to the agent to the Debtors' prepetition first lien secured lenders; (e) counsel to the agent to the Debtors' prepetition second lien secured lenders; (f) counsel to the ad hoc committee of certain of the Debtors' prepetition second lien lenders; (g) the indenture trustee for the Debtors' 8.625% senior unsecured notes; (h) counsel to the ad hoc committee of certain holders of the Debtors' 8.625% senior unsecured notes; (i) the indenture trustee for the Debtors' 9.0% senior subordinated notes; (j) counsel to the ad hoc committee of certain holders of the Debtors' 9.0% senior subordinated notes; (k) the indenture trustee for the Debtors' 7.5% convertible trust preferred notes; and (l) the Banks listed on Exhibit C. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

## NO PRIOR REQUEST

42.    No prior motion for the relief requested herein has been made to this or any other court.

24

WHEREFORE, the Debtors respectfully request that the Court enter interim and final orders, substantially in the forms attached hereto as Exhibit A, (a) authorizing the Debtors to continue using their Cash Management System, bank accounts, business forms, and investment guidelines; (b) granting postpetition Intercompany Claims administrative status; (c) authorizing the Debtors to continue to perform under Intercompany Arrangements and historical practices; and (d) granting such other and further relief as the Court deems appropriate.

Dated: October 30, 2006
      Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (Bar No. 2981)
Daniel J. DeFranceschi (Bar No. 2732)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700

KIRKLAND & ELLIS, LLP
Richard M. Cieri
Marc Kieselstein, P.C.
Roger J. Higgins
Ryan Blaine Bennett
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000

PROPOSED COUNSEL FOR THE DEBTORS
AND DEBTORS IN POSSESSION