## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| DURA AUTOMOTIVE SYSTEMS, INC., | ) Case No. 06-_____ (____) |
| et al.,[1] | ) |
| | ) Jointly Administered |
| Debtors. | ) |

### MOTION OF THE DEBTORS, PURSUANT TO SECTIONS 105(A), 363(B), 503(B)(9), AND 546(C)(1) OF THE BANKRUPTCY CODE, FOR AN ORDER AUTHORIZING THEM TO PAY THE PREPETITION CLAIMS OF CERTAIN CRITICAL VENDORS AND ADMINISTRATIVE CLAIMHOLDERS AND GRANTING CERTAIN RELATED RELIEF

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), hereby file this motion (the "Motion") for entry of an order authorizing the Debtors to pay prepetition claims of certain critical vendors and administrative claimholders.[2] In support of this Motion, the Debtors respectfully state as follows:[3]

---

[1] The Debtors in these proceedings are: Adwest Electronics Inc., Atwood Automotive, Inc., Atwood Mobile Products, Inc., Automotive Aviation Partners, LLC, Creation Group Holdings, Inc., Creation Group Transportation, Inc., Creation Group, Inc., Creation Windows, Inc., Creation Windows, LLC, Dura Aircraft Operating Company, LLC, Dura Automotive Canada ULC, Dura Automotive Systems (Canada), Ltd., Dura Automotive Systems Cable Operations, Inc., Dura Automotive Systems of Indiana, Inc., Dura Automotive Systems, Inc., Dura Brake Systems, L.L.C., Dura Cables North LLC, Dura Cables South LLC, Dura Canada LP, Dura Fremont L.L.C., Dura Gladwin L.L.C., Dura Global Technologies, Inc., Dura G.P., Dura Holdings Canada LP, Dura Holdings ULC, Dura Mancelona L.L.C., Dura Ontario, Inc., Dura Operating Canada LP, Dura Operating Corp., Dura Services L.L.C., Dura Shifter L.L.C., Dura Spicebright, Inc., Kemberly, Inc., Kemberly, LLC, Mark I Molded Plastics of Tennessee, Inc., Patent Licensing Clearinghouse L.L.C., Spec-Temp, Inc., Trident Automotive Canada Co., Trident Automotive, L.L.C., Trident Automotive, L.P., Trident Automotive Limited, and Universal Tool & Stamping Company, Inc.

[2] Forms of the proposed interim and final orders are attached hereto as Exhibit A.

[3] The facts and circumstances supporting this Motion are set forth in the Affidavit of Keith R. Marchiando, Chief Financial Officer of Dura Automotive Systems, Inc., in Support of First Day Motions (the "First Day Affidavit"), filed contemporaneously herewith.

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.
This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this
proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a), 363, 364,
503 and 546 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended by the
Bankruptcy Abuse and Consumer Protection Act of 2005 (the "Bankruptcy Code").

## BACKGROUND

3.      On October 30, 2006 (the "Commencement Date"), the Debtors filed voluntary
petitions for relief under chapter 11 of the Bankruptcy Code (the "Reorganization Cases"). The
Debtors are operating their businesses and managing their properties as debtors-in-possession
pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or
statutory committee has been appointed in these Reorganization Cases.

## RELIEF REQUESTED

4.      Pursuant to sections 105(a), 364(b), 503(b)(9), and 546(c)(1) of the Bankruptcy
Code and the "necessity of payment" doctrine, the Debtors hereby seek the entry of an order: (a)
authorizing them, in their sole discretion and subject to the terms and conditions set forth herein,
to pay, in the ordinary course of the Debtors' businesses, the prepetition claim (the "Critical
Vendor Claims") of certain parties who supply goods or services critical to the continued
operation of the Debtors' businesses (collectively, the "Critical Vendors"); (b) authorizing, but
not requiring, the payment of prepetition claims for the value of goods (the "Priority Vendor
Claims") received by the Debtors in the ordinary course of their business during the 20-day
period prior to the Commencement Date, which are entitled to administrative expense priority

2

under section 503(b)(9) of the Bankruptcy Code (the "Priority Vendors"); (c) approving a procedure for addressing those vendors who repudiate and refuse to honor their postpetition contractual obligations to the Debtors; and (d) granting related relief.

5.      In particular, the Debtors request the foregoing authority subject to the following caps:[4]

|  | Estimated Payables as of 10/26 | Interim Relief Sought | Final Relief Sought |
|---|---|---|---|
| Critical Vendor Claims[5] | $28,830,384 | $9,250,000 | $29,000,000 |
| Priority Vendor Claims | 24,321,404 | 9,250,000 | 25,000,000 |
| Foreign Vendor Claims | 3,329,778 | 3,400,000 | 3,400,000 |
| Shippers and Warehousemen Claims | 735,963 | 740,000 | 740,000 |
| Statutory Lien Claims (includes Tooling) | 2,548,109 | 2,600,000 | 2,600,000 |
| **Total** | $59,765,638 | $25,240,000 | $60,740,000 |

## THE NEED FOR RELIEF

6.      The Debtors are mindful of their duty to preserve and maximize the value of their estates by sustaining the Debtors' enterprise as a going concern as they transition into chapter 11. Providing seamless service to their customers is key. The Debtors have highly sensitive supply chains that easily could be disrupted by a recalcitrant vendor. Any disruption could jeopardize the Debtors' ability to fulfill commitments to customers going forward and undermine the

---

[4]    These caps are based on the prepetition accounts payable run for the period ending October 26, 2006. Certain adjustments and reconciliations will be necessary to account for those invoices which have been issued by the different vendors, but not yet received by the Debtors at the time the Debtors filed the respective motions. Accordingly, the Debtors reserve the right to request increases in each of these caps prior to the final hearing on such motions.

