UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                              .
IN RE:                        .        Chapter 11
                              .
Dura Automotive Systems,      .
Inc., et al.,                 .
                              .
        Debtor(s).            .     Bankruptcy #06-11202 (KJC)
.........................................................
```

Wilmington, DE
April 25, 2007
3:15 p.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For The Debtor(s):              Roger J. Higgins, Esq.
                                Kirkland & Ellis, LLP
                                200 East Randolph Drive
                                Chicago, IL 60601

                                Paul Basta, Esq.
                                Kirkland & Ellis, LLP
                                200 East Randolph Drive
                                Chicago, IL 60601

                                Joy Lyu Monahan, Esq.
(Via telephone)                 Kirkland & Ellis, LLP
                                200 East Randolph Drive
                                Chicago, IL 60601

                                Daniel DeFranceschi, Esq.
                                Richards Layton & Finger
                                One Rodney Square
                                Wilmingotn, DE 19801

                                David W. Parham, Esq.
(Via telephone)                 Baker & McKenzie, LLP
                                2300 Trammwell crow Center
                                2001 Ross Ave.
                                Dallas, TX 75201

|                                | Theresa Skotak, Esq.            |
| (Via telephone)                | In-House Counsel                |
|                                | Dura Automotive Systems, Inc.   |

|                                | Jack Edwards, Esq.              |
| (Via telephone)                | In-House Counsel                |
|                                | Dura Automotive Systems, Inc.   |

For Official Committee of:      Edmon Morton, Esq.
Unsecured Creditors             Young Conaway Stargatt
                                & Taylor, LLP
                                The Brandywine Bldg.
                                1000 West St.-17th Fl.
                                Wilmington, DE 19899

                                Thomas M. Mayer, Esq.
                                Kramer Levin Naftalis
                                & Frankel, LLP
                                1177 Avenue of the Americas
                                New York, NY 10036

                                Douglas Mannal, Esq.
                                Kramer Levin Naftalis
                                & Frankel, LLP
                                1177 Avenue of the Americas
                                New York, NY 10036

For 2nd Lien Committee:         Terri Brown-Edwards, Esq.
                                Potter Anderson & Corroon, LLP
                                Hercules Plaza
                                1313 N. Market St.
                                Wilmington, DE 19801

                                David C. Albalah, Esq.
                                Bracewell & Giuliani
                                19th Fl.
                                1177 Ave. of the Americas
                                New York, NY 10036

For UAW:                        Susan E. Kaufman, Esq.
                                Heiman, Gouge & Kaufman, LLP
                                800 King Street, Suite 303
                                Wilmington, DE 19899

                                Robin H. Gise, Esq.
                                Cohen Weiss & Simon, LLP
                                330 W. 42nd St.-25th Fl.
                                New York, NY 10036

| | |
|---|---|
| For Goldman Sachs: | Curtis Hehn, Esq.<br>Pachulski Stang Ziehl Young<br>Jones & Weintraub, LLP<br>919 N. Market St.-17th Fl.<br>Wilmington, DE 19899 |
| For JP Morgan Chase: | Richard Cobb, Esq.<br>Landis, Rath & Cobb, LLP<br>919 Market St.-Ste. 600<br>Wilmington, DE 19801 |
| | Andrew D. Gottfried, Esq.<br>Morgan Lewis<br>101 Park Ave.<br>New York, NY 10178 |
| For GECC: | Mark D. Olivere, Esq.<br>Edwards, Angell, Palmer &<br>Dodge, LLP<br>919 N. Market St., 15th Fl.<br>Wilmington, DE 19801 |
| For U.S. Trustee's Office: | William Harrington, Esq.<br>USTP<br>Department of Justice<br>844 King Street-Ste. 2313<br>Lock Box 35<br>Wilmington, DE 19801 |
| Audio Operator: | Nickita Barksdale |
| Transcribing Firm: | Writer's Cramp, Inc.<br>6 Norton Rd.<br>Monmouth Jct., NJ 08852<br>732-329-0191 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1          THE CLERK:  All rise.  Please be seated.

2          THE COURT:  Good afternoon.

3          MR. HIGGINS:  Good afternoon, Your Honor, Roger

4    Higgins for the Debtors.  At the outset I'd like to introduce

5    my partner, Mr. Paul Basta, whom you signed an Order to admit

6    pro hoc vice.  He will be arguing the matter revolving the key

7    Management Incentive Plan

8        And as a housekeeping matter what I would propose, Your

9    Honor, is all the other matters have either been continued,

10   resolved, or the motions withdrawn, and are essentially

11   uncontested, and I would propose that we leave the K MIP to the

12   last and deal with the 2nd Lien litigation matter first --

13          THE COURT:  That's fine.

14          MR. HIGGINS:  -- prior to that.  Okay.  Your Honor, I

15   would like to draw your attention to the status report we filed

16   with the Court on Monday.  We also attached a copy to the

17   agenda.  Turning our attention to the continued and resolved

18   matters, the Fagan motion has been continued, as has the motion

19   of the Lunneys.  Both these matters remain under negotiation

20   between the respective parties.  Also, the Teleflex motion

21   pursuant to section(503)(b)(9) has been continued.

22       That brings us to the motion by Baker & McKenzie for Entry

23   of an Order Granting Limited Stay relief.  This motion was

24   uncontested.  Counsel for Baker McKenzie is on the phone.  We

25   understand that Your Honor had some questions.

1          THE COURT:  I did.  The motion is one to -- asking

2     for permission to invade a retainer for purposes of paying

3     outstanding prepetition invoice or invoices.

4          MR. PARHAM:  That's correct, Your Honor.  This is

5     David Parham on behalf of Baker McKenzie.

6          THE COURT:  Good afternoon.  Was it disclosed in

7     connection with the original application to employ Baker &

8     McKenzie that you were owed money at the time of the filing of

9     the petition?

10          MR. PARHAM:  No, Your Honor.  It was not included in

11     the original affidavit.  We simply were unaware of it.  We

12     thought we had drawn down on all of our outstanding -- because

13     this is prepetition retainer that we're talking about.

14          THE COURT:  I understand.

15          MR. PARHAM:  We thought that we had drawn down on all

16     of our outstanding prepetition fees and expenses, and for

17     whatever reason this time and these expenses came in after the

18     filing date.  So we simply weren't aware of them.

19          THE COURT:  Well, I'm prepared to grant the relief,

20     but with the comment, as you might imagine it always gives a

21     Court pause when something that should have been disclosed was

22     not disclosed prior to Court authorization to engage a

23     professional.  And I don't know that if anything here could

24     have been done differently as a result of the particular

25     situation.  I only note that it's not the way I like to

1  proceed, and I'm sure any Bankruptcy Judge likes to proceed.

2  But with that admonition I've signed the order.

3          MR. PARHAM:  Well, I appreciate it, Your Honor.  And

4  I apologize.  It's not the way we like to proceed either.  It

5  just happened in this circumstance.

6          THE COURT:  All right, thank you.

7          MR. PARHAM:  Thank you.

8          MR. HIGGINS:  Your Honor, that brings us to item #5

9  on the agenda, which is the Debtor's Motion for Entry of an

10  Order Approving a Separation Agreement with a Former Executive

11  Vice President.  This is what we've been calling the Ness

12  agreement.  Again, here we did file the order under a

13  Certificate of No Objection, and understand that Chambers have

14  contacted us and you had stated that you wanted us to make a

15  proffer in this matter.

16          THE COURT:  If you --

17          MR. HIGGINS:  Now, Your Honor, I can do it one of two

18  ways.  We can offer the affidavit into evidence, or we could --

19  I can simply read from the affidavit.

20          THE COURT:  How long is it?

21          MR. HIGGINS:  It is five pages.

22          THE COURT:  Why don't you -- if you could hand me a

23  copy for me to take a look at I would appreciate that.

24          MR. HIGGINS:  All right.  If I may approach, Your

25  Honor?

1          THE COURT:  Yes.  Thank you.  Has this been e-filed

2  or no?

3          MR. HIGGINS:  This was e-filed, yes, Your Honor.

4          THE COURT:  Okay.  Okay.  What were Mr. Ness' duties?

5          MR. HIGGINS:  Mr. Ness was executive vice president

6  of Dura Automotive Systems, primarily responsible for the body

7  and glass side of the business.  Last year -- primarily in the

8  United States.  Last year when the head of the German

9  operations resigned Mr. Ness took over the German body and

10  glass operations, and he'd been with the company really since

11  May of 1981.  So he had been employed for 26 years, very

12  central figure throughout the formation of the company and in

13  the years since.

14          THE COURT:  Well, and that's why I guess the first

15  question I had was, is Mr. Ness an insider of the company?

16          MR. HIGGINS:  Yes, Your Honor.  He was listed in the

17  10K and would be -- and was an officer of the company and would

18  meet the definition of an insider under section 101.

19          THE COURT:  Okay.  I guess what I needed was a little

20  more convincing that this type of payment was not a 503(c)(2)

21  payment.

22          MR. HIGGINS:  I'd be happy, if I might, Your Honor.

23  Mr. Ness was particularly central in the operation of this

24  company for a long, long time.  You know, both -- you know,

25  primarily, obviously, on the body and glass side.  But over

1   time obviously became very familiar with all of the company's

2   operations, with its products, production methods, plans,

3   costing, you name it.  And as has been explained to me, and I

4   think is set forth in Ms. Gotech's affidavit, Ms. Gotech being

5   on the line and available for questioning, that the company

6   felt that Mr. Ness had -- was privy to too many secrets, trade

7   secrets, confidential information, operating information,

8   costing information, to -- for the company to be comfortable

9   with him seeking employment elsewhere with either direct

10  competitors or direct customers in the areas where Dura worked.

