IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| DURA AUTOMOTIVE SYSTEMS, INC., et al.,[1] | ) Case No. 06-11202 (KJC) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) Hearing Date: May 30, 2007 at 11:00 a.m. (EDT) |
| | ) |
| | ) Re: Docket Nos. 1105, 1163, 1174 and 1178 |

## DEBTORS' REPLY TO OBJECTIONS TO
## REVISED KEY MANAGEMENT INCENTIVE PLAN

The UAW's and the UST's objections to the Revised KMIP disregard what this Court recognized at the April 25, 2007, hearing:[2]

> there's no negative in my view to what the committee has agreed to here with the Debtor ... as we've come along and as the circumstances has developed and as you've proposed your business plan, we've decided that there's a better set of metrics. And ... that's actually ... a positive development.

*In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC), Hr'g. Tr. 55:16-21, April 25, 2007.

They similarly disregard the "hard fought negotiation" between the Debtors and their two creditor constituencies that refined the Revised KMIP metrics to provide more precisely targeted incentives for senior management to achieve certain goals designed to maximize creditor recoveries:

---

[1] The "Debtors" comprise the entities set forth in the Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Directing Joint Administration of the Debtors' Chapter 11 Cases, entered on October 31, 2006 [Docket No. 68].

[2] Capitalized terms used, but not defined, herein shall have the meaning ascribed to them in the *Debtors' Motion for Entry of an Order Authorizing the Revised Key Management Incentive Plan*, filed on May 10, 2007 [Docket No. 1105] (the "Revised KMIP Motion").

> MR. MAYER: [W]e looked at [the Debtors' business] plan and we negotiated targets based on that plan, which obviously cannot be made public. But that's pay-to-play, Your Honor. That is not pay-to-stay.
>
> THE COURT: So this plan passes the duck standard?
>
> MR. MAYER: Yes, Your Honor. We do not believe ... this [Revised KMIP] walks like a KERP and quacks like a KERP. This is a pay-to-play plan.

*Id.*, Hr'g. Tr. 30:23, 31:4, April 25, 2007.

### DEBTORS' RESPONSE TO THE UST AND THE UAW OBJECTIONS

**I.     THE CHAPTER 11 MILESTONES ARE APPROPRIATE INCENTIVE METRICS**

1.      Notwithstanding the closely negotiated - and precisely targeted - nature of the Revised KMIP, the UAW and the UST argue that the Revised KMIP for the Tier I Participants is, in large part, really a disguised retention plan. *Objection of UAW to Debtors' Motion for Entry of an Order Authorizing the Revised Key Management Incentive Plan* [Docket No. 1163], ¶¶ 6, 9 (the "UAW Objection"); *Objection of United States Trustee to Debtors' Motion for Entry of an Order Authorizing the Revised Key Management Incentive Plan* [Docket No. 1178], ¶¶ 4, 18 (the "UST Objection"). In particular, they both assert that a 25% payment upon delivery of the five-year business plan and a further 25% payment upon the Debtors filing a chapter 11 plan of reorganization do not constitute performance incentives - but are instead merely disguised retention payments. UAW Objection, ¶ 6; UST Objection, ¶ 18.[3]

---

[3] The UST's assertion that the business plan metric is a "slam dunk" because the business plan was "substantially complete at the time the revised KMIP metrics were agreed to by the parties" mis-apprehends the facts. In mid-April, when the Revised KMIP deal was struck, the 2007-08 operating forecast was complete - but substantial work on the five-year business plan remained to be done. That work is now - six weeks later - completed, and the business plan will be presented to the Creditors' Committee and Second Lien Committee on or about May 31, 2007.

2. These assertions contradict the well-established - and uncontroverted - facts of these chapter 11 cases.[4] Indeed, the Creditors' Committee proposed those two metrics in order to maximize their constituents' recoveries in these chapter 11 cases. The reasons why are straight-forward.

3. First, as counsel for the Creditors' Committee recognized:

> if this [business] plan is accomplished, it has certain positive connotations for recovery for Unsecured Creditors.

*In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC), Hr'g. Tr. 31:7-9, April 25, 2007. Unsurprisingly, the Creditors' Committee wishes to motivate senior management to deliver a realistic and well-conceived business plan - as quickly as humanly possible.