[5]    The total amount of vendor claims that do not fall within the definition of a Critical Vendor Claims as set forth herein is approximately $7,570,698.

3

Debtors' hard earned reputation for reliability. Missed or late deliveries would have an immediate and deleterious effect on the Debtors' chapter 11 prospects. To avoid such a result, the Debtors must secure an uninterrupted supply of necessary goods. To do so will require the Debtors to satisfy certain prepetition payables to Critical Vendors early in the case.

7. In almost all cases, the Debtors are the sole manufacturers of certain essential component parts and vehicle systems used by major automobile original equipment manufacturers (the "OEMs"), including Ford Motor Company, General Motors Corporation and DaimlerChrysler Corporation, as well as a number of tier one automotive parts suppliers (the "Tier I Customers," and collectively with the OEMs, the "Customers"). OEMs directly utilize the Debtors' products to manufacture their automobiles, and Tier I Customers use the Debtors' products to manufacture parts that they, in turn, sell to the OEMs.

8. The Debtors' products are designed and specifically qualified for particular applications. Typically, an OEM will contract with the Debtors to supply a specific product or system for a particular vehicle model or platform being built by the OEM. For example, using specifications provided by Ford, the Debtors are the only manufacturer of the parking brake system used in the Ford Explorer. That parking brake system is not interchangeable with the systems designed for any other vehicles made by Ford or other OEMs.

9. Due in part to the customization of their products, the parts produced by the Debtors are the end result of a lengthy and intensive development, testing, and manufacturing process. Before manufacturing of a product such as the Ford Explorer parking brake-even commences, the Debtors must decide if they will produce some or all of the component parts for the parking brake system or look to outside suppliers. If outside suppliers are needed, the Debtors — through their own rigorous selection process — typically contract with one vendor

4

for a particular component and rely on that vendor as their sole source supplier. Significantly, the parts sold to the Debtors are often times not standard parts, but rather, custom designed years in advance of production and built to fit the Debtors' specified needs. Using sole source suppliers allows the Debtors to reduce the cost of production startup, capital investment and validation costs necessary to make each part and to achieve a consistent quality. Sole sourcing is normal practice in the global automotive industry and is required to remain cost-competitive. In addition, sole sourcing is driven by a rigorous certification process — Ford uses the "Production Part Approval Process"[6] — that the Debtors and their suppliers must undertake for each part integrated into the products shipped to OEMs and ultimately incorporated into a completed vehicle. The parts produced by the Debtors, and the constituent components of these parts, must meet demanding specifications mandated both by the Debtors and the OEMs, as well as federally mandated safety standards, before it can be used in the Debtors' manufacturing process. Validation and qualification of each part requires extensive testing and evaluation, all of which takes, at least, several months to complete. Such lag-time and the just-in-time inventory process restricts the Debtors' ability to expeditiously resource many of their vendors.

10. Due to the extensive design, development and certification requirements, the normal time frame for the Debtors and their OEM Customers to select and certify a new supplier is from 6 months to 2 years. Thus, an OEM may place an order early as 2 years before production of a new vehicle line commences. In short, the Debtors cannot readily re-source a part and shift their business to another supplier after undergoing the above-described process without losing their certification for that part. In fact, certain OEM contracts explicitly prevent

---

6   GM and DaimlerChrysler also require the Debtors to undergo similar approval processes.

5

the Debtors from changing suppliers. In such an arrangement, the vendor is well aware of the Debtors' captive status and could seek to exploit that status to its advantage. Particularly in the Debtors' situation, it is imminently possible that a vendor could exploit this leverage and harm the Debtors' operations and relationships with the OEMs. In 2005, the Debtors had over $51 million in purchases of this type.

11.     To minimize inventory costs and allow for rapid shifts in manufacturing output (in response to consumer purchasing trends), OEMs and Tier I Customers follow the "just-in-time" model, in which they maintain no more than 1-3 days inventory of parts and raw materials and may schedule deliveries of components directly to the assembly line. This system requires highly choreographed design, purchasing, shipping and manufacturing operations. The Debtors and other automotive suppliers have adopted the same model, both in delivering their products and managing their own supply chain. Thus, any disruption at any level of the production process could have a dramatic ripple effect up and down the automotive supply chain.

12.     For example, Ford places orders on a weekly basis for Ford Explorer parking brake systems. Likewise, the orders placed by the Debtors with their suppliers for the parking brake components vary on a week-to-week basis. Because of the minimal inventory retained by the Debtors, the OEMs, and the Tier I Customers, and the short lead time on meeting orders, any breakdown in the supply chain, no matter how small, can halt production of the Ford Explorer, or any other OEM model similarly reliant on steady supplies.

13.     The Debtors, therefore, believe that, by ensuring continued deliveries and credit from the Debtors' suppliers, the relief sought herein also will prevent the Debtors' bankruptcy cases from having a "domino effect" up and down its customers and suppliers base. The Debtors themselves are generally a "sole-source provider" of critical components in vehicles produced in

6

North America and a major supplier to OEMs worldwide. Without timely shipments from their sole-source suppliers, the Debtors' manufacturing facilities would lack the requisite goods necessary for their operational needs, and in some instances, could be forced to shut down certain facilities shortly after a missed shipment. A shutdown of one of the Debtors' facilities may well cause an OEM to halt production of a platform on one or more assembly lines. Shutting down one assembly line could cause an affected OEM to assert damages against the Debtors exceeding $10 million per day.