11  And so negotiated this $125,000 noncompete clause as part of

12  his separation agreement so that he would be -- and it was a

13  very narrowly tailored noncompete, and indeed Mr. Ness is now

14  working in the heavy trucking industry.  And it's far enough

15  removed that the information that he has, you know,

16  intellectual properties that he has -- that he's aware of for

17  this particular year he can't use them or make direct

18  application of them in his new position.

19           THE COURT:  And how old is he?

20           MR. HIGGINS:  Mr. Ness is in his 50s.

21           THE COURT:  Okay.  So lots of employment life left in

22  him.

23           MR. HIGGINS:  That's our understanding, yes, Your

24  Honor.

25           THE COURT:  All right.  Does anyone else care to be

1  heard in connection with this motion?

2         MR. MAYER:  Yes, Your Honor.  Thomas Moers Mayer from

3  Kramer Levin Naftalis & Frankel on behalf of the Official

4  Committee of Creditors.  Your Honor, as you know, 503(c) has

5  been much on the minds of the Creditors Committee.  It's an

6  area where we spent a lot of time looking.  The Committee was

7  informed by the Debtor of Mr. Ness' situation.  We did consider

8  the Debtor's motion, and we determined not to object.  That

9  wasn't because we missed it.  It was because we talked about it

10 and this is where we came out.  We do not believe -- we would

11 not argue that this is a 503(c)(2) payment.

12         THE COURT:  All right.

13         MR. HARRINGTON:  Good afternoon, Your Honor, William

14 Harrington from the office of the United States Trustee.  I

15 rise to say, and again, we raised the same question Your Honor

16 raised with the Debtors and spent a lot of time talking with

17 them to make ourselves comfortable that it really was a payment

18 for nondisclosure, as opposed to, you know, a veiled severance

19 payment.  And as Your Honor knows, we've raised the -- that

20 exact issue in other matters in this case where we thought, you

21 know, agreements included severance agreements.  And we were

22 comfortable in this case that it truly was a payment so he

23 wouldn't disclose this information for a period of time.

24         THE COURT:  Wow, support from the U.S. Trustee.

25     (Laughter)

1           THE COURT:  I've signed the order.

2           MR. HIGGINS:  All right.  Well, thank you, Your

3    Honor.  This brings us to the next category of matters listed

4    as uncontested matters going forward.  Motion -- item #6, which

5    is the Metco motion, was withdrawn yesterday, as I understand

6    it.  The next motion is the Debtor's Motion for Entry of an

7    Order Authorizing and Approving Expedited Procedures for the

8    Sale or Abandonment of De Minimis Assets.  Again, we filed this

9    under a Certificate of Counsel.  We did make one change, and

10   that was to the period of notice, which went from 10 business

11   days to 15 calendar days.  That was in -- as a result of

12   discussions with the U.S. Trustee.  We also shared the motion

13   and discussed it with both the 2nd Lien Lenders and with the

14   Committee.

15          THE COURT:  Well, there was another change, and that

16   is a notice procedure which was implemented with respect to the

17   smaller asset sales.

18          MR. HIGGINS:  My apologies, Your Honor.  Yes, we were

19   going to file a quarterly report as well.

20          THE COURT:  Yes, and with those changes I don't have

21   any questions.  Does anyone else care to be heard in connection

22   with this motion?

23          ALL:  (No verbal response).

24          THE COURT:  If you have a Form of Order I'm prepared

25   to -- oh, I'm sorry.

1          MR. MANNAL:  Your Honor, Doug Mannal of Kramer Levin

2     for the Creditors Committee.  The -- there was one further

3     change granting notice of the smaller asset sales to the

4     Creditors Committee in time to object to any such sales.

5          THE COURT:  I thought I just said that.

6          MR. HIGGINS:  If I may approach, Your Honor.

7          THE COURT:  Yes.  Thank you.

8          MR. HIGGINS:  That bring us to item #8 on the agenda,

9     Your Honor.

10     (Pause in proceedings)

11          MR. HIGGINS:  Brings us to item #8 on the agenda,

12     Your Honor, which is the Committee's Motion to File Certain

13     Exhibits under Seal.  And I will yield the podium to Counsel.

14          THE COURT:  All right.

15          MR. MORTON:  Good afternoon, Your Honor.  Edmon

16     Morton from Young Conaway on behalf of the Official Committee

17     of Unsecured Creditors.  This motion is really just a

18     procedural motion that accompanies the statement of no

19     opposition that we filed in connection with the Key MIP, which

20     Your Honor will hear later today.  The Creditors Committee --

21     as explained in the motion, the Creditors Committee's lack of

22     opposition is based primarily on our agreement with the Debtors

23     that future Key MIP payments will be made pursuant to certain

24     metrics for senior participants.

25          We believe that it was necessary to have the record be

1    fulsome on those metrics and the basis of those metrics.

2    However, as I'm sure the Debtors would agree, the business plan

3    upon which they are based is the epitome of confidential

4    commercial information that should be protected by section

5    107(b) when it is to otherwise be disclosed.

6         As such, no party-in-interest has filed any opposition to

7    our motion, and we would respectfully request that Your Honor

8    enter an order.

9              THE COURT:  All right.  Does anyone else care to be

10   heard in connection with this motion?

11             MR. HARRINGTON:  William Harrington again from the

12   United States Trustee's office.  There again, we're very

13   concerned about the sealing of documents.  In this case because

14   it was a statement filed in response to a motion and not an

15   affirmative motion that did give us some comfort, and also the

16   nature of the information disclosed.  It's our understanding

17   the information contained in there, and frankly, Your Honor, I

18   haven't delved through the entire packet of information, but

19   that it's not even a completed business plan at this point.

20   It's in draft form and that it is on its way to completion.  So

21   we thought that also played into the fact that it was

22   confidential information.

23             THE COURT:  Does anyone else care to be heard?

24             ALL:  (No verbal response).

25             THE COURT:  All right.  Well, I have reviewed the

1  enclosures, and I'm in agreement with the Committee that it's

2  met its 107 burden, and I am inclined to grant the relief

3  that's been requested.  Do you have a Form of Order?

4         MR. HIGGINS:  May I approach?

5         THE COURT:  Yes.  Thank you.  The order has been

6  signed.

7         MR. HIGGINS:  Thank you, Your Honor.  This brings us

8  to item #9 on the agenda, which is the motion of Alps

9  Automotive for an allowance of certain claims.  That motion was

10 withdrawn this morning, Your Honor, and so Counsel for Alps is

11 no longer going forward with that.

12        THE COURT:  All right.

13        MR. HIGGINS:  We'll skip over the Key Management

14 Incentive Plan.  That brings us to item #11 on the agenda, Your

15 Honor.  And this was the Debtor's Motion for Entry of an Order

16 to Modify the Final DIP Order to Extend the Time the

17 Invalidate, Subordinate or Otherwise Challenge the Prepetition

18 Second Priority Liens.  We -- there was a statement by the

19 Committee in support of our motion.  There was also an

20 objection filed by the 2nd Lien Lenders to which we

21 subsequently filed a response.

22    I am happy to report, Your Honor, that today the parties

23 were able to reach an agreement continuing this motion to the

24 July 23rd hearing with the proviso that if the -- two provisos.

25 The first one being that if the Court does not enter the

1  requested relief at the 724 hearing that the Debtors would have

2  a 15-day period in which to file a complaint commencing this

3  proposed 2nd Lien preference litigation.  Likewise, if the

4  Debtors chose not to do that the Committee would likewise have

5  a similar period of time to file a motion seeking derivative

6  standing.

7        The second proviso being that if the Debtors were to

8  withdraw this motion at some time prior to the 724 hearing that

9  the Committee on or before the 724 hearing could file that

10 motion to be heard at a subsequent hearing.  We were discussing

11 among ourselves the concept of asking the Court for a

12 particular date for that.  And then I had talked to Counsel for

13 the 2nd Lien Lenders and we noticed that the 8/15 hearing is

14 there, and I believe that Counsel for the 2nd Lien Lenders is

15 amenable to having that hearing act as this stand-by hearing in

16 that unlikely circumstance.

17           THE COURT:  That's fine with me.

18           MR. HIGGINS:  All right.

19           THE COURT:  Do Counsel intend to embody this in a

20 Form of Order?

21           MR. HIGGINS:  We do, Your Honor.  We would like to

22 submit that Form of Order probably tomorrow morning.  We're

23 still trying to tweak some words and Counsel for the Second

24 Lien Lenders would like to take it back to his principals

25 first.

1          THE COURT:  Very well.

2          MR. HIGGINS:  I did want to make a statement as part

3  of the agreement to settle this matter, and that is that

4  without prejudice to the Debtors filing any avoidance action

5  against the 2nd Lien Lenders that it is the Debtor's

6  understanding at this time that the matter involving these

7  UCC(1) financing statements and all of the related issues

8  appurtenant thereto is really the only Chapter 5 action that

9  the Debtors are currently aware of.  And with that I would

10  yield the podium to Counsel for the 2nd Lien Lenders, who would

11  also like to make a statement to the Court.

12          THE COURT:  Okay.

13          MS. EDWARDS:  Good afternoon, Your Honor.  For the

14  record, Terri Brown-Edwards of Potter Anderson & Corroon on

15  behalf of the 2nd Liens.  Your Honor, I'd like to introduce to

16  the Court my co-Counsel, David Albalah, who's here from the law

17  firm of Bracewell & Giuliani in New York City.  I believe

18  Mr. Albalah has been pro hoced already into this case, Your

19  Honor.  But I wanted to formally introduce him to you since

20  this is his first time appearing.

21          We also have a client on the line, Your Honor, Mr. Rit

22  Caratte From the GSC Group.  He's one of the 2nd Lien Committee

23  members.  I want to thank your office for agreeing to allow Mr.