4. Confirming - and consummating - the resulting chapter 11 plan of reorganization - again as quickly as humanly possible - is similarly critical. Originally, the Creditors' Committee wanted a confirmation or consummation-based incentive payment. The Debtors were concerned that such a metric would have depended upon too many variables beyond senior management's control. Such exogenous variables necessarily attenuate a metric's incentive value.[5] The parties

---

[4] The UST made similar assertions - again ignoring the facts - in the *Nellson Nutraceutical* case about incentive payments being disguised retention payments. *In re Nellson Nutraceutical, Inc., et al.*, Case No. 06-10072 (CSS), Slip Op at 35 (Bankr. D. Del., May 24, 2007). In that case, the court approved incentive payments to senior management because they had done a "great job" even though certain financial goals were missed. *Id.* Indeed, the court agreed that it made "good business sense" to retroactively adjust those financial targets downward to permit a minimal incentive payment. *Id.*; *see also, infra*, at ¶ 13. Thus, it is clear that whether payments are incentive-based must be judged on the facts and circumstances of each individual case - and such payments may be made even if they have "some retentive effect." *Id.* at 36

[5] *See, e.g.*, Iman Anabtawi, *Explaining Pay Without Performance The Tournament Alternative*, 54 EMORY L.J. 1557, 1562-1566 (Fall 2005) ("Tying an executive's pay to market or industry-wide fluctuations over which he [or she] has no control does nothing to link that executive's pay to his [or her] own managerial performance. A more accurate measure of pay-performance sensitivity from the point of view of incentive compensation design is one that eliminates these external factors.") (internal citations omitted).

3

therefore agreed to making an incentive payment upon the filing of a chapter 11 plan "in contemplation of confirmation." Edwards Affidavit, ¶ 5 n. 4.

5.  Nonetheless, both the UAW and UST assert that providing incentives to management for filing a chapter 11 plan is inappropriate because "the *Debtors* are required to perform [that task] as part of their duties as chapter 11 debtors." UST Objection, ¶ 18 (emphasis added); *see also* UAW Objection, ¶ 6. That assertion completely misses the point.

6.  It ignores the value of expeditiously exiting from these chapter 11 cases - a goal that the Debtors have had, and clearly announced to this Court, since day one.[6] An expeditious chapter 11 exit is the best means of demonstrating to the Company's customers and other constituencies that they will have a viable and stable partner for the long haul.

7.  The chapter 11 plan filing incentive (to be paid only upon accomplishment) is thus particularly important because filing a confirmable plan will commence the final act of these chapter 11 cases - the confirmation and consummation process. Moreover, the chapter 11 plan filing incentive captures a myriad of related, critical-path tasks that must be pushed to conclusion in order to file and then confirm the chapter 11 plan:

- Completing the Company's ongoing operational restructuring efforts;
- Completing customer negotiations;

---

[6] Counsel for the Debtors stated:

> [O]ur plan for the case, Your Honor, basically, is to move as quickly as possible ... and to do so with the input of our financial and other stakeholders as well as our customers ... Simply put, Your Honor, automotive Chapter 11s are not fine wine. They don't get better with age, and we intend to move this case as quickly as we can, again, in consultation with our stakeholders."

*In re Dura Automotive Systems, Inc*, Case No. 06-06-11202 (KJC), Hr'g. Tr. 9:6-21, October 31, 2006.

4

- Completing various asset sales and other business rationalization efforts, the most important of which is the ongoing Atwood sale efforts; and

- Last, but certainly not least, negotiating an equity rights offering backstop mechanism prior to filing the chapter 11 plan.

8. These are difficult tasks that must be completed - and completed well - in order to set the stage for the final act. And the quicker that final act is commenced, the better. As the Debtors, the Creditors' Committee and the Second Lien Committee all agree, chapter 11 automotive cases do not get better with age. Thus, what better way to move that process along than to provide an incentive payment upon its completion?

9. Moreover, it is entirely appropriate to provide incentives to senior management to encourage superlative performance above and beyond a *debtor's* fiduciary duties. *In re Nobex Corp.*, Case No. 05-20050 (MFW), 2006 WL 4063024, at *3 (Bankr. D. Del. Jan. 19, 2006). In fact, it is incumbent upon the Debtors, as fiduciaries to their creditors, to extract the best possible performance from their senior managers in the discharge of those fiduciary duties - whether by maximizing estate value by improving an ongoing business, expeditiously completing a sale for the highest return to the estate or by developing and filing (and subsequently confirming) a complex chapter 11 plan of reorganization that depends upon an interlocking set of formidable tasks to be accomplished prior to that filing. *Nellson Nutraceutical*, Slip Op. at 34-35 (approving incentive payments for doing a "great job" even though financial goals were missed); *In re Werner Holding Co. (DE), Inc., et al.*, Case No. 06-10578 (KJC) (Bankr. D. Del.) (order entered December 27, 2006) (approving incentives for meeting EBITDA targets); *Nobex*, 2006 WL 4063024, at *3 (sale). And this metric provides an incentive for superlative performance of the vital goal of timely filing a confirmable chapter 11 plan.