14. In general, the Critical Vendors fall into two main categories: materials and maintenance vendors. The materials vendors supply, among other things: bulk raw materials such as coil steel, wire, bulk resins and flat glass; components and parts directly assembled into the Debtors' products; production materials such as welding wire and lubricants, and other materials consumed in the production process. The maintenance vendors provide parts, materials, and services to the Debtors' specialized manufacturing equipment and machinery.

15. The Debtors' complex and highly integrated manufacturing process can give an individual material or maintenance vendor significant leverage when one of its customers encounters financial straits or files for chapter 11 protection. The Debtors' vendors are thus well aware of their importance to the Debtors' operations. At least some of these vendors could demand that the Debtors satisfy prepetition obligations as a condition to continuing to do business with the Debtors.

16. In truth, anyone of a number of suppliers may have little choice but to take such a tack, since a substantial portion of its revenues, and hence its survival, may depend on income from the Debtors. Certain of the Debtors' suppliers have untenable financial situations that have been exacerbated in recent years due to the difficulties experienced by OEMs and other

7

automotive parts suppliers. Other suppliers have small operations highly dependent upon the Debtors' business for their continued viability. Many of these smaller vendors have limited access to capital and can ill afford their own loss of operating revenues. Thus, the nonpayment to certain essential vendors could result in production line stoppages or other business disruptions, and might ultimately result in such vendors ceasing operations altogether or filing their own bankruptcy cases.

17. Thus, without an inventory stockpile of parts on-hand, the Debtors can either: (a) not pay an uncompromising vendor and cease production, causing delays or shutdowns for their upstream customers; or (b) accede to a vendor's demands. The former option invariably creates a crisis of confidence (not to mention hardship) for the Debtors' Customers, which can further erode revenues, and create setoff claims, while the latter option impedes the Debtors' efforts to preserve working capital. As has virtually every other automotive parts supplier seeking chapter 11 protection over the past several years, the Debtors face precisely this dilemma.[7]

18. The Debtors propose to forestall this dilemma by adopting a carefully formulated and methodically applied approach to identifying Critical Vendors and Priority Vendors, paying those creditors on account of some or all of their prepetition claims, and, in return, obtaining favorable trade credit terms (such as a return to pre-crisis normal course of business terms) for the postpetition delivery of goods and services. Doing so will go far towards ensuring the

---

[7] See, e.g., In re J.L. French Automotive Castings, Inc., Case No. 06-10119 (MFW) (Bankr. D. Del. 2006); In re Dana Corp., Case No. 06-10354 (BRL) (Bankr. S.D.N.Y. 2006); In re Delphi Corp., Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. 2005); In re Tower Automotive, Inc., Case No. 05-10578 (ALG) (Bankr. S.D.N.Y. 2005); In re Collins & Aikman Corp., Case No. 05-55927 (SWR) (Bankr. E.D. Mich. 2005).

8

integrity of the Debtors' supply chain. Each day of trade credit provides significant additional liquidity to maintain profitable operations and production levels.

19. Instituting normal automotive industry trade credit terms will improve the Debtors' chances of successfully reorganizing. Allowing the purchase of goods on credit preserves working capital and liquidity and will enable the Debtors to maintain their competitiveness and to maximize the value of their businesses. The Debtors estimate that being placed on cash-in-advance terms with all vendors would require an increase of at least $60 million in borrowings under the postpetition DIP credit facility and detract from other funding needs. In light of this significant increase, the Debtors will seek to prevent the compression of trade terms early in these cases (while at the same time avoiding interruptions in supply).

20. In sum, allowing the Debtors to selectively pay the prepetition claims of Critical and Priority Vendors, in exchange for favorable credit terms, will serve the purposes of facilitating the Debtors' reorganization, maximizing value for creditors, and preventing the Debtors' chapter 11 filing from pushing other companies and individuals into insolvency.

## IDENTIFYING CRITICAL VENDORS

21. To identify Critical Vendors, the Debtors, in conjunction with Glass & Associates, Inc., closely reviewed their accounts payable and prepetition vendor lists and consulted with facility management and others throughout the Debtors' management and purchasing operations to identify those creditors most essential to the Debtors' operations. The criteria considered included whether: (a) a particular vendor is a "sole-source" provider; (b) certain quality control requirements of the OEMs prevent the Debtors from replacing the vendor; (c) the Debtors currently receive advantageous pricing or other terms from a vendor; and (d) a vendor additionally might face its own liquidity crisis, due to such vendor's operational or

9

cash flow issues, if the Debtors do not immediately pay its prepetition claim. The Debtors also considered whether a vendor would make good on its threat to stop shipping goods and whether an amount less than the full amount of a vendor's claim could induce continuation of shipments. The Critical Vendor Claims Cap (discussed below) represents the aggregate amount, after accounting for the foregoing factors, that the Debtors believe will suffice to ensure the integrity of their operations on account of the Critical Vendor Claims.

22. Based on their books and records, the Debtors estimate that they have approximately 3,000 vendors with outstanding prepetition claims. Of this amount, and after accounting for claims the Debtors propose to satisfy through their *Motion for an Order Authorizing Them To Pay Prepetition Claims of Certain Foreign Vendors* (the "Foreign Vendor Motion") and Debtors' *Motion for Authority To Pay Prepetition Claims of Shippers, Warehousemen and Other Lien Claimants and For Related Relief* (the "Shippers and Lien Motion"), the Debtors estimate that the claims of only 500 vendors constitute Critical Vendor Claims. By this Motion, the Debtors propose to satisfy the prepetition claims of vendors and suppliers located in the United States and Canada that fall within the definition of a Critical Vendor as set forth herein.