24  Caratte to appear telephonically today.  And with that, Your

25  Honor, I'd like to cede the podium to my co-Counsel,

1  Mr. Albalah.

2          THE COURT:  Thank you.

3          MR. ALBALAH:  Good afternoon, Your Honor.  May it

4  please the Court, David Albalah from Bracewell & Giuliani, LLP.

5  I'm here simply to state that normally we're not in the

6  business of asking people that may sue you to bring it on, and

7  while we don't want them to bring it on, the reason I rise is

8  to make it clear that more important is we want to make sure

9  that no delay in bringing it on delays the exit from Chapter

10 11.  That's our primary goal.

11         We're fine with the lawsuit being brought today.  We'll

12 deal with it.  But we're just concerned that a delay, and the

13 reason why we made the objection, is that we're concerned that

14 a delay may cause a delay in exiting Chapter 11.  We understand

15 that the Debtor is anxious to get out and they intend to file a

16 plan, that's all been disclosed.  We support that.  As long as

17 we can get out -- with all due respect, we like being here, we

18 want to get out as quickly as we can.  Thank you.

19         THE COURT:  Really?  You're one of the few people

20 who's ever told me that.  That you like being here.

21      (Laughter)

22         MR. ALBALAH:  Well, I won't snatch defeat from the

23 jaws of victory.

24      (Laughter)

25         MR. ALBALAH:  Thank you.

1          THE COURT:  You're welcome.

2          MR. HIGGINS:  Your Honor, I wanted to echo what

3    Mr. Albalah said about the Debtors.  It is a prime goal of the

4    Debtors to exit this bankruptcy case, as much as we do enjoy it

5    here in Delaware.

6          THE COURT:  No offense taken.

7          MR. HIGGINS:  (Laughs).  In the -- you know, in the

8    third quarter, for all humanly possible, and as early in the

9    fourth quarter as we can, and we have -- as Mr. Albalah said,

10   we have put forth in that status report a fairly explicit time

11   line of ambition goals to meet, and dealing with this 2nd Lien

12   litigation is part of getting from here to exit.

13         THE COURT:  Very well.

14         MR. HIGGINS:  And with that, Your Honor, I would turn

15   the podium over to Mr. Basta to address this Key Management

16   Incentive Plan.

17         THE COURT:  Okay.

18         MR. BASTA:  Good afternoon, Your Honor.  Paul Basta

19   from Kirkland & Ellis.  In connection with this matter on the

20   phone we have Mr. Jack Edwards.  Mr. Edwards is an independent

21   member of the Board of Directors of the company and Chairman of

22   the Compensation Committee.  We also have Ms. Theresa Skotak,

23   who is the Vice President of Human Resources.

24      We're here today to seek approval of payments under the

25   company's Key Management Incentive Plan.  I'm gonna be

1   referring to this during the hearing, because I won't be able

2   to help myself, as a K MIP.  We are seeking to pay $1.28

3   million of the $6.8 million program to the Tier 1 and Tier 2

4   employees.  We're also seeking to pay a catch-up payment of

5   $486,000 to the Tier 1 employees.

6       In light of the agreement on this topic that we reached

7   with the Creditors Committee and the 2nd Liens we approached

8   the United States Trustee's office and the UAW regarding their

9   objections about streamlining the evidentiary approach to this

10  hearing.  What we had agreed with them was that the evidentiary

11  base would essentially take the form of the affidavits filed by

12  -- submitted by Ms. Skotak and Mr. Edwards, as well as

13  Mr. Edwards' deposition.

14      From the Debtor's perspective we're only going to be

15  relying upon Mr. Edwards' affidavit and Ms. Skotak's second

16  affidavit.  And if it is acceptable to Your Honor after I've

17  made a brief argument I'd propose to proffer their testimony

18  through those affidavits, and they're available here to be

19  questioned if Your Honor has any questions.

20          THE COURT:  Let me make sure I have all of those

21  items.  I believe I do.

22          MR. BASTA:  The second Skotak affidavit, Your Honor,

23  is dated April 4th and was submitted in connection with our

24  second motion.  And Mr. Edwards' affidavit is dated April 23rd

25  and was submitted in connection with our reply.

1          THE COURT:  All right, I have that.  And I have read

2    the transcript, Mr. Edwards' transcript.

3          MR. BASTA:  Thank you, Your Honor.  If I could

4    proceed to argument?

5          THE COURT:  Go ahead.

6          MR. BASTA:  The context of the timing of seeking

7    these payments is laid out in the status report so Your Honor

8    could have a picture of kind of where we stand in this

9    reorganization.  I'm not gonna go into all the detail that's in

10   the papers describing the K MIP plan, but I am gonna give a

11   brief overview of it.

12         Prior to the commencement of the Chapter 11 cases the

13   company rewarded performance through something called the Long-

14   Term Performance Plan.  And as the company was sort of headed

15   towards its bankruptcy case the Compensation Committee

16   determined to move away from that program.  The program was too

17   long.  It has a two to three-year horizon.  It wasn't focused

18   on 50-cubed, which is the company's operating program --

19   operational restructuring.  And it was equity based, and given

20   where the equity was, equity wasn't rewarding performance.

21         So prior to the petition date the Compensation Committee

22   and the Board adopted the K MIP.  And the K MIP is a $6.8

23   million program, and it's targeted at 55 people who have their

24   finger on the operational restructuring.

25         Payment against the $16 million -- against the $6.8

1  million, excuse me, are based upon four metrics.  The first

2  metric is the 50-cubed metric, and it's based on moving 2,000

3  jobs to best in cost or lowest cost facilities by 12/31/07.

4  The second metric is the budget metric, and that is completing

5  the 50-cubed operational restructuring by the end of this year

6  for less than $100 million.  The third metric is the 510

7  program metric.  And that's eliminating 510 positions by

8  12/31/06, this last December.  That objective has been

9  accomplished.  And the fourth one is personal goals, looking at

10  each person's contribution to the operational restructuring.

11       There have been three awards, or three proposed awards, I

12  should say.  The first was prior to the bankruptcy.  The

13  company awarded $952,000 of the 6.8.  The company then made its

14  first post bankruptcy award of $925,000.  And we've put that

15  into what we'll call our first K MIP promotion.  And we spoke

16  to Mr. Mayer and the Creditors Committee, and the Creditors

17  Committee looked at it and said, "We're okay with the payments

18  going out to the Tier 2 people.  But as to the Tier 1, which is

19  the top five managers of the company, we'd like you to hold off

20  because you guys are developing your business plan, and we want

21  to see your business plan before we sign off on this $486,000."

22       The company said, that's okay.  And we completed the

23  business plan, and we had meetings with the Creditor groups on

24  the business plan, and then that led to an agreement.  And the

25  agreement with the key stakeholders is that the 1.28 million

1  that we're seeking today would not be opposed by the 2nd Lien

2  Committee or the Creditors Committee.  The $486,000 that was

3  held back would not be opposed by those committees.  But that

4  in the future payments out of the K MIP would be set on a new

5  set of metrics that are predicated on EBITDA, completion of the

6  five-year business plan, and the filing of a plan of

7  reorganization.  And the company felt comfortable with that

8  approach, predominantly because of its work on the business

9  plan and where we are with the business plan.

10      The understanding is that this new proposed metric to

11  govern future awards will be subject to a new motion that will

12  probably be before the Court and parties-in-interest will have

13  an opportunity to object to that.

14      So why do we believe the relief requested today should be

15  approved?  The answer is is that it satisfies the legal

16  standards.  First of all, we believe this is ordinary course.

17  The Global Home Products case says that section 503, I'm

18  quoting, "Is not applicable to the plan in that it is an

19  incentive plan consistent with ordinary course of business."

20  Our view is K MIP is ordinary course of business.  Corporations

21  in this country reward performance.  Dura is not like -- it is

22  like every other corporation in that it does so.  It had a

23  long-term performance plan in place prior to the bankruptcy

24  filing.  And therefore we believe it satisfies both the

25  horizontal and vertical tests, which is that it's ordinary

1  course for this company, and it's ordinary course for companies

2  that are similar to this company.  And in light of that we

3  think the analysis for approval is quite simple.  We think it

4  should just be approved.  And in the affidavits that are

5  submitted I think a factual record is made that performance

6  plans were in place prior to the filing.

7       Even if it's not ordinary course, and I'm not sure the

8  U.S. Trustee completely agrees with this, we believe we're in

9  the land of 503(c)(3).  And under 503(c)(3) nonretention plans

10  can be approved under facts and circumstances test.  And we've

11  sited a lot of case law that says that really means business

12  judgment.  We don't believe this is the case where the Court

13  has to make a decision as to whether 503(c)(3) requires a more

14  searching inquiry than business judgment standard because we

15  believe there are many reasons supporting these payments.  And

16  I'm gonna go over them.

17       The first thing I'm gonna do is to measure these K MIP

18  payments against the six questions that Judge Lifland asked in

19  Dana when considering management incentive payments.  The first

20  thing he asks is does the plan reward performance?  This

21  rewards performance.  It requires -- it's a very specific plan

22  with very specific operating targets, and it's achievement

23  against those targets that is the measure of success.  And it's

24  tied to --

25       (PA system announcement)

1          MR. BASTA:  It's very specific in its objectives and

2    its goals and it's measured to an operational restructuring.  I

3    thought it was interesting in Mr. Edwards' deposition

4    transcript where he describes the program as being affective

5    because it's a measure of operational control that's within the

6    control of the participants.  It's not a function of what's

7    happening out in the industry, what's happening into the

8    automotive space as a whole.  It's rewarding people for

9    completing their jobs, and those jobs are moving to lower cost

10   facilities and obtaining reductions in cost to the company

11   that's gonna have a tangible benefit.  So we believe the plan

12   is targeted.