## II.  THE EBITDA METRICS ARE INCENTIVES JUSTIFIED BY THE FACTS AND CIRCUMSTANCES

10. The UST and UAW argue that the structure of the third metric, which provides for payments based upon the Company meeting certain EBITDA targets, does not meet the "facts and circumstances" test set forth in section 503(c)(3). UST Objection, ¶¶ 14, 21-23, 27; UAW Objection, ¶¶ 7-9. What is more, they assert that there should a *per se* rule against incentive payments tied to performance goals below 100% of a particular business plan forecast. UST Objection, ¶¶ 14, 21-23, 27; UAW Objection ¶¶ 8-9.

11. Yet, the single case to which the UAW cites actually stands for the proposition that there should be no such *per se* rule. *In re Delphi Corp., et al.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. July 21, 2006). In *Delphi*, Judge Drain was concerned about providing an incentive to executives for attaining less than 100% of certain EBITDA performance goals when the debtor was embroiled in section 1113 and section 1114 actions that threatened to substantially roll back worker pay and retiree benefits:

> While, *normally, I would not pick out a provision like that, for a [bonus] plan like this*, I think, *in this particular context*, where the same business plan that is being presented to the workers as the basis for asking them for concessions is being used as the basis for the bonus targets, it does not seem to me to be fair to award a bonus for performance off of, or worse than, that business plan by 30 percent in this context.

*Delphi Corp.*, Case No. 05-44481, H'rg Tr. 251:21-252:8, February 10, 2006 (emphasis added). In other words, Judge Drain was making a special exception based upon the relevant facts and circumstances in that case by not approving incentive payments for EBITDA results below plan targets.

12. That exception - and the reasons therefor - highlight perfectly why the EBITDA metrics in the Revised KMIP are well-designed and appropriate for *these* chapter 11 cases. The

6

Debtors, the Creditors' Committee and the Second Lien Committee all recognize, in their judgment and based upon their intimate knowledge of the Company, that the 2007-08 operating forecast EBITDA targets are a particularly formidable (although not impossible) challenge. Indeed, this Court has approved as being appropriate under the facts and circumstances of a particular chapter 11 case certain incentive payments for achieving EBITDA results that were less than the original target. *See, e.g.*, *Werner Holding*, Case No. 06-10578 (order entered December 27, 2006).

13. And another bankruptcy court in this district just yesterday approved - again based upon the relevant facts and circumstances - an *after-the-fact* modification to an incentive plan - even though the debtor had failed to achieve even the lowest EBITDA target under its previous plan. *In re Nellson Nutraceutical, Inc., et al.*, Case No. 06-10072 (CSS), Slip Op. at 34-35 (Bankr. D. Del., May 24, 2007). It did so because, as the court found:

> the Debtors' failure to achieve those targets was not a result of any failure by the employees, who, in fact, had done a "great job." Thus, Mr. Dias testified that it made "good business sense" to modify the 2006 OCP to allow for payment of bonuses even though the Debtors missed their EBITDA target.

*Id.* at 35.

14. Here, there is significant risk that the Company could fall far short of its EBITDA targets. For starters, the targets are significantly higher than actual EBITDA results in the corresponding periods in 2006. Moreover, they are highly contingent on successful completing of the 50-Cubed Plan and an array of other restructuring initiatives. And the Company is operating in a highly turbulent automotive supply industry in which the conditions underlying the business plan could change - thereby thwarting even the best management performance.

15. The Creditors' Committee, the Second Lien Committee and the Debtors understand this risk. They therefore explicitly recognized, in formulating the EBITDA metric,

that exceeding even 80-90% of the EBITDA goals will be a considerable achievement, worthy of the full "Final Payment." Edwards Affidavit, ¶ 12. And exceeding 95% or more of the EBITDA goals will be a truly superlative achievement, worthy of an enhanced Final Payment. *Id.*

16.    In setting these goals, the Debtors exercised their considered business judgment - not in a vacuum - but in agreement with the two creditor stakeholder groups in these chapter 11 cases.

**[remainder of page intentionally blank]**

For the reasons set forth herein, the Debtors respectfully request the court overrule the UAW Objection and the UST Objection, and grant the relief requested in the Debtors' Revised KMIP Motion.

Dated: May 25, 2007  
       Wilmington, Delaware

Respectfully submitted,

*/s/ Daniel J. DeFranceschi*
Daniel J. DeFranceschi (Bar No. 2732)  
Jason M. Madron (Bar No. 4431)  
RICHARDS, LAYTON & FINGER, P.A.  
One Rodney Square  
920 North King Street  
Wilmington, Delaware 19801  
Telephone: (302) 651-7700

-and-

KIRKLAND & ELLIS LLP  
Richard M. Cieri  
Marc Kieselstein, P.C.  
Paul M. Basta  
Roger J. Higgins  
Ryan Blaine Bennett  
200 East Randolph Drive  
Chicago, Illinois 60601  
Telephone: (312) 861-2000

COUNSEL FOR THE DEBTORS AND DEBTORS-IN-POSSESSION