23. Contemporaneously with this Motion, the Debtors filed the Foreign Vendors Motion, in which the Debtors seek permission to pay the prepetition claims owed to vendors and service providers located in foreign jurisdictions. The Debtors estimate that they owe approximately $3.4 million to their foreign vendors. Also, in the Shippers and Lien Motion, the Debtors seek permission to pay the prepetition claims of their trade creditors such as shippers, warehousemen, or suppliers of capital equipment or tooling who likely have the ability under state law to impose liens on certain goods. As of the Commencement Date, the Debtors estimate

10

that they owe approximately $740,000 for shipping and warehousing charges and owe approximately $2.6 million for statutory lienholder and tooling charges.

## THE PRIORITY VENDORS

24.     Certain obligations owed to the Debtors' suppliers are not necessarily covered by this Motion, the Foreign Vendor Motion, or the Shippers and Lien Motion. However, many of the obligations related to the relief sought in these motions are on account of goods that were received by the Debtors in the ordinary course of business within the 20-day period prior to the Commencement Date. Under recently-enacted section 503(b)(9) of the Bankruptcy Code, such claims are entitled to administrative priority. Thus, the Debtors believe that they are authorized to pay these Priority Vendor Claims, as administrative expense claims, incurred in the ordinary course of the Debtors' businesses pursuant to section 363(c)(1) of the Bankruptcy Code, regardless of whether the claimant is a Critical Vendor. Similar to the payment of Critical Vendors, the Debtors seek this Court's authority to pay, at their sole discretion, such Priority Vendor Claims in the ordinary course of the Debtors' business before the conclusion of these cases, so long as the Priority Vendors agree to continue to ship goods to the Debtors and on the credit terms set forth below to avoid any supply chain interruptions. The Debtors' estimate that approximately $25 million in Priority Vendor Claims is owed on account of goods the Debtors received during the twenty-day period before the Commencement Date. The Debtors expect to pay up to approximately $25 million in Priority Vendor Claims prior to the conclusion of these Reorganization Cases.[8]

---

[8]     As more fully discussed in the "Basis for Relief" section below, this Court and other courts have recently approved the payment of similar claims pursuant to section 503(b)(9) of the Bankruptcy Code.

11

## PROPOSED TERMS OF PAYMENT OF CRITICAL VENDOR AND PRIORITY VENDOR CLAIMS

25.     The Debtors seek authority to pay in their discretion, up to $29 million in Critical Vendor Claims (the "Critical Vendor Cap").[9]  As of the Commencement Date, this amount represents less than 1% of the Debtors' total liabilities and approximately 41% of the Debtors' total prepetition trade-related liabilities.[10]  Payment of Priority Vendor Claims — even if made to Critical Vendors — shall not count against the Critical Vendor Cap.

26.     The Debtors propose to condition payment to Critical Vendors and Priority Vendors (collectively, "Critical/Priority Vendors") upon agreement to continue supplying goods and services to the Debtors on terms that are acceptable to the Debtors with an awareness of industry trade terms between the parties (the "Customary Trade Terms").  The Debtors reserve the right to negotiate trade terms with any vendor demanding terms less favorable to the Debtors (to the extent the Debtors determine such terms are necessary to procure essential goods or services or are otherwise in the best interests of the Debtors' estates).

27.     To commit the vendors to Customary Trade Terms, the Debtors propose that checks used to pay any prepetition claims contain a legend substantially in the following form:

> By accepting this check, the payee agrees (a) to provide the payor and its affiliates with normalized trade credit and provide other business terms on a postpetition basis (consistent with past practices), including with respect to any applicable credit limits, pricing and the provision of equivalent levels of service, on terms at least as favorable as those extended to the payor and its affiliates prior to the commencement of payor's chapter 11 case, or as are otherwise acceptable to the payor, for the duration of the payor's chapter 11 case, identified as Case No. _____, pending in the United States Bankruptcy Court for the District of Delaware (the

---

[9]   The Debtors reserve the right to request Court authority at a later date to increase the Critical Vendor Cap

[10]  This amount excludes intercompany payables.

"Bankruptcy Court"), and (b) upon request, to release to payor any property of payor in payee's possession. Payee hereby submits to the jurisdiction of the Bankruptcy Court for the enforcement of such agreement.

28. The Debtors also propose that a letter, substantially in the form of the letter attached hereto as <u>Exhibit B,</u> be sent to Critical/Priority Vendors and shall include, but not be limited to, the following terms:

(a) The amount of such Critical/Priority Vendor's estimated prepetition trade claims, accounting for any setoffs, other credits and discounts thereto, shall be as mutually determined in good faith by the Critical/Priority Vendor and the Debtors (but such amount shall be used only for the purposes of this Order and shall not be deemed a Claim allowed by the Court and the rights of all interested persons to object to such Claim shall be fully preserved until further order of the Court);

(b) The Critical/Priority Vendor's agreement to be bound by the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability and other applicable terms and programs), which were most favorable to the Debtors and in effect between such Critical/Priority Vendor and the Debtors on a historical basis for the period within one-hundred twenty (120) days of the Commencement Date or such other trade terms as agreed by the Debtors and such Critical/Priority Vendor or such other trade terms, practices and programs that are at least as favorable as those that were in effect prepetition in the Debtors' sole discretion ("Customary Trade Terms");