13         The second question that Judge Lifland asked is is it a

14   reasonable cost?  We believe the answer to that is yes.  Even

15   though we're not seeking approval today of all of the 6.8

16   million, the 6.8 million is reasonable when one considers that

17   the 50-cube program is targeted to save $66 million in savings.

18   Certainly believe that the amount that is being sought is not

19   excessive under the circumstances.

20         The third factor, is the scope of the program fair?  Here

21   the scope is fair.  It's a 55-person program and it covers

22   those parties, those individuals that are gonna have the

23   ability to control the success of 50-cubed.

24         The fourth question is, is the program consistent with

25   industry standards?  We also believe the answer to this is yes.

1  For example, in the Global Homes case the performance was

2  linked to individuals accomplishing sales levels.  We don't

3  believe this is dissimilar from that approach.  Oftentimes

4  there will be specific targets made by a company for the

5  employees to have to achieve in order to be rewarded for it,

6  and our plan does that.

7       The last -- the fifth question Judge Lifland asked is

8  whether or not the Board and the Compensation Committee due

9  diligenced the need for the program, and in Mr. Edwards'

10  affidavit, as well as in his deposition testimony, I think he

11  lays out the facts and circumstances that took place last

12  summer when the company's financial situation was unfolding

13  rapidly and they were approached by management regarding the

14  need to implement a performance plan.

15       The last question Judge Lifland asked is whether or not

16  independent Counsel reviewed the program.  Here independent

17  Counsel did not review the program.  We don't believe, however,

18  that is fatal.  Certainly the Creditors Committee and the 2nd

19  Lien Committee are independent and have reviewed what is

20  happening here and we're proceeding with no objection from

21  those parties.

22       So those are the six factors that the Dana Court looked

23  at.  I would submit that there are three additional reasons why

24  the program should be approved.  The first is just imbedded in

25  the business judgment test.  What the business judgment test

1  does is to look at whether or not an action is proposed in good

2  faith and with the absence of any conflict of interest.  Here

3  all three members of this company's Compensation Committee of

4  the Board are independent.  They're not participating in this

5  program.  There's no evidence that they're doing anything other

6  than trying to do what's best for Dura.

7       The second reason I would submit, Your Honor, is the

8  timing of the request.  We accommodated the Creditor's

9  concerns.  We've provided them the business plan, and they have

10 that business plan and have submitted it under seal, and our

11 request for these payments comes after they've had a chance to

12 see where the reorganization is headed.

13      And then the third is quite obvious that we don't have an

14 objection from the key economic stakeholders in the case.

15      So for those reasons we think it's approved.  We think it

16 should be approved.  We've received two objections.  One from

17 the UAW and one from the United States Trustee's office.

18 Neither of the objections touch the substance.  In other words,

19 I just went through six data factors and three other factors

20 which are reasons why these payments are appropriate.  The

21 objections don't touch on anything substantive about the

22 appropriateness of the payments.

23      What the UAW essentially says is don't get piecemeal

24 approval of the payments.  You have to come in and get approval

25 of the whole thing.  Well, it's funny, because when you want to

1   get approval of the whole thing everyone says, you know, slow

2   down, don't get approval of the whole thing.  Get approval of

3   the payments individually so we can see what progress the case

4   is making.  I think that the approach that we're taking here is

5   actually quite balanced, because if you look at it from a big

6   picture, management is being rewarded for performance

7   objectives that were disclosed to them and that they achieved

8   against.  And the economic stakeholders have showed up and said

9   that's okay, but in the future we would like you to hit these

10  different marks.  And that's okay because now management knows

11  those different marks that they need to hit.  And so I don't

12  believe the objection that we're proceeding piecemeal is a

13  reason to deny the program.  In fact, I think the way that

14  we're proceeding makes sense given the interests of the

15  Creditors and the interests of management whose morale we need

16  to keep in order to get the operating turnaround done.

17      The United States Trustee raises, I think, three

18  objections.  The first objection is that the presence of

19  discretion in the Compensation Committee regarding the awards

20  should defeat the program.

21          THE COURT:  Well, don't -- doesn't the U.S. Trustee

22  say specifically it's the absolute discretion --

23          MR. BASTA:  Yes.

24          THE COURT:  -- to which he objects?

25          MR. BASTA:  Yes.  And I wanted to cover that.

1    There's nothing anywhere that says that discretion vitiates the

2    business judgment standard.  In other words, who's exercising

3    the discretion?  The discretion is being exercised by

4    independent directors who don't have a conflict of interest.

5    That's exactly who the discretion should be exercised by.

6        Second, we're here.  We're before the Court.  We're

7    justifying the exercise of the discretion and future awards are

8    gonna be based upon metrics that the Creditors Committee has

9    negotiated.  So it's hard to see how the existence of

10    discretion in this context, and given the bankruptcy process

11    that we are in is somehow harmful to the plan.

12        The second objection that the Trustee raises is that it's

13    not ordinary course.  I've outlined the reasons why we believe

14    it is ordinary course.  I won't repeat myself.

15        The third objection was I think in their first objection

16    they made a reference that this is really retention, it's not

17    503(c)(3).  I don't know if that objection is gonna be pressed.

18    I'm not gonna argue it now.  If the Trustee raises it in their

19    objection I can come back to it.

20        That would summarize my argument --

21        THE COURT:  And the U.S. Trustee also echoed some of

22    what I would call the policy arguments that the UAW raised

23    about loss of jobs.

24        MR. BASTA:  Your Honor, I didn't touch on that, you

25    know, in my remarks.  It was intentional.  You know, look, the

1  loss of jobs is a hard thing.  I think that having worked with

2  the company, nobody at the company wants jobs to be lost.  The

3  company wants to be competitive.  And the company is designing

4  programs to allow them to compete in this market.  And I think

5  it's actually the ultimate exercise of fiduciary duty to make

6  those decisions, to turn around the company, and put it in the

7  position to compete.

8           THE COURT:  Thank you.  Before you leave the podium,

9  I just note that the Edwards affidavit is not signed.  At least

10  the copy in the binder that I have.

11          MR. BASTA:  Your Honor, it was refiled electronically

12  with the signature.  We can make sure that Chambers gets a copy

13  of that.

14          THE COURT:  All right.

15          MR. BASTA:  Your Honor, my -- is it fair to assume

16  that the affidavits will constitute the direct testimony and I

17  should not read them into the record?

18          THE COURT:  No, based upon what I understand is

19  agreement about the evidentiary record, it will consist of, in

20  addition to the pleadings, the two affidavits, Scotak

21  affidavits, the Edwards affidavit and the Edwards transcript,

22  is that correct?

23          MR. BASTA:  Yes.

24          THE COURT:  Okay.

25          MR. BASTA:  Thank you, Your Honor.

1          MR. MAYER:  Thank you, Your Honor.  Tom Mayer again

2    for the Official Committee of Unsecured Creditors.  As Your

3    Honor knows, we did not object.  The statement we did not

4    object is -- does not do justice to the amount of work the

5    Committee has done on this matter.  There's been a rocky road

6    to this settlement.  This is not been something quietly done in

7    a back room without fighting.

8          As Your Honor knows, the last time we were here we had

9    negotiated something that we specifically called a truce.  And

10   there was a limited amount of money that we did not object to

11   going out to door to junior members of management under this

12   truce.  And our principal concern was that the program was

13   based on the continued accomplishment of goals under the 50-

14   cubed and 510 programs.  And at that point in time the

15   Committee did not know whether these programs were -- continue

16   to be critical to the success of this company.  And we were

17   concerned that we would have a presentation by management that

18   said, gee, well, you know, 50-cube isn't working.  We have to

19   do something else.  And we would have been asked to sign off on

20   bonuses relating to a program that turned out not to be

21   critical to the success of the company.

22         Since the last hearing the company has had numerous

23   briefings with the Creditors Committee on the business plan

24   that is attached and under seal indicates the importance of 50-

25   cubed and 510 to the success of the reorganization.  And

1   therefore the Debtor's statement that rewarding people for

2   accomplishing these goals has an economic merit to it, is

3   something that the Committee has looked at and does not object

4   to.

5       That being said, it was a rocky road to this point.  The

6   Debtor sent us a draft, filed a pleading.  In our view real

7   negotiations did not take place until some time thereafter.

8   And as our statement indicates, we had asked for adjournment so

9   that we wouldn't have to engage in discovery.  We wouldn't have

10  to start taking depositions.  And time got compressed and we

11  had to do that.  And in fact, the Edwards deposition stopped

12  abruptly because we reached agreement on the targets that were

13  -- that are set forth in the Proposed Order and set forth in

14  our statement.

15      So this was a hard fought negotiation, and to borrow more

16  words from Judge Lifland in <u>Dana</u>, I litigated that matter

17  before Judge Lifland and actually led the team that pursuaded

18  him to deny the first of the management compensation programs

19  in that case.  Judge Lifland was very intent on pay-to-play

20  instead of pay-to-stay.  Well, we have looked at this business

21  plan, and the reason we wanted it attached is that we wanted a

22  line in the sand.  This is -- they came to us with this plan.

23  And we looked at it and we negotiated targets based on that

24  plan, which obviously cannot be made public.  But that's

25  pay-to-play, Your Honor.  That is not pay-to-stay.

1          THE COURT:  So this plan passes the duck standard?

2          MR. MAYER:  Yes, Your Honor.  We do not believe this

3   is -- this walks like a KERP and quacks like a KERP.  This is a

4   pay-to-play plan.  Without getting into exactly what it

5   promises, which would be inappropriate, the Unsecured Creditors

6   Committee has looked at the plan.  You know, we haven't fully

7   vetted it.  But obviously by implication, if this plan is

8   accomplished it has certain positive connotations for recovery

9   for Unsecured Creditors.  And from my perspective, Your Honor,

10  and I would submit without signing on to the Debtor's arguments

11  on ordinary course or business judgment, I agree with the

12  Debtors this is not the case in which to determine whether

13  business judgment standing alone is the standard here.