(c) The Critical/Priority Vendor's agreement to provide goods and services to the Debtors based upon Customary Trade Terms, and the Debtors' agreement to pay in accordance with such terms;

(d) The Critical/Priority Vendor's agreement not to file or otherwise assert against any or all of the Debtors, their estates or any other person or entity or any of their respective assets or property (real or personal) any lien (a "Lien") (regardless of the statute or other legal authority upon which such lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to the Critical/Priority Vendor by the Debtors arising from agreements entered into prior to the Commencement Date, and that, to the extent that the Critical/Priority Vendor has previously obtained such a Lien, the Critical/Priority Vendor shall immediately take all necessary actions to remove such Lien;

13

(e)     The Critical/Priority Vendor's acknowledgment that it has reviewed the terms and provisions of this Order and consents to be bound hereby;

(f)     The Critical/Priority Vendor's agreement that it will not separately assert or otherwise seek payment for reclamation claims outside of the terms of the order granting this Motion unless the Critical/Priority Vendor's participation in the trade payment program authorized by the order granting this Motion is terminated; provided that such claims, if thereafter raised by the Critical/Priority Vendor as permitted by the order granting this Motion, shall be treated as though raised on the date of the order granting this Motion; and

(g)     If either the trade payment program or the Critical/Priority Vendor's participation therein terminates, or a Critical/Priority Vendor who has received payment of a prepetition claim later refuses to continue to supply goods to the Debtors on Customary Trade Terms, subject to defenses, any payments received by the Critical/Priority Vendor on account of such Critical/Priority Vendor's prepetition claim will be deemed to have been in payment of then outstanding postpetition obligations owed to such Critical/Priority Vendor and that such Critical/Priority Vendor shall immediately repay to the Debtors any payments made to it on account of its prepetition claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then outstanding, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise.

29.     Such a letter, once agreed and accepted by a Critical/Priority Vendor, shall be the legally binding contractual arrangement between the parties governing their commercial trade relationship (the "Trade Agreement"). The Debtors seek authority to enter into the Trade Agreements, if and at the time when they determine in their discretion that such an agreement is necessary to their postpetition operations. The Debtors also explicitly seek authority, following diligent efforts to enter into a Trade Agreement with a Critical/Priority Vendor, to make payments on account of such Critical/Priority Vendor's claims in the event that no Trade Agreement has been reached, if the Debtors determine, in their business judgment, that failure to pay the Critical/Priority Vendor Claim is likely to result in irreparable harm to the Debtors' business operations, such as the potential shutdown of one of the Debtors' manufacturing plants.

14

30. For those Critical/Priority Vendors that have agreed to ship on trade terms other than their Customary Trade Terms, the Debtors reserve the right to obtain written acknowledgment of such terms on a case-by-case basis. Nothing in this Motion should be construed as a waiver by any of the Debtors of their rights to contest any invoices of a Critical/Priority Vendor under applicable non-bankruptcy law.

31. If a Critical/Priority Vendor later refuses to continue to supply goods to the Debtors on Customary Trade Terms during the pendency of these Reorganization Cases (or on such terms as were individually agreed to between the Debtors and such Critical/Priority Vendor), then the Debtors may, in their sole discretion, and without further order of the Court, declare that: (a) any payment of a Critical/Priority Vendor Claim made by the Debtors under the Order granting this Motion shall be deemed to be a postpetition advance that the Debtors may recover from such Critical/Priority Vendor in cash or in goods; and (b) upon any such recovery by the Debtors, the claim of such Critical/Priority Vendor paid after the Commencement Date shall be reinstated in the amount so recovered.

32. The Debtors propose that any Trade Agreement terminated as a result of a Critical/Priority Vendor's refusal to comply with the terms thereof be reinstated if:

      (a)    Such determination is subsequently reversed by the Court, after notice and a hearing following a motion by the Critical/Priority Vendor, for good cause shown that the determination was materially incorrect;

      (b)    The underlying default under the Trade Agreement was fully cured by the Critical/Priority Vendor not later than five (5) business days following the Debtors' notification to the Critical/Priority Vendor that a default had occurred; or

      (c)    The Debtors, in their discretion, reach a favorable alternative agreement with the Critical/Priority Vendor.

33. The Debtors shall maintain a matrix summarizing, with respect to the period following the Commencement Date, (a) the name of each Critical/Priority Vendor, (b) the

amount each Critical/Priority Vendor was been paid on account of its Critical/Priority Vendor Claims, and (c) the goods and/or services provided by each Critical/Priority Vendor.

## LIMITED WAIVER RIGHTS AND PROCEDURE FOR COURT REVIEW

34.     The Debtors also request that the Debtors be given flexibility to deal with emergency situations.  As discussed, it is possible that a vendor not meeting the Debtors' conditions set forth in this Motion may attempt to exert leverage against the Debtors by threatening (notwithstanding its existing legal obligations) to withhold shipments unless its prepetition claim is paid.  The Debtors believe that such actions may well violate section 362 of the Bankruptcy Code.  The Debtors anticipate that a small percentage of their vendors which are either unfamiliar with the provisions of the Bankruptcy Code or simply decide to be recalcitrant will make such threats , and that such threats will in fact be credible, despite the Debtors' belief that such vendor does not meet the standards required for payment pursuant to this Motion and the vendor's failure to demonstrate otherwise.  Nonetheless, to respond to such threats on an expedited and provisional basis, and to avoid any disruptions in their operations, the Debtors respectfully request that they be granted the authority (but not the direction) to elect, in their sole discretion, to waive the conditions set forth in this Motion for payment of a claim under the Critical Vendor Cap (the "Waiver") and to conditionally pay the claim of such threatening or non-conforming vendor (the "Non-Conforming Vendor").  In the event that the Debtors elect to grant a Waiver to a Non-Conforming Vendor, the Debtors seek the authority to file a Notice of Waiver, in substantially the form attached hereto as Exhibit C (the "Notice of Waiver"), and a proposed Order to Show Cause, in substantially the form attached hereto as Exhibit D (the "Order to Show Cause"), with this Court within three (3) business days of payment pursuant to the Waiver.  The Debtors further propose to serve any such Notice of Waiver and Order to Show Cause on:   (a) the Non-Conforming Vendor; (b) the Office of the United States Trustee;