14      In our view this statute was enacted and this program has

15  been enacted so that people are rewarded for providing returns

16  to Unsecured Creditors.  We think this program accomplishes

17  that goal.  And for that purpose -- for that reason we do not

18  object to this -- to what has been requested by the Debtor.

19          THE COURT:  All right, thank you.  Anyone else wish

20  to speak in favor of the relief the Debtor has requested?

21          ALL:  (No verbal response).

22          THE COURT:  I hear no response.  All right, let me

23  hear from the objectors.

24          MR. HARRINGTON:  Good afternoon, Your Honor.  I guess

25  not surprisingly, based on your earlier comments, we will not

1  be here to support the Debtor's position on this portion of the

2  hearing.

3        THE COURT:  Well, it's good to have you back anyway,

4  Mr. Harrington.

5        MR. HARRINGTON:  Limping as I may.  Your Honor, we

6  absolutely do not think this is an ordinary course plan.  And

7  the reason we agreed to the submission of affidavits and the

8  submission of the deposition transcript of Mr. Edwards is we

9  think the Edwards deposition very, very clearly indicates that

10  this is not an ordinary course plan.

11       Your Honor, the Edwards deposition indicates that this is

12  a replacement of a long-term incentive plan that had been

13  enacted back in early 2006 when typically Dura enacted its

14  long-term incentive plans, and Edwards says that.  He says that

15  it was typical for long-term incentive plans, and he

16  discriminates between long-term and short-term by plans that

17  last longer than a year, and plans that generally last shorter

18  than a year.  And he said the typically long-term incentive

19  plans were enacted in the beginning of a year, and that's when

20  the Committee would get together and they would enact long-term

21  plans.

22       This plan, however, was enacted in August, and it was

23  really a modification of the former long-term incentive plan

24  that in August of last year the Committee -- or the company

25  determined that the long-term incentive plan they had in place,

1  which was a stock plan, was futile because the way the company

2  was performing it was highly likely it was starting to roll

3  into a restructuring of some sort in potentially a bankruptcy.

4  If it was going into bankruptcy equity would have no value, and

5  there would be no incentive for a stock plan.

6      So the company had to come up with something else.  So in

7  August, at a time when they have never come up with a long-term

8  plan before, it was the first time they had ever come up with a

9  long-term plan in August, at least -- and I retract that.  At

10  least in the 10-year tenure that Mr. Edwards had been on a

11  Board they had never had a long-term incentive plan of this

12  nature that was enacted in August.

13      So really, Your Honor, this is nothing more than a

14  prepetition enactment of a K MIP, which is different from the

15  historical practice having bonus programs in place.  And I

16  don't deny that this company has always had some sort of bonus

17  program in place.  But this particular plan is not like all of

18  the other plans.

19      The other distinction, Your Honor, even the plan -- the

20  long-term incentive plan that it was replacing was unlike any

21  other plan that at least during Mr. Edwards' tenure this

22  company had ever had.  Because the targets were based on

23  financial restructuring.  They weren't based on financial

24  performance, and they weren't based on operational performance.

25  And Mr. Edwards said all other bonus programs the company had

1    had before were based on one of those two things.  Either

2    financial performance targets or operational performance

3    targets such as quality control.  This long-term incentive

4    plan, it started in the spring and then was modified in the

5    late summer, is based on financial restructuring, which is

6    something wholly new.  And I don't think you can say when we

7    create a first-time plan early in the year, modify it right

8    before the filing, that that creates an ordinary course of

9    business for this Debtor.  And so I think you fail one of the

10   tests under ordinary course for that very reason alone.

11        This plan was also different because it was atypical for

12   the company to structure -- and again I go back to the spring

13   plan for the long-term incentive plan, an all or nothing

14   approach.  Usually the company had various targets they had to

15   hit.  And so in spring they set up the financial restructuring

16   plan for the equity plan and it was an all or nothing approach.

17   They had to scale that back when they modified it in the spring

18   because they started to look at it again and they couldn't

19   really figure out what that meant, you know, what was the

20   definition of a financial restructuring?  So it became more and

21   more difficult to kind of quantify that.

22        The other thing that's interesting, Your Honor, was when

23   this plan was originally enacted it was an all or nothing

24   approach.  And when it was changed in August, based on advice

25   of Counsel, they then decided they had to change it from an all

1  or nothing approach to, you know, various interim components

2  and also kind of a range.  And I think that's important, Your

3  Honor, because we had a plan in place that was established by

4  the business people.  And then it's changed right before the

5  filing on the advice of Counsel.  So I think that makes it

6  different than any of the other plans, which had been enacted

7  solely by the business people.

8      Mr. Edwards also testified at his deposition that this was

9  the first plan he had ever seen that gave complete discretion

10  to the Committee.  In fact, there was a special meeting called,

11  as he testified in his deposition, and he was very surprised

12  that this much discretion was being given to the Committee,

13  because rarely in the past had the Committee has this type of

14  discretion.  They would just award things based on looking at

15  metrics.  And if people met the metrics they would get the

16  award.  This plan, however, Your Honor, is completely based on

17  the discretion of the Committee.

18      Your Honor, the Debtor relies on <u>Dana</u> and <u>Global Homes</u>,

19  and I think those cases are very different because if you look

20  at the <u>Global Homes</u> case that was a shorter-term incentive plan

21  that had financial objectors, that was exactly like the

22  incentive plans that had been enacted by that company year in

23  and year out.  Whereas this incentive plan was very different

24  than the standard financial performance operational performance

25  bonus programs that this company had enacted.  In fact, in <u>Dana</u>

1  I think Judge Lifland made his decision personally based on the

2  fact that there was a 50-year history of having short-term

3  incentive bonus programs like that part of the incentive --

4  that part of the bonus program that he was improving in <u>Dana</u>

5  too.

6      So what we have here is a very different circumstance.

7  Well, this company certainly has had bonus programs, it's never

8  had a bonus program like this.  And this program was designed,

9  really, with the filing on the horizon with the intent of

10  creating metrics during a bankruptcy case that they could meet.

11  Because obviously their financial performance metrics at that

12  time were not gonna work for the company, because the company

13  was having such problems with its finances.

14      There again, if the Debtor's argument is correct that

15  essentially <u>Global Home Products</u> as if you have an incentive

16  component and you've ever had a bonus program in the past it's

17  an ordinary course plan, and so it's not subject to the

18  scrutiny under 503(c).  I'm not sure why 503(c) was enacted,

19  and it doesn't serve any purpose because I don't think there's

20  -- there's very few bonus programs out there, and certainly

21  there will be none again that will specifically state this plan

22  is only for retention purposes.  So I think every plan has a

23  sort of dual component now that has some incentive position and

24  some retention position, and if you have just, you know, the

25  tiniest bit of incentive and you've ever had a plan in the past

1   and that makes it ordinary course, I don't see what Congress

2   was doing when it enacted 503(c).  I mean, there has to be some

3   purpose to 503(c).  And Your Honor, we're not gonna argue that

4   this particular plan is a 503(c)(1) plan.

5       We do think there is a valid incentive component in this

6   plan, albeit, and we're probably going to defer -- in the

7   nature of time we will probably defer to the UAW to argue

8   whether the loss of jobs is a -- or moving jobs from the United

9   States abroad and, you know, terminating certain jobs, is a

10  valid purpose for an incentive plan in the bankruptcy context.

11  And I will leave that to the UAW to argue, although we did

12  raise it in our motion -- or our objection as well.

13      But Your Honor, I think the key component of this plan is

14  the absolute and unfettered discretion that is provided to the

15  Committee in this plan.  There are no hard metrics built into

16  this plan, Your Honor.  And I think it's very clear when you go

17  through the plan, starting with the administration of the plan,

18  and it says, "The Committee is authorized to interpret the plan

19  to establish, amend and rescind any rules and regulations

20  relating to the plan."

21      Further down in section 3 of the plan, "Any decision of

22  the Committee in the interpretation and administration of the

23  plan as described herein shall lie within its sole and absolute

24  discretion and shall be final, conclusive and binding on all

25  parties concerned."

1          THE COURT:  But isn't that really what it has to say?

2   As a matter of corporate governance?  Doesn't it have to say

3   that?

4          MR. HARRINGTON:  Your Honor, I think the Committee

5   has to be given some discretion.  But it also should have some

6   metrics built into the plan to measure against.  This plan does

7   refer to the restructuring goals, the 510 plan, and the 50-

8   cubed plan.  But Your Honor, there are no -- and particularly

9   with respect to the interim payments, there are no metrics

10  against which to measure this plan.  There is a final metric,

11  and that is the accomplishment of those restructuring goals.

12  But there's nothing in this plan that says, you know, if this

13  many jobs are terminated by this date, or if this many jobs

14  have been moved by this date they will get X.  This is

15  completely left into the discretion of the Committee, which

16  takes a look at it in hindsight.

17     If you look at the Edwards affidavit they very clearly lay

18  out sort of metrics the Committee looked at.  But all those

19  metrics were after the fact.  The company came in and

20  said, "Look, this is what we did.  Do you think this is enough

21  to give us a payment?"  And then they decide for a payment.  So

22  I'm not sure how that creates an incentive, Your Honor.

23  Because it's all -- the work has been done, and then it's

24  evaluated as to whether that is good enough.  And it's within

25  the absolute discretion of this Committee.  This Committee has

1  nothing to sort of benchmark that against.  And so effectively

2  they're a rubber stamp.  When the company says --

3          THE COURT:  But still under the umbrella of the

4  overall stated articulated goals?