16

(c) counsel for the official committee of unsecured creditors appointed in these cases pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee"); (d) the respective counsel for the agent(s) to the Debtors' first and second lien prepetition secured lenders; (e) the respective counsel for the indenture trustees for the Debtors' senior and senior subordinated notes; and (f) counsel for the agent to the Debtors' postpetition secured lenders.

35.     The Debtors further propose that, at the first regularly-scheduled hearing occurring at least five business days following entry of the Order to Show Cause by this Court, the Non-Conforming Vendor be required to appear before this Court and demonstrate why such Non-Conforming Vendor should not be held in violation of the automatic stay. Should the Court determine that, by its conduct, the Non-Conforming Vendor has violated the automatic stay, the Debtors respectfully request that this Court require the Non-Conforming Vendor to disgorge the payments made by the Debtors pursuant to the Waiver, plus attorneys' fees and interest accrued on such amount at the rate specified under the relevant agreements governing the DIP credit facility or such other higher rate as this Court specifies, within three (3) business days of entry of the order holding such Non-Conforming Vendor in violation. Furthermore, the Debtors expressly reserve their right to file any motions, adversary complaints, or other pleadings that they determine in their sole and absolute discretion are necessary or appropriate to pursue other remedies including, without limitation, injunctive relief.

36.     Bankruptcy courts have granted relief similar to that requested herein with respect to such threatening and recalcitrant vendors. See, e.g., In re Dana Corp., No. 06-10354 (BRL) Bankr. S.D.N.Y. Mar. 3, 2006) (order authorizing debtors to pay critical vendor and priority claims and establishing procedures for vendors refusing to perform postpetition contractual obligations); In re Delphi Corp., No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 13,

17

2005) (order authorizing the debtors to conditionally pay the claim of a non-conforming supplier subject to an order to show cause).

**BASIS FOR RELIEF**

A.      **This Court May Allow Payment of Certain Critical and Priority Vendor Claims Under Section 503(b)(9) of the Bankruptcy Code.**

37.      Roughly $19.5 million of the $24.3 million in Priority Vendor Claims, or 80%, are due to the same vendors which are included in the Critical Vendor category. As discussed above, payment of Priority Vendor Claims -- even if made to Critical Vendors -- shall not count against the Critical Vendor Cap.[11]

38.      By this Motion, the Debtors do not seek to alter the priority of these claims — much less do so in a manner that prejudices the rights of the Debtors' general unsecured creditors. Instead, the Debtors merely seek to alter the timing of undisputed administrative expense payments that Priority Vendors already are entitled to receive as a matter of statute. Instead of satisfying Priority Vendor Claims after confirmation of a plan of reorganization (at which time such payments may be too late to benefit the estates), the Debtors seek to pay these claims, as they become due in the ordinary course of business, while such payments can still induce the individual vendor to adhere to favorable trade terms and do business with the Debtors on a going-forward basis. The Debtors believe that this relief is in the best interests of the Debtors' estates because: (a) favorable trade terms will prevent the contraction of the Debtors' liquidity; and (b) this Court's time and resources will not be burdened with numerous motions

---

[11]     In relevant part, this new section of the Bankruptcy Code provides that "there shall be allowed administrative expenses... including...the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9).

18

from individual vendors requesting payment on account of their administrative priority expense claims.

39.     This Court and other courts have recently approved the payment of similar claims pursuant to the new section 503(b)(9) of the Bankruptcy Code. See In re Werner Holding Co. (DE), Inc., No. 06-10578 (Bankr. D. Del. June 13, 2006) (order granting vendors' administrative expense claims with priority under sections 503(b) and 507(a)(2) of the Bankruptcy Code for undisputed obligations arising from outstanding orders relating to shipments of goods delivered, received and accepted by the Debtors within 20 days before the petition date and authorizing, but not directing, the Debtors to pay such claims); see also In re Pliant Corp., No. 06-10001 (Bankr. D. Del. Jan. 4, 2006) (same); In re Dana Corp., No. 06-10354 (BRL) (Bankr. S.D.N.Y Mar. 3, 2006) (order authorizing the debtors to pay $52.1 million in prepetition claims of essential suppliers and additionally authorizing payment of administrative priority claims under §503(b)(9)).

**B.     This Court May Allow Payment of Critical and Priority Vendor Claims Under Sections 363 and 364 of the Bankruptcy Code.**

40.     As to both the Critical Vendors and Priority Vendors, this Court also may grant the relief requested herein pursuant to sections 363 and 364 of the Bankruptcy Code. Section 363 provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under this section, a court may authorize a debtor to pay certain prepetition claims. See, e.g., In re Conseco, Inc., No. 02-49672 (Bankr. N.D. Ill. Jan. 14, 2003); In re UAL Corp., No. 02-48191, at 91-93 (Bankr. N.D. Ill. Dec. 9, 2002) (authorizing payment of prepetition claims under section 363 of the Bankruptcy Code as an out-of-the-ordinary-course transaction); Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.), 29 B.R. 391, 397 (S.D.N.Y.