5          MR. HARRINGTON:  I don't disagree, Your Honor.

6          THE COURT:  Okay.

7          MR. HARRINGTON:  But I think there are no sort of

8  interim metrics, and no way to decide.  I mean, even the

9  weighted average, I'm not sure where that comes from.  The

10  first time I saw that weighted average was in the Edwards

11  affidavit.  There's nothing in the plan that says you have to

12  give this weight to this or this weight to that.  It also is

13  interesting to me, Your Honor, if you look at the different

14  time periods.  In the first two time periods you got 14% of the

15  $6.8 million amount for 14% of the completion.  Second period

16  you've got 16% for 16%.  On the third period you've got 18% for

17  15%.  So there's not even consistency in the application of

18  these metrics based on the Committee.  The Committee has the

19  discretion and it changes based on its whim at that time and

20  how the company provides certain metrics that have already

21  happened to the Committee.

22      Your Honor, I also think it's interesting the Committee

23  settlement.  If there are valid metrics in this plan why do we

24  now need a settlement which creates new metrics and new metrics

25  which are based on financial performance, which effectively

1  goes to the ordinary course, too, because that would make it

2  more like all the prior plans that this company has had.  As

3  opposed to this plan, which is based on a financial

4  restructuring.

5      So, Your Honor, we think it's very clear that this is not

6  an ordinary course of business transaction.  So I think, and we

7  do agree that this is not a retention plan covered under

8  503(c)(1).  We think it is very clearly an incentive plan and

9  again, whether the incentives that the plan creates are

10 appropriate or not I'll leave to the UAW.

11     But we definitely think this plan falls under 503(c)(3)

12 and we do think this is a case where the Court has to make a

13 determination as to what higher standard is appropriate.  And

14 we think it's very clear that it can't be --

15         THE COURT:  If any.

16         MR. HARRINGTON:  Yes, Your Honor.  But we do think

17 it's clear that 503(c)(3) serves no purpose if justified by the

18 facts and circumstances of the case doesn't mean something

19 different than the business judgment rule, because if --

20         THE COURT:  Well, it says something different and

21 I've -- I will say I've interpreted it to mean something above

22 the business judgment standard but maybe not much farther above

23 it.  I mean, I don't know how else to describe it.

24     And I guess someday if I get a chance to write on it or

25 read the wisdom of others on the topic, you know, I may form a

1   firmer view in my mind about precisely what it means.  But you

2   know, that language was used and that's what Congress chose.

3          MR. HARRINGTON:  And that's our position, Your

4   Honor.  If they did mean the business judgment standard there

5   was a series -- you know, a slew of case law that could have

6   left the Court to rely on -- and so 503(c)(3) would not have

7   been necessary.

8          And Your Honor, it's sort of combined with our argument

9   that there are no metrics based in the plan that you can't have

10  meant -- we believe you can't have created a record justified

11  by the facts and circumstances if it's all hindsight and there

12  are no benchmarks in which to achieve, because there's no

13  incentive for people to perform if they're not seeking certain

14  benchmarks and objectives.

15         And we feel the plan is devoid, at least on an interim

16  basis, of benchmarks.  And it's -- if it's solely within the

17  discretion of the committee on the advice of management, it

18  effectively just becomes a rubber stamp for management coming

19  in and saying, okay, we're ready for this percentage now.  Sign

20  off and we're going to make this payment.

21         Your Honor, I think the Debtor went through the six

22  factors set forth in the Dana case, and while I hadn't planned

23  on doing that, I think there is -- I don't think they're

24  undisputed like the Debtor had characterized them.  I mean, the

25  first one is rewards performance -- and again, I think I'll

1  defer to the UAW as to whether this plan rewards appropriate

2  performance.  But I think there is a question as to whether it

3  -- this plan rewards appropriate performance.

4      The second and third one, Your Honor, I think can be taken

5  together.  And that's cost and whether it's appropriate.  And

6  the Debtor essentially says $6.8 million is a rather de minimis

7  amount based on, you know, if this plan is in effect a cost

8  savings.  But $6.8 million is a significant amount of money,

9  Your Honor.

10     And it's -- also I think important to note that

11 approximately 50% of that is going to be paid to roughly five

12 people.  And so kind of on the whether it's appropriate and how

13 the cost is distributed, we are looking at $6.8 million but a

14 very significant proportion of that is going to be paid to the

15 five senior people who were all clearly insiders.

16         THE COURT:  Well, are we really talking about $6.8

17 million at this --

18         MR. HARRINGTON:  Not today, but today we're talking

19 about a payment of I guess almost a million dollars to those

20 five people, Your Honor.

21     We also -- one of the other factors, Your Honor, is

22 industry standards.  And I don't think we have any evidence one

23 way or the other with respect to industry standards here.  I

24 don't think there's anything in the deposition transcript and I

25 don't think there was anything concrete in the affidavits with

1    respect to industry standards -- with respect to a performance

2    or an incentive plan that's based on a financial restructuring.

3    And I think Debtor conceded the independent Counsel fact that

4    they didn't have independent Counsel look at it.

5        Your Honor, for those reasons I think Your Honor has to

6    analyze this plan under 503(c)(3).  And we would argue that

7    it's not justified by the facts and circumstances.

8            THE COURT:  Thank you.

9            MS. KAUFMAN:  Good afternoon, Your Honor.  Susan

10   Kaufman for the UAW.  With me today is Robin Gise of the firm

11   of Cohen Weiss & Simon in New York.  Your Honor has admitted

12   Ms. Gise pro hac vice earlier this week and with the Court's

13   permission Ms. Gise will address the Court.

14           THE COURT:  All right.

15           MS. KAUFMAN:  Thank you.

16           MS. GISE:  Good afternoon, Your Honor.  I will do my

17   best to not reiterate any points already made by the United

18   States Trustee in objecting to this motion.  The UAW is the

19   exclusive collective bargaining representative of approximately

20   690 employees of the Debtors at their facilities in both

21   Michigan and in Indiana.

22       In 2006, the Debtors announced the closure of the

23   LaGrange, Indiana facility, which will result in the loss of

24   250 jobs for UAW represented employees.  The Debtor

25   acknowledged in its remarks that the loss of jobs is a hard

44

1  thing.  That being the case, the UAW does not think it's

2  appropriate to reward management for the loss of rank and file

3  jobs in a management incentive program.

4         THE COURT:  And how do you suppose that this plan

5  does that?

6         MS. GISE:  Your Honor, under the current version of

7  the Key MIP, under which the interim payments are before the

8  Court today, one of the components of the Key MIP is something

9  called the 50-cubed plan.

10    And part of the -- I guess one of the cubes of the 50-

11  cubed is a program that rewards -- or assigns, you know, it

12  targets the rewards for the executives and other employees

13  covered under the Key MIP by the number of jobs transferred

14  from United States and Canada based facilities to those in

15  lower-cost countries, known as LCCs.  And also best in cost

16  facilities, which may be -- which has a particular definition

17  in the Debtor's papers.  And you know, isn't necessarily --

18  aren't necessarily ones that are overseas.

19    That said, in the initial Key MIP motion that was filed in

20  February it was clear to me from reading it that to the extent

21  jobs were transferred to best in cost facilities they were not

22  included in the numbers that, you know, set the targets under

23  the Key MIP.  So the way we look at this program is you know,

24  the more jobs that are eliminated, the higher the awards

25  granted to management under the Key MIP.

1           THE COURT:  Well, it seems to me that taken to its

2    logical conclusion, your position is that any time a company's

3    decided that it must reduce its workforce, that to incentivize

4    its management to achieve that goal is an impermissible purpose

5    under an incentive plan, at least for bankruptcy purposes.

6    That makes no sense to me.

7           MS. GISE:  Your Honor, when -- the UAW's position is

8    that a Chapter 11 reorganization is, you know, fundamentally

9    about what it says -- reorganizing the company.  And one of the

10   elements of reorganizing a company is that the company's going

11   to continue to do business.  In order to do business, you need

12   people to do the work.

13          So to, you know -- to base a management compensation

14   program, you know, black and white, on the basis at least in

15   part of reducing the number of rank and file jobs, you know in

16   this case the UAW happens to be, you know, a member of the

17   Creditors Committee -- although obviously it appears only today

18   on its own -- and is a stakeholder in this company.

19          And has you know -- the UAW's support and that of all

20   employees is certainly necessary for this company to

21   successfully reorganize.  That's it really an insult to reward

22   management based on the number of jobs eliminated and

23   transferred overseas.

24          THE COURT:  Well, what if the company has decided it

25   no longer has a need for those employees?

1          MS. GISE:  That -- you know, that -- we're making

2    our argument.  We don't think that in a bankruptcy, where

3    you're subject to -- you know, if a company's not in

4    bankruptcy, that's a different case.  Then I wouldn't be here

5    today.   Then stakeholders wouldn't have any say --

6          THE COURT:  Well, then they're --

7          MS. GISE:  -- over --

8          THE COURT:  -- free to dispose of employees any way

9    --

10          MS. GISE:  Well, we wouldn't agree with -- we

11    wouldn't go that far, but the fact is they're in bankruptcy.

12    They're -- you know, their actions are subject to your approval

13    and you know, to the approval of the other major stakeholders

14    and to all stakeholders actually in the case.