19

1983) (authorizing, pursuant to section 363, a contractor to pay prepetition claims of some vendors who were potential lien claimants, because the payments were necessary for the general contractors to release funds owed to the debtors, benefiting the estate). In order to do so, "the debtor must articulate some business justification, other than the mere appeasement of major creditors." In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). As already discussed, the Debtors' request to pay Critical and Priority Vendors easily meets this standard because the failure to satisfy their claims and the failure to obtain Customary Trade Terms, could adversely any impact the day-to-day operations of their businesses.

41. Section 364 of the Bankruptcy Code also permits a debtor-in-possession, after notice and hearing, "to obtain unsecured credit or incur unsecured debt" other than in the ordinary course of business. See, e.g., In re UAL Corp., No. 02-48191 (Bankr. N.D. Ill. Dec. 11, 2002) (payments of prepetition claims under section 363 have further support where the Debtor seeks "the extension of credit under section 364 on different than usual terms, terms that might include payment of a prepetition obligation.").

C.  **This Court May Allow Payment of Critical and Priority Vendor Claims Under Section 105(a) of the Bankruptcy Code and the Necessity of Payment Doctrine.**

42. The Court's general equitable powers are codified in section 105(a) of the Bankruptcy Code. Section 105(a) empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this Title." 11 U.S.C. § 105(a). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (citing NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984)). Section 105(a) authorizes a court to "permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor." In

20

re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992); see also In re Just for Feet, Inc., 242 B.R. 821, 825 (D. Del. 1999) ("to invoke the necessity of payment doctrine, a debtor must show that payment of the prepetition claims is critical to the debtors' reorganization").

43.     Under the doctrine of necessity, a bankruptcy court may exercise its equitable powers to authorize a debtor to pay the prepetition claims of certain critical vendors. See In re Columbia Gas Sys., Inc., 136 B.R. 930, 939 (Bankr. D. Del. 1992) (recognizing that "[i]f payment of a prepetition claims 'is essential to the continued operation of [the debtor], payment may be authorized'"). Indeed, it is not uncommon for courts in this District to authorize the payment of critical trade claims where the payment of such claims is essential to the debtor's continued operations. See, e.g., In re Dana Corp., No. 06-10354 (BRL) (Bankr. S.D.N.Y Mar. 3, 2006) (order authorizing the debtors to pay $52.1 million in prepetition claims of essential suppliers); In re J.L. French Automotive Castings, Inc., No. 06-10119 (MFW) (Bankr. D. Del. Mar. 6, 2006) (order authorizing the debtors to pay up to $10.6 million in prepetition claims of critical trade creditors); In re Pliant Corp., No. 06-10001 (MFW) (Bankr. D. Del. Jan 4, 2006) (order authorizing debtors to $18.2 million in prepetition critical vendor claims); In re Delphi Corp., No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 13, 2005) (order authorizing the debtors to continue vendor rescue program and payment of $90 million in prepetition claims of financially distressed sole source suppliers and vendors without contracts); In re Tower Automotive, Inc., No. 05-10578 (ALG) (Bankr. S.D.N.Y. Mar. 14, 2005) (order authorizing the debtors to pay $40 million in prepetition claims of essential suppliers);[12] Just for Feet, 242 B.R. at 826

---

[12] Such arrangements occur in a variety of other industries as well. See also In re Calpine Corp., No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 21, 2005) (order authorizing the debtors to pay prepetition claims of essential suppliers); In re Delta Air Lines, Inc., No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 16, 2005) (same); In re Loral Space & Commc'ns Ltd., No. 03-41710 (RDD) (Bankr. S.D.N.Y. July 16, 2003) (same); In re (Continued...)

(authorizing payment of prepetition claims of trade creditors that continue customary trade terms).[13] The Debtors respectfully submit that similar relief is warranted in these Reorganization Cases.

44.     Other Bankruptcy Code provisions imply that such payments may be authorized. Section 549(a) of the Bankruptcy Code, which governs postpetition transfers, provides that "the trustee may avoid a transfer of property of the estate ... that occurs after the commencement of the case...that is not authorized...by the court." Thus, by necessary implication, a bankruptcy court may authorize appropriate postpetition payments to satisfy prepetition obligations. See Dubuque Packing Co. v. Stonitsch (In re Isis Foods, Inc.), 37 B.R. 334, 336 n.3 (W.D.Mo. 1984) ("[P]roposed transfers [to pay prepetition claims may] be presented in advance to a bankruptcy court for its approval and would thereafter be insulated from attack").

45.     Maintaining favorable trade terms and credit is critical to the continued, uninterrupted operation of the Debtors' businesses and in the best interests of all of the Debtors' creditors. As stated above, if the Critical Vendors stopped doing business with the Debtors, the Debtors' ongoing operations would be devastated, costing the estates and their creditors far more than the costs associated with paying these claims. Thus, as all of the Debtors' creditors will

---

WorldCom, Inc., No. 02-13533 (AJG) (Bankr. S.D.N.Y. July 23, 2002) (same); In re PSINet, Inc., No. 01-13213 (REG) (Bankr. S.D.N.Y. June 1, 2001) (same).