15      And it -- given the fundamental purpose of a Chapter 11

16    reorganization, it just -- it seems antithetical to that to

17    reward management for cutting rank and file jobs.  In fact, you

18    know, in the Supreme Court's landmark case of <u>NLRV v. Bildisco</u>

19    <u>& Bildisco</u>, the Court stated that the fundamental purpose of

20    reorganization is to prevent a Debtor from going into

21    liquidation with the attendant loss of jobs.  So you know, we

22    view that as part of the purpose of a Chapter 11 case.

23          THE COURT:  Anything further?

24          MS. GISE:  Yes, Your Honor.  You know, that was --

25    when this motion was filed in February, the UAW put forth an

1  objection, which you know, we've attached as Exhibit-A to our

2  present objection.  And we didn't -- given the stipulation to

3  pay the Tier 2 employees and to continue the payments of the

4  Tier 1 employees, the UAW decided not to press its objection

5  and to wait until the opportunity was ripe.  And it appears

6  that the opportunity is ripe today.

7       But our other objection is primarily one of -- really of

8  process.  You know, when you look at the original Key MIP and

9  where we are today, they sought -- the Debtors sought

10  authorization to make $6.8 million worth in payments under the

11  Key MIP.  Prepetition they ended up making just under a million

12  under that program.  With the interim stipulation in February,

13  there was another approximately 440,000.

14       The current motion seeks authorization to pay

15  approximately 1.7 million, which when you combine it with the

16  payments previously both paid and authorized by this Court,

17  comes to 3.2 million.  That is almost one-half of the original

18  amount of the Key MIP.

19       And this is a program which, you know, has certainly not

20  yet at least been approved by the Court in its present form and

21  which it's clear from the statement of the Creditors Committee,

22  did not have the support of some of the major stakeholders in

23  this case.  And is going to be pretty significantly changed

24  when the other business plan and EBITDA metrics are added in

25  the amended Key MIP motion, which'll be filed I presume

1  sometime next month.

2      So what you have here is a program which pretty much

3  everyone agrees -- even Mr. Edwards stated in his affidavit

4  that does -- is not sufficiently targeted in its present form

5  to incentivize management in order to successfully reorganize

6  Dura.  But yet after -- you know, given -- in the addition to

7  the payments that are before the Court today, almost half of

8  the Key MIP will have been paid out.

9      And from a sort of process standpoint, it just doesn't

10  sound right.  Why are we approving these payments that are

11  under a program that nobody agrees is going to do the job?  And

12  you know, the Debtor referred to the UAW's objection as

13  objecting to a piecemeal approach, and in some sense that

14  really is what we are objecting to -- that the payments are

15  being sort of, through various stipulations, being agreed to

16  but yet not until today are we really looking at what the

17  program is all about.  And yet it's not even the program that's

18  going to continue going forward.

19      The UAW also -- and I will not reiterate the arguments,

20  but we do agree with the U.S.  Trustee that this is not an

21  ordinary course program in any sense of the phrase.  It was

22  clearly a program that was formulated practically on the eve of

23  filing for bankruptcy and we don't believe there's any basis

24  for arguments in ordinary course program.

25      Similarly, and we -- the UAW is happy to hear that Your

1    Honor has considered the 503(c) standard as something more than

2    the business judgment and the UAW certainly agrees that that

3    standard should not be synonymous with the business judgment

4    standard and that it would not do justice to Congress' intent

5    in passing that section in order to rein in excessive

6    management compensation awards in bankruptcy.

7        And with that, at this point the UAW is not prepared to

8    comment -- since it's not before the Court -- on the substance

9    of what the Key MIP will be in the future -- as what -- you

10   know, the terms that are contained in the I guess more recent

11   filings as far as the EBITDA targets and the metrics.  And we

12   will -- when that motion is brought before the Court, we will

13   most likely respond at that time.

14       With that, Your Honor, the UAW respectfully requests that

15   the Debtor's motion should be denied and does not think that

16   the payments are justified under the facts and circumstances

17   within the meaning of Section 503(c).

18           THE COURT:  All right.  Thank you.

19           MS. GISE:  Thank you, Your Honor.

20           THE COURT:  Does anyone else other than the Debtor

21   care to be heard?

22           ALL:  (No verbal response).

23           THE COURT:  All right.  I'll give you a brief

24   opportunity for rebuttal.

25           MR. BASTA:  Thank you, Your Honor.  I'm going to be

1  brief.  Let's start with ordinary course.  503(c)(3) makes

2  sense when it's juxtaposed to 503(c)(1) and (c)(2), which

3  impose new and highly stringent standards to retention and

4  severance and then says at the end, but let me be clear if it's

5  not retention or severance you can do other things if the facts

6  and circumstances are appropriate.

7      That's how the statute works.  You can't look at it in

8  isolation and say, oh, it doesn't make sense because every

9  performance bonus or every bonus that you ever make is not --

10  is now going to pass muster under this.  That's not what it's

11  doing.  It's setting it apart from the retention and severance

12  provisions that are above it.

13      I think the ordinary course framework that the United

14  States Trustee posit is too narrow.  I don't think the question

15  that is being asked is, is this exact program the kind of

16  program that you always had?  I think it's asking whether you

17  normally reward performance.

18          THE COURT:  Well, I think there's an element of

19  truth in what the Debtor and the U.S. Trustee are arguing here.

20  And that is, looking at ordinary course, it seems to me that

21  you can look at a number of factors.

22      And one of them is, well, if you've changed plans in the

23  couple of months before bankruptcy, you know, how different was

24  the -- is the new plan from that which went before it?  And

25  that could be considered a factor to be looked at to determine

1  whether it was in the ordinary course.

2       Frankly, however, I think the more important circumstances

3  to look at in determining whether what happened in August of

4  last year was what were the circumstances in which the company

5  found itself and what were the reasons that it made the change?

6  And frankly, I don't think they were in the ordinary course of

7  their business.

8       They were in a financial circumstance and an industry

9  condition which necessitated a change in how employees were

10  incentivized.  And in a way -- I know there's an irony to it

11  because you would say, that's the responsible thing for a

12  company to do.  And I would tend to agree with that.  But

13  because the bankruptcy followed, you know, there's an overlay

14  that has to be considered.

15       And I think the overlay says, under -- arguably, under

16  circumstances like existed during the relevant periods both

17  pre- and post-petition here, it's better that we look to

18  503(c)(3) because again, while from a corporate governance

19  standpoint, it might have been the responsible thing to do,

20  from a pre-bankruptcy and bankruptcy standpoint you'd have to

21  say, well, under those circumstances, let's take a look and

22  apply the 503(c)(3) standard.  Now, that's not necessarily

23  fatal --

24            MR. BASTA:  I -- it --

25            THE COURT:  -- to the relief that's being requested

1  today, but based on the record that's -- the agreed record

2  that's been submitted and the arguments that have been made,

3  that's where I'm coming out on the ordinary course argument.

4          MR. BASTA:  Okay.  I'm not going to try too hard to

5  change your mind, but I will just note that corporations find

6  themselves, when they have to -- where they need to sell

7  assets.

8      And when they need to sell assets, they impose programs --

9  they insert programs in which they reward management for

10 getting more for the assets.  And sometimes they find

11 themselves in operational restructurings out of Court, and

12 sometimes they find themselves chugging along and want to make

13 it a -- just straight EBITDA target.  And that's how they

14 operate.

15     And in all of those instances, the transfers that are made

16 to those programs are rewarding performance.  And so when I

17 read 503(c)(3), I say to myself, well, what are you doing here?

18 Are you -- if you're rewarding performance, you know, whether

19 you're doing it by linking it to cost savings or asset sales

20 like they had in some of the other programs in the cases that

21 we've cited, or what the Calpine Court did -- all of these

22 things -- I didn't read the cases there to say you know, the

23 tailoring of this program to the unique aspects of the

24 restructuring destroy the ordinary course nature of what you're

25 doing.

1          THE COURT:  And I'm not saying in every case that

2   they would.

3          MR. BASTA:  Right.  Right.

4          THE COURT:  I'm just saying in some cases they may.

5          MR. BASTA:  Okay.  The second point that the United

6   States Trustee made, again, is on this discretion point.  And I

7   wanted to touch upon that.  I think Your Honor is correct in

8   saying that it has to be in there.  You know, there's a couple

9   things that that provision does.

10      One of the things that it does is when a particular

11  individual does not perform and does not get credit to the

12  element of the program based upon their individual objective,

13  that they cannot come then and make a claim against the

14  corporation claiming that there was an entitlement here under

15  the program.

16      The discretion has benefits, which if it's -- if the

17  discretion is exercised appropriately, then the implementation

18  of the program is done in a tailored way to reward those people

19  that do the job.

20      And what concerned me about the Trustee's comments was it

21  seemed to forget that corporations have to be run, and they got

22  to be run by people.  People with duties that the law imposes.

23  And the suggestion is that this provision of discretion -- the

24  comp committee is going to show up and say, you know what?

25  None of these metrics were met but -- ah, you know what?  Let's

1  just give these guys a pass and pay them.

2      I don't think that's an appropriate presumption to make

3  and I don't think that reading the Edwards deposition -- that's

4  the way that the comp committee here or in other corporations -

5  - and I know that Your Honor made remarks about the business

6  judgment standard, but again, if the discretion is being

7  exercised by independent people without a conflict of interest,

8  I don't think 503(c)(3) was supposed to eliminate the ability

9  of the board to make those kinds of compensation decisions.

10          THE COURT:  No, I don't think so either.  And here

11  you have the added protection of the bankruptcy --

12          MR. BASTA:  Of the bankruptcy --

13          THE COURT:  -- overlay and the scrutiny of the

14  committee, including others.