[13]   See also In re Meridian Automotive Systems, No. 05-11168 (Bankr. D. Del. May 26, 2005) (MFW) (same); In re Glass Group, Inc., No. 05-10532 (Bankr. D. Del. Mar. 2, 2005) (PJW) (same); In re Maxide Acquisitions, Inc., No. 05-10429 (Bankr. D. Del. Feb. 15, 2005) (MFW); In re Fleming Companies, Inc., No. 03-10945 (Bankr. D. Del. May 6, 2003) (MFW) (same); In re Alterra Healthcare Corp., No. 03-10254 (Bankr. D. Del. Jan. 24, 2003) (MFW) (same); In re Genesis Health Ventures, Inc., No. 00-2692 (Bankr. D. Del. June 26, 2002) (PJW) (same). This Court has also upheld the relief requested by the Debtors concerning their remedies for breach of a Trade Agreement. See In re Maxxim Medical Group, Inc., No. 03-10438 (Bankr. D. Del. Feb. 19, 2003) (PJW).

22

benefit if this Court approves the payment of the prepetition claims of Critical Vendors, the Court should exercise its equitable powers to grant the relief requested in this Motion.

### REQUEST FOR AUTHORITY FOR BANKS TO HONOR AND PAY CHECKS AND FUNDS TRANSFERS RELATED TO CRITICAL VENDOR AND PRIORITY VENDOR CLAIMS

46.     Finally, by this Motion, the Debtors request that all applicable banks and other financial institutions be authorized and directed, when requested by the Debtors in the Debtors' sole discretion, to receive, process, honor and pay any and all checks presented for payment of, and to honor all fund transfer requests made by the Debtors related to, Critical Vendor Claims or Priority Vendor Claims, whether such checks were presented or fund transfer requests were submitted prior to or after the Commencement Date, so long as sufficient funds are available in the applicable accounts to make the payments. The Debtors represent that these checks are drawn on identifiable disbursement accounts and can be readily identified as relating directly to the authorized payment of Critical Vendor Claims and Priority Vendor Claims. Accordingly, the Debtors believe that checks other than those relating to authorized payments will not be honored inadvertently.

47.     The Debtors further represent that they have anticipated access to sufficient debtor-in-possession financing to pay all Critical Vendor Claims and Priority Vendor Claims to the extent described herein, as such amounts become due in the ordinary course of their businesses. [14]

48.     Nothing contained herein is intended or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute

---

[14] Concurrently with the filing of this Motion, the Debtors have filed a motion seeking approval of up to $300 million in debtor-in-possession financing with General Electric Capital Corporation, Goldman Sachs Credit Partners L.P., and Barclays Capital PLC.

23

any claim on any grounds; (c) a promise to pay any claim; (d) an implication or admission that any particular claim constitutes a Critical Vendor Claim; or (e) a request to assume any executory contract or unexpired lease, pursuant to section 365 of the Bankruptcy Code.

### REQUEST FOR WAIVER OF STAY

49.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." As set forth above, the immediate payment of the Critical Vendor Claims is essential to prevent potentially irreparable damage to the Debtors' operations, value and ability to reorganize. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the ten-day stay imposed by Rule 6004(h) of the Bankruptcy Rules, to the extent it applies.

### NO BRIEFING SCHEDULE REQUIRED

50.     The Debtors submit that this Motion does not present any novel issues of law requiring briefing. Therefore, pursuant to Rule 7.1.2 of the Local District of Civil Practice and Procedure of the United States District Court for the District of Delaware (the "Local District Court Rules"), incorporated by reference into Rule 1001-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Debtors respectfully request that the Court set aside the briefing schedule set forth in Rule 7.1.2(a) of the Local District Rules.

### NOTICE

51.     No trustee, examiner or creditors' committee has been appointed in the Reorganization Cases. The Debtors have provided notice of this Motion to: (a) the United States Trustee for the District of Delaware; (b) those parties listed on the Consolidated List of

24

Creditors Holding Largest Thirty Unsecured Claims Against the Debtors, as identified in their chapter 11 petitions; (c) counsel to the agent for the Debtors' postpetition secured lenders; (d) counsel to the agent to the Debtors' prepetition first lien secured lenders; (e) counsel to the agent to the Debtors' prepetition second lien secured lenders; (f) counsel to the ad hoc committee of certain of the Debtors' prepetition second lien lenders; (g) the indenture trustee for the Debtors' 8.625% senior unsecured notes; (h) counsel to the ad hoc committee of certain holders of the Debtors' 8.625% senior unsecured notes; (i) the indenture trustee for the Debtors' 9.0% senior subordinated notes; (j) counsel to the ad hoc committee of certain holders of the Debtors' 9.0% senior subordinated notes; and (k) the indenture trustee for the Debtors' 7.5% convertible trust preferred notes. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

## No Prior Request

52.     No prior request for the relief sought in this Motion has been made to this or any other court.

25

WHEREFORE, the Debtors respectfully request that the Court enter interim and final orders substantially in the forms attached hereto as Exhibit A, (a) authorizing the Debtors to pay prepetition claims of certain critical vendors and suppliers of goods entitled to administrative priority, and (b) granting such other and further relief as the Court deems appropriate

Dated: October 30, 2006
Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (Bar No. 2981)
Daniel J. DeFranceschi (Bar No. 2732)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700

KIRKLAND & ELLIS LLP
Richard M. Cieri
Marc Kieselstein, P.C.
Roger J. Higgins
Ryan Blaine Bennett
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000

PROPOSED COUNSEL FOR THE DEBTORS
AND DEBTORS IN POSSESSION