15          MR. BASTA:  The other point that the Trustee makes

16  is that our agreement with the Creditors to new metrics

17  invalidates the old metrics or suggests that the old metrics

18  were not -- I also don't agree with that --

19          THE COURT:  And I don't either.

20          MR. BASTA:  Well, then I won't spend any time on it.

21          THE COURT:  And -- no.  And there's -- the reason

22  that I don't agree with it is that again, and I -- in terms of

23  incentive plans that I've been asked to approve, I probably now

24  -- at least up until now -- have approved more payments on an

25  interim basis than I have on a long-term, going-forward basis.

1  And there are a couple reasons for that.

2      One is at least in the cases that I've had and to which

3  the new 503 applies, the situations have been volatile both

4  pre- and post-petition.  The Creditors Committee isn't formed

5  on Day One.  They're not informed on the day they're appointed.

6  This all takes time, yet at the same time there is a real need

7  to keep management moving forward to get hopefully to the

8  successful end of a Chapter 11 process.

9      So the payments can't wait -- the outcome of everybody's

10  review so sometimes it's by agreement, as it is in part here.

11  And sometimes it's over objection as it is in part here that

12  I've permitted interim payments under the appropriate

13  circumstances.  I've also conditioned them.  I've also denied

14  them in part.  I mean, no case as yet anyway has been the same

15  as the one which preceded it.

16      But I -- there's no negative in my view to what the

17  committee has agreed to here with the Debtor and that is, look,

18  as we've come along and as the circumstances has developed and

19  as you've proposed your business plan, we've decided that

20  there's a better set of metrics.  And now I -- that's actually,

21  I think, a positive development.

22          MR. BASTA:  In terms of the Trustee's comments

23  regarding the cost of the program.  I wanted to reiterate that

24  the proposed savings are 66 million in annual savings when you

25  consider that.

1            THE COURT:  Well, and when you compare this against

2   --

3            MR. BASTA:  Almost any other plan --

4            THE COURT:  And the annual sales of the company --

5            MR. BASTA:  No, it's modest.

6            THE COURT:  The number is, I think, that's a fair

7   characterization of it.

8            MR. BASTA:  I wanted to talk briefly about the UAW

9   objection and whether or not the 510 aspects of it and moving

10  the jobs to lower-cost places is a legitimate item.  I think it

11  is a legitimate item.  And it's refreshing in its specificity.

12  It -- you know, if you have it tied to EBITDA -- and I know

13  that's what the Creditors want -- but in terms of incenting

14  people to accomplish specific things, it's tailored.

15      It's like if I have my daughter and I tell my daughter

16  that the house is a mess -- pick it up and she'll say, well, my

17  brother made a mess.  But if I tell her, go clean up your room,

18  she'll say, oh, I understand that.  That's in my control.

19  That's what this program does, is it --

20           THE COURT:  Wait, you mean she just does that when

21  you tell her?

22      (Laughter)

23           MR. BASTA:  Oh, no, no.  She never -- no, no, no.

24  She watches TV.

25      So I really believe that it is a legitimate function and I

1  don't believe that the 510 program is an elimination of jobs.

2  It is -- it does eliminate jobs, but it is get the same amount

3  of work done with 510 less people to do it.  That's what the

4  challenge of the target requires.

5         THE COURT:  Yes.  And I tend to agree with the

6  Debtor on this.  And I'm not saying there isn't a circumstance

7  under which a job elimination incentive -- if in fact this plan

8  could be characterized that way -- wouldn't be -- wouldn't have

9  some evil about it.  But this record doesn't support that

10 conclusion.

11        MR. BASTA:  The last point, Your Honor, is the UAW's

12 suggestion that the 3.2 that are sought to be paid out is not

13 commensurate with the progress achieved.  I would note for Your

14 Honor that 510 is done.  It's in the bag.

15        And 1,041 of the 2,000 jobs have been moved to LCCs and

16 best in cost places.  And it's -- the company's under budget in

17 accomplishing the plan and so we believe that we have prevented

18 -- presented facts to suggest the levels of payments that we're

19 seeking to make are commensurate with the progress achieved.

20        THE COURT:  All right.  Thank you.  All right.  I am

21 prepared to make my ruling.  Was there anything further?  Okay.

22        I am going to overrule the objections and grant the relief

23 that's been requested and in addition to the reasons I've

24 already expressed in discussion with Counsel, it's clear to me

25 that based on this record, including the second Edwards

1  affidavit, that there are sufficiently identifiable guidelines,

2  basis on which to judge performance upon which these interim --

3  and I guess at this point I'll consider them one-time payments,

4  because the plan is proposed to be changed, and I'll address

5  that if and when the further motion is filed.

6      And that the Debtor here has demonstrated under the facts

7  and circumstances of this case that these payments are

8  appropriate and necessary.  I look also at the status of the

9  Chapter 11 -- the filing -- the Chapter 11 filing was made in

10  October of last year.

11      We're now at a point where it's clear to me the Debtor is

12  poised to move forward toward a proposal of a plan.  And it

13  seems to me that this might be yet the most critical time to

14  incentivize the covered employees to get to that step and

15  beyond.  I agree there was no evidence here of what the

16  industry standard is.

17      I frankly haven't developed a specific list of factors

18  that should be considered as Judge Lifland did in Dana.  Longer

19  I'm on the bench, I'm also convinced that there ought to be no

20  test that has more than five factors.  I guess except as higher

21  law tells me that I need to employ them.

22      I do think there's a reasonable cost involved here.

23  Performance is being rewarded.  The discretion that rests with

24  the compensation committee not only does not trouble me but I

25  think it's appropriate under the circumstances.

1      And it is regrettable that jobs are being lost here, but I

2  don't see any -- as I said, any evil in the plan that's --

3  under which these payments are being made that suggests that

4  that's an inappropriate incentive and guideline to be used in

5  determining whether these payments should be made.

6      So for those reasons, I'm prepared to grant the relief

7  that's been requested.  Do you have a question?

8          MR. HARRINGTON:  Just a clarification.  And I think

9  it was implied by your colloquy with Counsel.  But the approval

10  of the plan is under 503(c)(3) --

11          THE COURT:  It is, but --

12          MR. HARRINGTON:  Okay.

13          THE COURT:  I would tell you in this case it doesn't

14  matter because it satisfies -- I think that this record would

15  justify arguably both standards.  But in fact, I applied the

16  503(c)(3) standard.

17          MR. HARRINGTON:  Thank you, Your Honor.

18          MR. HIGGINS:  Your Honor, Roger Higgins for the

19  Debtors.  I do have a Form of Order that has been slightly

20  modified and if I could approach, we could then walk through

21  these modifications --

22          THE COURT:  Okay.

23          MR. HIGGINS:  -- that we made with the Committee.

24          THE COURT:  Have they been presented to others as

25  well?

1          MR. HIGGINS:  We made these changes in concert with

2     the Committee today, Your Honor.

3          THE COURT:  Okay.  Have the objectors seen --

4          MR. HIGGINS:  We -- they have not.  I'm happy to

5     share that with them, Your Honor.

6          THE COURT:  All right.  If you would.

7          MR. ALBALAH:  Your Honor, if there's nothing left on

8     the calendar other than this, would it be appropriate to ask to

9     be allowed to be excused?

10          THE COURT:  You may.

11          MR. ALBALAH:  Thank you.

12          MR. HIGGINS:  If I may approach, Your Honor?

13       (Pause in proceedings)

14          THE COURT:  Blackline.

15          MR. HIGGINS:  Your Honor, there were two specific

16     changes made -- one was language that we worked out with the

17     committee this morning to reflect the fact that the Debtors --

18     and it's at the top of page 2 -- the Debtors, the Creditors

19     Committee and the 2nd Lien Committee having agreed to the terms

20     of a revised Key MIP as described in the second motion -- the

21     Debtors, the Creditors Committee and the 2nd Lien Committee

22     having agreed that the revised Key MIP shall contain the

23     conditions set forth in Schedule 1 and the fact that the

24     Debtors have stated they intend to file a motion, which we

25     indeed do.

1    The next change obviously, Your Honor, is the Schedule 1

2  attached to the order and you will find that that reflects the

3  revised Key MIP metrics as set forth in the motion.  And those

4  are the changes.

5         THE COURT:  All right.  Either of the objectors have

6  any comments about the revised Form of Order?

7         MS. GISE:  No, Your Honor.

8         MR. HARRINGTON:  The only thing I would ask, Your

9  Honor, is -- one is just a reservation of rights that this in

10  no way inhibits our rights to object to the revised Key MIP

11  motion that comes out in May.  I don't think it does.  But I

12  just wanted to --

13        MR. HIGGINS:  We agree with that on the record, Your

14  Honor.

15        MR. HARRINGTON:  And the other thing is --

16        THE COURT:  Yes, well, I view the Schedule 1

17  conditions as the Debtor's promise not to do what they've done

18  anymore, but to change their ways to a different standard.

19        MR. HARRINGTON:  And Your Honor, the only other

20  thing is I think the order should be amended to reflect that

21  it's granted in its entirety in accordance with the statements

22  made on the record by the Court.

23        MR. HIGGINS:  Your Honor, we'd be happy with that

24  change.

25        THE COURT:  Very well.

1          MR. HIGGINS:  All right.

2          THE COURT:  Anything further for today?

3          MR. HIGGINS:  No, Your Honor, that concludes all the

4    matters before the Court today.

5          THE COURT:  All right.  Thank you.  That concludes

6    this hearing.  Court is adjourned.

7          MR. HIGGINS:  All right.  Thank you, Your Honor.

8       (Court adjourned)

9

10                         CERTIFICATION
11   I certify that the foregoing is a correct transcript from the
12   electronic sound recording of the proceedings in the above-
13   entitled matter.
14

15   *Lewis Parham*                              5/2/07

16   _____        _____
17   Signature of Transcriber                Date