UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .    Chapter 11
                                .
DURA AUTOMOTIVE SYSTEMS, INC., .    Case No. 06-11202(KJC)
*et al.,*                        .    (Jointly Administered)
                                .
          Debtors.              .    May 30, 2007 (11:04 a.m.)
                                .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1           THE CLERK: All rise.  Be seated.

2           THE COURT: Good morning, all.

3           UNIDENTIFIED SPEAKER: Good morning, Your Honor.

4           MR. HIGGINS: Good morning, Your Honor.  Roger

5    Higgins for the debtors.  We have only one matter going

6    forward today, Your Honor, that is with respect to the

7    revised KMIP motion.  We will do that last in the agenda, but

8    I did want to run through the rest of the agenda and alert

9    you to some changes in the W.Y. Campbell retention order.  We

10   had a number of - a colloquy with the U.S. Trustee, and there

11   were a number of minor revisions made there that I'll alert

12   you to.  Item number 1, the Fagan motion to lift the stay has

13   been continued.  Teleflex, item number 2, has also been

14   continued as has the automatic stay relief motion of Atlas

15   Copco.  Item number 4, which was a motion for a protective

16   order, the motion was withdrawn.  We worked out with the U.S.

17   Trustee a means of redacting the agreement, and that has been

18   filed on the docket.  That brings us to the uncontested

19   matters - for each of the uncontested matters we did file

20   certificates of no objection and the first one being the

21   motion for entry of an order authorizing the debtors to

22   assume certain unexpired leases.  We did submit the order.  I

23   have another copy of the order here.

24           THE COURT: The order's been signed.

25           MR. HIGGINS: All right, great.  Thank you, Your

1   Honor.  Second one is the motion to extent exclusivity

2   through the 30th of September.  Again we filed a CNO for that,

3   and I have an order here.

4           THE COURT: That order has been signed as well.

5           MR. HIGGINS: And then the next item, which is

6   number 7 is W.Y. Campbell, and if I may approach, Your Honor

7   -

8           THE COURT: Yes.

9           MR. HIGGINS:  - we do have a blackline.

10          THE COURT: Thank you.

11          MR. HIGGINS: The changes we made to this order,

12  Your Honor, reflect, as I said before, a colloquy with the

13  U.S. Trustee, made a number of minor adjustments.  The first

14  change is, we made the application - we changed on page 2 the

15  fact that the application is hereby granted with the words

16  added "subject to the provisions herein".  The next part was

17  that the W.Y.C. success fee and the fees payable would be

18  subject to review under § 328 for all parties except for the

19  U.S. Trustee, and the U.S. Trustee would have § 330 review,

20  and the words were "except the U.S. Trustee shall retain the

21  right to object to the transaction fees and/or minimum

22  monthly fees based upon the reasonableness standard provided

23  in 11 U.S.C. § 330 with the further understanding that

24  reasonableness for this purpose shall not be evaluated

25  primarily on an hourly or length of case criteria".  Your

1    Honor, the indemnification provisions were changed on page 3

2    in item (B) and the words were "liability to the debtors

3    arising from a breach of the engagement letter" were added to

4    the carve-out from the indemnification.  On page 4, we had a

5    couple of changes.  The first being there was an ordinal

6    paragraph stating that the following provisions shall be

7    deleted from paragraph (4) of Exhibit B to the engagement

8    letter, words to the effect, "provided that in no event shall

9    the aggregate contribution of all such indemnified parties

10   exceed the amount of fees received by Campbell under the

11   agreement".  And the next paragraph says that, "§ 10(d) of

12   the engagement order" - or "the engagement letter shall not

13   be construed in any way to define or limit W.Y.C.&C.'s

14   fiduciary obligations as a retained professional under

15   § 327(a) of the Bankruptcy Code".  And, the last ordinal

16   paragraph to be added says words to the effect, "that in the

17   event the debtors seek to extend the scope of W.Y.C.&C.'s

18   engagement beyond that related to the hinges and latches

19   business, the debtors shall provide 10 days' advance written

20   notice of such amendment to counsel for the U.S. Trustee, the

21   Creditors Committee, and the Second Lien Committee".  I did

22   want to add two items that we said we would put into the

23   record, Your Honor.  The first being that W.Y. Campbell has

24   agreed to provide a supplemental affidavit providing

25   additional description of a pre-existing engagement by a non-

1    debtor German entity, a subsidiary of the debtors' Dura

2    Holding Germany GMBH relating to the sale of a German plant,

3    plant in Germany owned by Dura Holding GMBH.  And the last

4    item with regard to W.Y. Campbell is the U.S. Trustee wanted

5    a representation on the record clarifying the minimum monthly

6    fee, and we are clarifying that for purposes of W.Y.

7    Campbell's compensation.  The minimum monthly fee of $250,000

8    in the aggregate is to apply only when there is no

9    transaction consummated.  In any case, where a transaction is

10    consummated and W.Y. Campbell consequently earns its

11    transaction fee, no minimum monthly fee will be owed or paid.

12    And I believe that addresses all the concerns of the U.S.

13    Trustee with respect to the W.Y. Campbell order.

14        THE COURT: All right.  The only question I had

15    relates to § 10(L).

16        MR. HIGGINS: This is of the engagement letter, Your

17    Honor?

18        THE COURT: Yes.  It refers to an existing agreement

19    - well, engagement letter, dated August 22, 2006, which shall

20    remain in effect.  What's the subject of that engagement

21    letter?

22        MR. HIGGINS: That engagement letter, Your Honor, is

23    the letter relating to the sale of the German plants.

24        THE COURT: Okay, so, it concerns an engagement,

25    however, that I take is now concluded but as amended by the

1   provision here.

2          MR. HIGGINS: I'm sorry, Your Honor.  The German

3   letter is - that engagement is over.  The U.S. entity, Dura

4   Operating Company, was a party to that letter, however, they

5   are not liable for any fees under that engagement letter.

6   That was part of the deal struck with W.Y Campbell.

7          THE COURT: And I see there's a reduction of the

8   fee.

9          MR. HIGGINS: Exactly, Your Honor.  That letter

10  remains in force and solely with respect to Germany Holdings

11  GMBH.

12         THE COURT: All right, that answers my question.

13  Does anyone else care to be heard in connection with this

14  application?

15         MR. HARRINGTON: Your Honor, William Harrington from

16  the Office of the United States Trustee.  Counsel for the

17  debtor has correctly stated our agreement on the record.

18         THE COURT: All right, thank you.

19         MR. HARRINGTON: Thank you, Your Honor.

20         THE COURT: That order has been signed.

21         MR. KIESELSTEIN: Thank you, Your Honor.  Good

22  morning, Your Honor, Marc Kieselstein for the debtors.  Your

23  Honor, the last item on the agenda is our revised KMIP

24  motion.  First, Your Honor, in terms of ground rules, similar

25  to the last hearing, Your Honor, the parties have agreed that

1  the evidentiary record would be limited to the affidavit of

2  Mr. Edwards, the chair of the Dura Comp Committee.  Your

3  Honor, we might also ask the Court to take judicial notice of

4  the prior motions and the prior affidavits, but I don't think

5  we'll need to go there.  Mr. Edwards is, once again,

6  available on the phone should the Court have any questions,

7  and we would, once again, look to proffer his affidavit at

8  the conclusion of my argument in lieu of live testimony.

9  Your Honor, as to the substance, I will try to be brief

10  because much of this falls into the category of *deja vu* all

11  over again.  Your Honor will recall that the debtors are

12  engaged in an operational restructuring.  You've heard it

13  referred to 50Q and 510 program.  That program was designed

14  to reduce costs, increase efficiency while enhancing quality

15  and reliability, and Your Honor is well aware that prior KMIP

16  motions and payments have been pegged to measurable progress

17  in that operational restructuring.  Your Honor, this motion

18  represents a creditor-driven and agreed to refinement of

19  those metrics for the senior most participants in the KMIP

20  and the point of these refinements, Judge, is to translate

21  the operational improvements into two things.  First,

22  tangible progress in these Chapter 11 cases toward an

23  expedited exit and second, insuring that the operational

24  improvements are driven to the bottom line and actually

25  translate into financial improvements for the benefit of

1    stakeholders.  Again, Your Honor, these refinements were the

2    product of a healthy dialogue with the Creditors Committee

3    and the Second Lien Committee and in fact were required as

4    the price of peace, if you will, for the last KMIP motion not

5    being objected to by those parties, and you'll again recall

6    that in the last KMIP motion the payments and arrears, if you

7    will, on the operational improvements were authorized by this

8    Court.  Your Honor, we fully understand the desire of the

9    creditors to have the operational metrics translated into

10   something more tangible for them, more realizable for them in

11   the near term, especially for the senior-most people in the

12   company, and so we were comfortable with that approach and

13   agreed to it as a predicate to going forward with this motion

14   for additional and future payments, Your Honor.  So we are in

15   agreement today with the Creditors Committee and with the

16   Second Lien Committee, but perhaps predictably, we have two

17   objections, once again, from the United Auto Workers and the

18   United States Trustee's Office, Your Honor, and those

19   objections basically fall into two categories.  First, Your

20   Honor, there's an argument that because the debtor and its

21   management has an inherent fiduciary duty to proceed to a

22   plan of reorganization at some point and that embedded within

23   that task is to develop a five-year business plan, that the

24   parties should not be incented or awarded for doing what his

25   or her fiduciary duty already requires.  Your Honor, we think

1    that argument falls into the proves-too-much category.

2    Obviously debtors and managers have a fiduciary duty to

3    maximize value for creditors, nonetheless, it's not unusual,

4    in fact it's commonplace to incent those managers to go about

5    achieving those broader fiduciary goals in such a way as to

6    create more value sooner for key stakeholders.  So that's a

7    threshold issue.  There's no authority cited whatsoever for

8    the proposition that there should be no compensation or

9    incentive payments made pegged to the filing of a plan of

10   reorganization or the delivery of a five-year business plan,

11   and again, that's logical.  These are important tangible

12   benchmarks for a debtor to try to achieve and to achieve in a

13   certain way in a Chapter 11, and it's not surprising or

14   illogical that creditors would want to peg these sorts of

15   payments to those types of milestones being hit.

16        THE COURT: Well, without in any way challenging the

17   proposition that they're necessary or that they're tangible

18   and identifiable, you know, another thread that runs through

19   consideration of incentive plans is, at least since the '05

20   amendments, arguably, that shouldn't necessarily have changed

21   the subject I'm about to discuss.  They don't seem like much

22   of a reach.

23        MR. KIESELSTEIN: Well, I would say, viewed as a

24   vacuum, saying filing a plan is not much of a reach.  Well,

25   sure, I mean, I could file a - you know, we could file a ten-

1  page skeletal plan tomorrow with no substance.  I would note

2  the agreement that we had with the creditors, there was a

3  footnote to that agreement that made clear that a plan that

4  was to be filed needed to be done without a view toward

5  confirmation.  Translation of that, they thought is, don't

6  file a placeholder and think you're going to get 25 percent

7  of this KMIP paid out for the senior most people.  That would

8  be a breach of the spirit and presumably letter of the

9  agreement.  We have no intention of doing so.  This plan

10  metric is against the backdrop of the debtor having worked

11  very hard and feverishly, really, to try and accomplish a

12  great deal so we can make the early exit that we've talked

13  about since the first day of this case, Judge, and underlying

14  that is, again, the operational restructuring, the

15  development of a five-year business plan that's going to be

16  presented tomorrow to both the Creditors Committee and to the

17  Second Lien Committee, customer negotiations that are ongoing

18  pursuing an at-with divestiture, and pursuing a rights

19  offering that would underlie the capital structure we'd like

20  to see it exit.  So this is not some, you know, casual stray,

21  file a plan, collect $500,000 and not pass go type of

22  construct.  There's a context here which is, I think,

23  critically important to understanding why there is a great

24  deal of work involved in getting to the point that we need to

25  get to to collect on that benchmark, if that's responsive,

1    Your Honor.  And again, the five-year business plan itself

2    has been the product of numerous months of intensive work by

3    the company and its consultants to transform the footprint of

4    the company going forward and to generate a business plan

5    that will, frankly, be attractive to customers, and it will

6    attract capital in the marketplace.  So, these are not throw

7    away metrics by any stretch of the imagination.

8            THE COURT: And I don't mean to minimize the efforts

9    given the state of this industry that are required to put the

10   company in a place where it can be successful.

11           MR. KIESELSTEIN: So, I would suggest, if it were

12   the first day of the case and in a vacuum we were suggesting

13   there ought to be some reward for filing a plan of

14   reorganization, I could see where that might raise some

15   eyebrows, but that's not our situation.  And again, I think

16   the Creditors Committee, the Second Lien Committee are

17   vigilant in guarding the interests of their constituents and

18   if they thought they were just giving us an easy ticket to

19   punch, they probably wouldn't have gone there.  So, Your

20   Honor, that's really the first objection that was filed.  The

21   second objection is that this plan contemplates payment even

22   if the debtor does not hit a 100 percent of its EBITDA target

23   going forward and that somehow there ought to be a binary

24   world where you get the pad if you get a hundred percent, and

25   if you don't hit a hundred percent, you don't get anything.

1   I don't think that's how life works.  It's certainly not how

2   the automotive industry works.  I know the UAW cited to the

3   unpublished order of Judge Drane (phonetical) in Delphi.  We

4   obviously read the transcript and that was a very unique

5   situation and in fact Judge Drane himself noted that he would

6   not usually latch onto this type of provision, but given the

7   unique juxtaposition in that case where you had the debtor on

8   record as saying that they were going to be asking their

9   employees for a 50 percent cut in their wage and benefit

10  package and that they were going to be commencing their 1113

11  litigation literally days after the hearing on the incentive

12  program, that under those circumstances where you had a very

13  emotionally charged atmosphere, that the juxtaposition of

14  bonuses, if you hit 70 percent of your EBITDA targets with 50

15  percent wage cuts for employees was perhaps not the right way

16  to go about getting that 1113 process which is, after all,

17  meant to be consensual in the end, that was not the way to

18  get the ball rolling.  Judge Drane was very careful to say,

19  you can come back later and if you can tell me, you know, why

20  you missed the target then we could always revisit the issue,

21  but that was a unique set of circumstances.  And Mr. Edwards

22  is on the phone, and I'm loath to have him testify on the

23  phone, but we did look into it in response to the objection

24  that we got from the UAW and in fact, it's commonplace in

25  Dura's history to have payouts when less than a hundred

1    percent of the targets were hit, and again, it's sort of a

2    commonsense reaction that if you're trying to do something

3    challenging you're putting up challenging and not lay-up type

4    benchmarks that if people come very close to that, that that

5    should suffice.  Here, in fact, the creditors had no issue

6    with actually augmenting the size of what everyone has agreed

7    is a modestly-sized program here, so that if you got to a

8    hundred percent of the EBITDA targets, which are formidable

9    here given recent trends, that there would be additional

10   money paid out because the creditors wanted there to be a

11   sufficient incentive to try and clear that very high bar.

12   But even if we were to hit 80 to 85 percent of the EBITDA

13   targets, the Creditors Committee is, I think, of a view, and

14   Mr. Mayor will speak to this I believe, that that would be

15   sufficient to underlie the type of plan of reorganization

16   that we have contemplated that would allow us to emerge from

17   bankruptcy and have his constituents with a very significant

18   stake in the enterprise.  So, from their perspective they're,

19   you know, cold, straight-ahead perspective, hitting the 80 or

20   85 percent would be a good outcome.  So I don't believe

21   there's any authority really for the per se rule that the UAW

22   suggests which is if you don't hit a hundred percent, you get

23   nothing.  So I think both of the objections here simply don't

24   past muster, Your Honor.  I think whether one looks at this

25   under a business judgment standard, under the enhanced

1    business judgment standard that Your Honor spoke about last

2    time, we think this is actually not a close call.  I don't

3    think last month was a close call either, but if you had to

4    pick between the two, that was in our view a much closer call

5    than this one is having moved along and made more progress in

6    the case.  I would also note that a recent Nellson opinion,

7    very recent, it just came out last Thursday, which talked

8    about revisiting a metric or recognizing the appropriateness

9    of paying out to management even if a hundred percent of a

10   target is not hit because of exogenous circumstances.  And

11   we're in the auto industry here, Your Honor.  Conceivably,

12   and we hope not, you could have an announcement by one of the

13   big three, as they've done periodically over the last couple

14   of years, announcing that they're going to cut production of

15   a certain model or models, and if that were to happen, Your

16   Honor, that's something we have zero control over, and that

17   could make it impossible to get to the hundred percent

18   because you simply aren't selling enough parts because

19   they're not making enough cars.  You can nonetheless be

20   hitting on all cylinders for what it is we're trying to

21   accomplish, but under the UAW's construct, there would be no

22   payment in those circumstances, and we don't think that's

23   proper business judgment.  We don't think that's the way that

24   things have to be or should be.  So, Your Honor, in sum, we

25   think that these metrics are formidable but attainable.  We

1   think they strike the right balance.  The stakeholders with

2   the most skin in the game think it strikes the right balance.

3   These are not disguised retention lay-ups that anyone could

4   easily satisfy, and therefore, we would ask that the motion

5   be granted.

6          THE COURT: How about specifically the U.S.

7   Trustee's Tier One payment objection?

8          MR. KIESELSTEIN: Your Honor, again, I think, as I

9   understand -

10          THE COURT: I understand that that may be subsumed

11   within the two objections that you've described.

12          MR. KIESELSTEIN: I think it basically is.  I think

13   that as - maybe I missed something in their objection.  I

14   think the basic thrust of their objection is that these are

15   really, once again, retention payments, again because, you

16   know, debtors file plans and debtors deliver business plans

17   and that this is really just a way of pay to stay rather than

18   paying them to accomplish or effectuate anything, and we

19   don't think the record bears that out at all in this case.

20   If there's anything specific in their objection that I need

21   to address, Your Honor, besides that, I'll let them speak.

22          THE COURT: All right, thank you.

23          MR. KIESELSTEIN: Thank you.

24          THE COURT: All right, let me hear from anyone else

25   in favor of the relief that's being requested today.

1           MR. MAYOR: Thank you, Your Honor.  Thomas Moors

2    Mayor of Kramer Levin Naftalis & Frankel LLP for the Official

3    Committee of Unsecured Creditors.  Your Honor, at the last

4    hearing, I confirmed that if this does not quack like a KERP

5    and that remains our view.  If I may borrow a phrase from

6    Judge Lifland (phonetical), we took a holistic approach to

7    the compensation in this case, and I think it's appropriate

8    to review the history of how this compensation program has

9    evolved.  We initially objected to the payment of the big

10   five, if you will, and delayed it until further conversations

11   could take place.  We commenced a litigation against payment

12   of the big five from taking discovery, which was halted by

13   this particular deal, and I think you need to take both the

14   filing of the plan and the business plan and the targets in

15   the context of the history of this case, that it's important

16   to the Committee.  You will recall that we asked for the two-

17   year look forward, the preliminary business plan to be filed

18   under seal because we wanted a benchmark.  So to take the

19   issues of this is all within the debtors' control and these

20   things are therefore controllable targets, that's not quite

21   right.  If you look at what happened here, where the

22   creditors can be - prefer to have a compensation program that

23   says you have to file a business plan which we in our sole

24   discretion that we like?  Of course we would like that, but

25   that's not a negotiated solution.  Similarly, we would like

1    to have a condition that says, You have to file a plan which

2    we in our sole and absolute discretion like, but the debtors'

3    management is not going to agree to that either.  So what do

4    you have here?  You have a record where we had an initial

5    objection and they gave us the two-year plan which we filed

6    under seal as a benchmark frankly because we liked the two-

7    year plan.  Now we have a five-year plan, which we have been

8    preliminarily briefed on.  Based on that preliminary

9    briefing, we agreed not to object to the extension of

10    exclusivity for four and a half months.  So the history of

11    this case, Your Honor, is that the Committee is focused on

12    managing for value, managing for recovery and, frankly, what

13    we've seen is that the debtors' management has been doing

14    that.  Of course that could change.  We'll come back and yell

15    about it if it does.  But both the business plan target and

16    the history of this case what you're seeing is the

17    development of a business plan that the Creditors Committee

18    is cautiously in favor of in terms of the plan of

19    reorganization because they have to file in contemplation of

20    a plan.  If it's a fake plan, we'll be back in court, we'll

21    be yelling about it, but the dynamic of the case is that

22    there is progress here.  There was a two-year plan which we

23    were optimistic about.  We have a preliminary look on a five-

24    year plan that we're optimistic about.  They have a four and

25    a half month extension of exclusivity to get to a

1    confirmation on a timetable that we are cautiously optimistic

2    about, and all of these things are management to enhance

3    recoveries which in our view is what 503©) is there to do,

4    and we took a holistic view of these elements in order to

5    sign off on the 25 percent payable upon a business plan,

6    which we get officially tomorrow; 25 percent payable upon

7    filing of a plan of reorganization, which we anticipate

8    within the next four and a half months; and the balance on

9    the EBITDA targets.  Now, Your Honor, I submit that the U.S.

10   Trustee's argument that you shouldn't be paid just for

11   hitting targets, it's only half an argument because anybody

12   can set targets high enough such that 80 percent is a real

13   achievement, and anybody can set targets low enough such that

14   a hundred percent is no achievement at all.  The question is,

15   were these targets negotiated?  And the answer to that

16   question is, yes.  The chair of the Creditors Committee and

17   one other Creditors Committee member flew out to Detroit

18   while the deposition was taking place to negotiate these

19   targets and these represent the Committee's view as to what

20   are reasonable targets for this debtor to achieve, and based

21   on that holistic approach, on the history of the case, and

22   the way it has been proceeding, the Creditors Committee

23   supports the debtors' motion to approve payment.

24          THE COURT: Thank you.  All right, let me hear from

25   the objectors.

1          MR. HARRINGTON: Good morning, Your Honor.  William

2     Harrington from the Office of the United States Trustee.

3     Your Honor, when we filed our objection, we were very

4     cognizant of your prior ruling, and we tried to narrowly

5     tailor our objection to address the issues we think were

6     still present by this negotiated settlement, and I don't

7     disagree with debtors' counsel that the objection is two-

8     fold.  In our first objection, I think if you read our

9     papers, was primarily concerned with respect to the retention

10    aspect of this plan, which, I think, you can break directly

11    down the middle.  I mean, 50 percent is paid for what is

12    arguably an incentive portion and 50 percent is paid for what

13    is arguably a retention portion.  And so, that's what we

14    tried to address, and we've limited our objection to the Tier

15    One employees because they are the only employees covered by

16    these new metrics.  The Tier Two employees are still running

17    under the old metrics that effectively Your Honor approved at

18    the last hearing.  So we didn't continue our objection with

19    respect to the Tier Two employees.  Your Honor, with respect

20    to the Tier One employees, I think there's no argument that

21    the Tier One employees are insiders, and so, I won't even

22    address that issue because I think that issue is undisputed.

23    The question, Your Honor, with respect to the retention

24    aspects, which I would characterize as the filing of a

25    business plan or the presentment of a business plan to the

1   Committee in the filing of a plan of confirmation.  Your

2   Honor, an incentive is getting someone to go above and beyond

3   the call of duty.  When your call of duty requires you to

4   file a plan to inherently satisfy your fiduciary obligations

5   and to get to a confirmation you have to file a business plan

6   to move along that track, you're not doing anything above and

7   beyond the call of duty.  You're doing what you are required

8   to do, and so there's no incentive in that.  So if there is

9   no incentive it effectively has to be a retention plan.

10  There can't be any other purpose to it in keeping these

11  employees employed through that time period and working along

12  the goals they are required to perform.

13          THE COURT: Well, some companies have been known to

14  enjoy the warmth of a Chapter 11 proceeding and sometimes

15  have been accused of not being in any hurry to exit.  Now,

16  most Chapter 11 debtors will say, you know, We don't really

17  like being here.  We're here because we have to be.  But I,

18  you know, it's possible that there could be a situation even

19  with the new deadlines that, you know, a company might choose

20  to languish a little bit.  So, in concept it seems to me that

21  - Well, as I said to debtors' counsel, I don't know that

22  necessarily we would consider the development of the business

23  plan and the filing of a confirmable Chapter 11 plan a reach,

24  it could be an incentive.

25          MR. HARRINGTON: Your Honor, I think that can be

1   answered.  In effect, there is no deadline.  There is no

2   deadline that they receive the 25 percent if the presentment

3   of the business plan is accomplished by May 31st, and if the

4   plan of confirmation is filed by August 30th, and there's no

5   component that creates, you know, a quicker process or an

6   expedited process that if Your Honor's contention is that you

7   should be incentivized to move the process along faster,

8   that's not included in this plan.  There's also nothing

9   included as to what has to be in the five-year business plan

10  or what has to be in the plan itself.  Now, debtors' counsel

11  has argued that, you know, presumably it would be a breach of

12  the agreement if they don't file a confirmable plan, but what

13  does that mean?  There's nothing in the plan saying X has to

14  happen with respect to the plan that is being filed or X has

15  to happen with respect to that five-year business plan.  So,

16  while arguably, you know, the spirit of the agreement would

17  be breached, the agreement itself wouldn't be breached, and

18  what Your Honor is approving today is the agreement.  Your

19  Honor, with respect to the five-year business plan, I think

20  we have another issue which is essentially done.  I mean,

21  it's going to be presented to the Committee tomorrow.  So, we

22  have no going-forward incentive.  I mean the incentive has

23  been accomplished, and again, as I said before, there's no

24  requirement of what's in that business plan.  Also, with

25  respect to the plan of confirmation, there, you know, if the

1    spirit of the agreement is breached by the filing of, you

2    know, just a placeholder plan, you've still accomplished what

3    is required under the agreement.  So I think there's no

4    incentive component.  So if there's no incentive component,

5    again, I would argue that it's effectively a retention plan.

6    It forces these employees to be employed for the period to

7    accomplish the tasks they are required to perform.  Your

8    Honor, with respect to the second part of our objection,

9    which is more towards the arguably incentive portion of this,

10   I understand, Your Honor, it's a negotiated settlement, but

11   it's a negotiated settlement that strays from the company's

12   prior practices, and, Your Honor, it was our agreement to

13   rely on the record.  I would ask Your Honor to take judicial

14   notice of the deposition testimony of Mr. Edwards that was

15   made part of the record at the last hearing where Mr. Edwards

16   testified that in his experience the company had never

17   approved a financial based performance incentive plan where

18   someone was paid a hundred percent of their bonus for meeting

19   less than a hundred percent of the target.  What we have

20   here, Your Honor, is a bonus program where if you hit a

21   hundred percent of the target you receive your bonus plus,

22   and so we've completely changed the playing field from the

23   historic practice that the debtor had enjoyed pre-petition.

24          THE COURT: And why is that a bad thing?

25          MR. HARRINGTON: Well, Your Honor, the argument is

1   that these are formidable targets.  Mr. Edwards also

2   testified that pre-petition this was done at a hundred

3   percent because the shareholders expected the debtors to meet

4   their targets.  So, inherently, those were formidable

5   targets.  So why should the playing field change now that we

6   are in bankruptcy to lower the bar when outside of bankruptcy

7   you had a higher bar and this company performed historically

8   to meet that challenge?  Now we are asking them to fail

9   essentially by 20 percent and still get their bonus.

10  Historically, we had asked them to meet their projections,

11  which were formidable because the shareholders required them

12  to be, and now we're in bankruptcy and so now we're arguing

13  that it's not as necessary to meet the formidable targets.

14          THE COURT: Well, another way to look at it, and the

15  debtor didn't use these words exactly, but the way I tend to

16  look at it is that the industry continues in its state of

17  volatility.  Players in the industry continue to be - well,

18  continue to struggle in light of the circumstances.  So, as

19  the debtor did say, you know, there are things which are

20  happening which are beyond its control and which might impact

21  whether targets could be hit completely apart from the

22  efforts given by those who are subject to the incentive

23  payments.  Now, the other way to look at the latter is that

24  the debtor's chosen to describe it in terms of well, if you

25  get a hundred percent you get this.  If you hit less than 80

1    percent, you get that, which is, I think, not something

2    anyone apparently anticipates, but it's that little range,

3    it's that range in between, but if you hit a certain amount

4    you get a certain amount.  You don't get the full amount.

5    So, it's a way of incentivizing performance but rewarding the

6    performance even though it doesn't hit a hundred percent.

7    Now, I don't see anything inherently wrong about that.  You

8    know, in your view, you would propose an all or nothing

9    thing.

10             MR. HARRINGTON: No, Your Honor, I don't see it

11   inherently wrong with creating a tiered structure, and I also

12   don't see anything wrong with creating a structure where, you

13   know, you increase the payments based on performance.

14             THE COURT: Then what's the flaw in this structure?

15             MR. HARRINGTON: My concern, Your Honor, is the

16   historical practice was that you received a hundred percent

17   payout for a hundred percent of the target.  We've now

18   lowered the bar.  So we're arguing that our pre-petition

19   projections were less aggressive than our post-petition

20   objections.  Now they're formidable.  I don't know what they

21   were pre-petition.  They had to meet the shareholders'

22   expectations pre-petition.  So I assume they were formidable

23   then.  So if your historical practice is to set the bar at a

24   hundred percent for a hundred - at least a hundred percent

25   for a hundred percent payout, why do you now get the benefit

1   in bankruptcy when Congress has made clear its intention

2   that, you know, payments to senior management should be

3   scrutinized intensely, should we be lowering the bar now that

4   we're in the bankruptcy context.

5        THE COURT: But see, I think you're talking about

6   apples and oranges.  The fact that Congress has required

7   courts to give greater scrutiny to these things, has nothing

8   to do, I think, with comparing pre- and post-petition

9   practices.  I guess there are circumstances under which that

10  might be relevant as if, for example, the day before the

11  filing the debtor has a plan that's called a retention plan

12  and renames it and offers the same plan for approval in the

13  bankruptcy.  Okay, I guess, pre- and post-petition practices

14  might be relevant in that circumstance, and there would be

15  others that you could think of without too much trouble, but,

16  you know, often the fault of management, in and out of

17  bankruptcy, is that it doesn't react quickly enough to

18  changes in the industry and in the market or doesn't see them

19  far enough in the distance to be able to make changes to

20  address them before they can be harmful to the company.

21  Here, the company and its creditor body are saying - well,

22  part of the creditor body are saying, Look, we're trying to

23  react to how the situation is now and to incentivize

24  employees based upon what's happening now and what we hope

25  will happen in the future.  They're reacting to current

1   events.  It seems to me that's - not to do that would be a

2   bad thing.

3       MR. HARRINGTON: And I don't disagree with you, Your

4   Honor, but I think they also did that outside of the

5   bankruptcy context and outside of the bankruptcy context they

6   had to meet their projections.  Their projections were

7   arguably - I mean, under the standard, you're arguing that

8   the projections are more credible outside of the bankruptcy

9   context than they are inside because now you have to fail to

10  meet your standard to get your hundred percent payout whereas

11  pre-petition you had to meet your projections to get your

12  hundred percent payout.  So I think it is relevant to whether

13  this payout is justified by the facts and circumstances, and

14  I think you have nothing else to look for except historical

15  practices.  And so, if you look at this company's, which is

16  the best evidence of historical practice, their payout used

17  to be targeted at a hundred percent.  Now their hundred

18  percent payout is not targeted at a hundred percent and the

19  distinction is we're now in a bankruptcy context.  There's

20  been no evidenced placed that these projections are more

21  robust than the projections the company was required to file

22  in the pre-petition world.  And I think if there was evidence

23  of record that, yes, now we have more formidable or more

24  robust projections which give us a requirement now that 80

25  percent is equivalent to what a hundred percent used to be, I

1   think you could justify it, and without that type of

2   evidence, I think, arguably, it's not justified by the facts

3   and circumstances.

4          THE COURT: All right.  Thank you.

5          MR. HARRINGTON: Thank you, Your Honor.

6          MS. KAUFMAN: Good morning, Your Honor.  Susan

7   Kaufman for the UAW.  With me today is Babette Ceccotti of

8   the firm of Cohen Weiss & Simon in New York.  A motion for

9   her admission *pro hac vice* was filed with the Court.  I do

10  not know whether the Court has entered the order on that or

11  not, so I am moving her admission orally today.

12         THE COURT: All right, thank you.  Welcome.

13         MS. CECCOTTI: Thank you and good morning, Your

14  Honor, and I will try to be brief and not to repeat the

15  arguments by Mr. Harrington as I'm sure the Court appreciated

16  the union raised virtually the same two issues.  And I guess,

17  again, I'll try to respond to some of Mr. Kieselstein's

18  remarks as well.  The UAW also believes that in one way or

19  another, and here we are focusing on the Tier One group.  We

20  consider the Tier Two group to have been covered by Your

21  Honor's last order and like the U.S. Trustee we are trying,

22  you know, to keep current on all of the rulings in this case

23  on this subject.  With respect to the Tier One payout

24  schedule, in one way or another we are really talking about

25  an event, and with respect to the first two payments, they

1   really do focus on delivery and filing and not achievement.

2   Now, why do we think that that's not truly an incentivizing

3   event?  I think even given the state of the cases in this

4   area and as counsel for the UAW we've seen, you know, any

5   number of them go in any number of different directions.

6          THE COURT: That's really the difficulty I find.

7   Everything's all over the place.

8          MS. CECCOTTI: Well, understood, Your Honor, but I

9   think that that doesn't mean that we turn delivery events

10  into incentives under 503©), and here's why: First, I'm glad

11  that Mr. Kieselstein clarified the footnote about filing the

12  plan in contemplation of confirmation because, frankly, I

13  wasn't really sure what that meant, but I think what it shows

14  here is that given the flexibility in Chapter 11 and given

15  the fact that you can have anything going on in a case

16  whether it's in a troubled industry or not, people have

17  gotten used to the concept of a placeholder plan or something

18  that you would file that, you know, maybe it was going to

19  have to be amended or modified even in significant respects.

20  And I think that the statute allows that but that is a very

21  different thing than saying, Okay, now we're going to

22  actually just take straight Chapter 11 101, we're going to

23  file a plan in contemplation of confirmation, and that

24  becomes now a new thing that we're going to call an incentive

25  to get a payment for senior executives under an executive

1    comp plan.  So I think we have to be careful and we should

2    really, with a new enactment by Congress, which speaks to a

3    particular concern that I really don't think we can ignore,

4    and Congress doesn't want us to ignore.  So on the one hand,

5    we have a flexible Chapter 11 process that people have gotten

6    sort of comfortable with, but that doesn't mean you take that

7    flexibility and all of a sudden say that filing a plan now

8    becomes an incentivizing act that is worth of making a plan

9    an incentive plan and not an retention plan or some other

10   just let's pay the executives type plan.  I think the same

11   can be said with respect to the delivery of the business

12   plan, and here again, we sit on the Creditors Committee.  We

13   know how hard our professionals have worked back and forth

14   with the company on these issues, and we're not trying to

15   take anything away from their efforts which have been

16   considerable and commendable, but here again, we are talking

17   about the give and take between a Creditors Committee and a

18   debtor and that can take many different forms, and there can

19   be many sort of avenues that that path can take during the

20   course of a case.  So while I think that sitting as a member

21   of the Creditors Committee we think it's a good thing that

22   the creditors are going to hear the business plan tomorrow, I

23   don't know that delivery in and of itself, even considering

24   the challenges that Mr. Mayor spoke about, I don't think that

25   as a matter of law, given again a clear pronouncement from

1   Congress that that means that the mere delivery of a plan

2   gets senior executives of a company 25 percent of their

3   potential bonus payment.  So I think again, we have to be

4   careful here when we're talking about what does the statute

5   mean and what is sort of Chapter 11 dynamic; right, that I

6   think we would all agree here has been very flexible (a) over

7   time, and (b) allows for any number of relationships, a give

8   and take between the debtor and any number of constituents.

9   So that the sort of negotiation between the Committee and the

10  debtors about which, you know, I'm not going to give anything

11  away, they got the Committee to that point today is simply

12  one example of a committee - two committees and a debtor

13  reaching a particular accommodation about how a case is going

14  to be conducted.  Should that be as a matter of law an

15  incentive giving rise to 25 percent of a bonus payment for

16  senior executives?  We say as a matter of law, the answer to

17  that should be no.

18            THE COURT: And I don't necessarily disagree with

19  that proposition.  It seems to me that process is important

20  and if the process has been as it's been described, that's a

21  fairly traditionally reliable way of evidence that the right

22  economic result has occurred because those parties who

23  arguably might have the most at stake in the proceeding, have

24  come to a place where presumably reasonable business people

25  have arrived in light of the various circumstances and

1   dynamics.  Now, I guess that's not always the case because

2   accommodations are reached for different reasons sometimes,

3   and it's often difficult for the Court to figure out what the

4   reason is other than what might be the obvious.  But even if

5   the process has been as it should be, I agree, I still need

6   to look at the result, and does the result past muster under

7   the Bankruptcy Code?

8           MS. CECCOTTI: Agreed, and I guess there what I

9   would simply emphasize again, is that the triggering

10  mechanism for the payment is delivery and filing not any

11  particular result.  Let me just make a couple of other points

12  about the target issue, and I guess actually it's relevant to

13  this issue as well because I think as the Nellson

14  Neutraceutical's case that debtors have cited shows, this

15  case is not like that case because in this case the debtors

16  are looking ahead to various - looking ahead and sort of

17  using the potential uncertainty to justify, to kind of beef

18  up or underscore, if you will, the incentive nature of the

19  delivery mechanisms.  In the Nellson Neutraceutical's case,

20  the adjustment was made retroactively in 2007.  Everybody

21  looked back and said, Gee, you know, because of circumstances

22  beyond our control, we should really readjust these because

23  the Judge there found that everybody really did work hard and

24  everybody - these things were just simply beyond, you know,

25  beyond everybody's control.  And so, there is a material

1    difference, I think, between looking ahead into the future

2    and trying to say, Well, this is - We're just trying to take

3    into account the things that might or might not happen in the

4    future, and therefore, if we keep on this really, you know,

5    sort of speedy path that we're on, we will have done a good

6    thing and saying, we'll look at it retrospectively and we'll

7    say, What is the result?  How did the creditors do?  How did

8    the whole relationship of dynamic play out in terms of

9    recovery, in terms of operational success, in terms of, you

10   know, the panoply of things that would go into having a

11   confirmable reorganization plan?  And making an assessment at

12   that point based on what has occurred as opposed to

13   speculation based on the fact that we're in a tough industry

14   and this case could zig or it could zag.

15          THE COURT: Well, let's go with that for a moment.

16          MS. CECCOTTI: Sure.

17          THE COURT: Here the debtor and two important

18   constituencies in the bankruptcy have said, If you give us a

19   five-year plan, we think that should trigger the first

20   payment.  You say, Well, we haven't seen it yet.  You don't

21   know if it's going to be any good, but the Committee and the

22   Second Lien Holders are apparently willing to trust the

23   debtor based on a preview that is far enough along that it

24   ought to serve as a basis.  What do you think ought to be the

25   trigger?

1        MS. CECCOTTI: It seems to me that if the notion of

2   a case in a tough industry is the backdrop here, that you

3   really don't know what's going to happen, and again, I'm

4   going to make a distinction here between the fact that these

5   are senior executives that we're talking about here versus

6   the junior participants because I think the junior

7   participants are probably in a slightly different place, but

8   to me if you're talking about payments to senior executives

9   who presumably were hired because they are qualified to run a

10  company in a tough industry and take it through that

11  industry's tough times, then it seems to me you look at the

12  end and you say, What has happened here?  You don't find

13  ways, which is really what this looks like to me, you don't

14  simply find ways to pay them.   They're already being paid.

15  They're presumably, again, sophisticated bargainers for their

16  own compensation coming in.  These are not the junior

17  participants.   We are talking about senior executives, and

18  they are in a position, one would expect, to have the smarts

19  and the qualification to be at the head of a company.

20        THE COURT: Well, the argument typically is, not

21  just in this industry but in others, is that executive

22  compensation is set in such a way that all of the intended

23  compensation or expected compensation is never in just the

24  wage.   There are always other components, and the argument

25  here would be that in the framework of the Chapter 11, we

1   pick other components tied to the 11.  I don't see that as in

2   a concept as an illegitimate process.

3       MS. CECCOTTI: Well, I guess my reaction to that

4   would be if there is an issue with executive comp at that

5   level, it should just be handled as a compensation issue not

6   as simply a way to devise a program that's going to somehow

7   past muster under rules that Congress has made.  I mean, it's

8   - granted I can imagine the compensation consultants were all

9   scratching their heads when this law went into effect, and

10  everybody's been scrambling since it's gone effective to

11  figure out ways to deal with this type of a law in the

12  executive comp environment which I would agree with you

13  certainly does tend to favor incentives over just, you know,

14  payment for showing up.  I think that's a comp - a debate

15  that happens, you know, outside of bankruptcy and is under,

16  you know, a good deal of fire now in its own right, just

17  putting aside anything that 503©) happened to overlay on it,

18  but again, if there's a compensation issue, then it should

19  just be dealt with as a straightforward matter of

20  compensation instead of through the vehicle of coming into

21  Bankruptcy Court and trying to figure out ways to just pay

22  more money to the executives because that's - and again, you

23  know, I listened very carefully to your dialogue with Mr.

24  Harrington on the targets, and I guess my response on the 80

25  percent versus, you know, what they get at 80 and 85 and a

1   100 and a 110, is that it's - again, it's a way to look like

2   we can just get money to people.  I'm not, again, taking

3   anything away from the efforts of the Committee to negotiate

4   the targets.  I think it probably bears a general observation

5   that these things are happening in real time and the Court

6   has heard any number of these motions and probably has a very

7   good feel for what has gone on vis-a-vis the Committee and

8   the debtors regarding the issue of the targets, but

9   notwithstanding all of that effort it is still, you know,

10  based on imperfect information and a negotiated resolution,

11  not the best that either side could have gotten.  So, again,

12  I don't - It doesn't - To me, looking at the schedule there,

13  the somewhat convoluted schedule, what that says to me is,

14  this is a way to pay the executives more money and why don't

15  we just do it in a straightforward way and through whatever

16  vehicle normally occurs when compensation is being

17  negotiated?

18          THE COURT: I think the short answer there is

19  because nobody would agree to that.

20          MS. CECCOTTI: Well, again, I don't think that we

21  can take a statute and ignore it, and it seems to me that the

22  payments here are not consistent with what Congress intended,

23  and I think it's quite clearly the case, particularly again,

24  if we are relying on attributes of a Chapter 11 case.  For

25  example, targets that are, you know, that have a range and

1    that, you know, may or may not be met for any number of

2    reasons, again, having nothing to do with factors that even

3    these folks can control, but again, the place to look at that

4    would be, in my view after the fact, I have every expectation

5    that at the end of the case there will be some sort of

6    management plan that becomes, you know, stapled to the

7    reorganization plan.  We'll be looking at it anyway.  So, in

8    any event, I think the only other point I wanted to - Again,

9    I was just, I would just underscore the fact that we're

10   talking here about the senior executives and that this is -

11   everything that we've just discussed here should really be

12   taken in the context of senior executives who, again, are

13   expected to perform at a particular level or they wouldn't be

14   senior executives.  Thank you.

15            THE COURT: So -

16            MS. CECCOTTI: Yes.

17            THE COURT:  - is it fair to say that you do not

18   object to payment under the Tier Two part of the plan?

19            MS. CECCOTTI: Again, Your Honor, I think that we

20   looked at your rulings on the issues that we had raised with

21   respect to Tier Two, and we believe that you overruled our

22   objection last time, so we didn't want to belabor the point.

23            THE COURT: All right, thank you.

24            MR. KIESELSTEIN: Your Honor, I'm just going to hit

25   a few points and sit down.  Your Honor, with respect to Mr.

1   Harrington's argument, he made a couple of points I want to

2   respond to first, that the delivery of the business plan is

3   tomorrow, therefore by definition it's not incentivizing.

4   Obviously these new metrics were developed and agreed to some

5   six to eight weeks ago with the Creditors Committee and while

6   people don't want to presume anything, people were working

7   toward that goal and in fact the prior motion on prior orders

8   were paying - came in arrears and I guess you can always get

9   into the - do a loop of, well, if you come in and it's done

10  already by definition you've missed the boat.  I don't think

11  that's the way it should work.  With regard to this hundred

12  percent issue, I really think we're kind of saying the same

13  thing.  It's a presentation issue.  When the metrics were

14  revolutionized and we went from operational to EBITDA

15  candidly the company's reaction was, Well, if you want us to

16  stay at a hundred percent of these EBITDA targets, you know,

17  and then the creditors agreed, we candidly think the more the

18  money ought to be put into this, you know, rather modest

19  plan.  So a hundred percent to us gets us a hundred percent

20  of the payout and 80 percent gets us the amount that was in

21  the KMIP before but not a hundred percent.  Third, I think

22  Ms. Ceccotti's argument really points out the danger of per

23  se rules.  We're not in here arguing that it's a matter of

24  law.  Delivery of a plan is by definition sufficient to

25  justify the payment of a KMIP instalment in every case.  In

1   many cases it may be entirely inappropriate and when we talk

2   about just delivery, all right, we're not planning on

3   dropping off, you know, the local hometown newspaper on the

4   doorstep.  Hopefully it will be the Sunday Times, Your Honor.

5   That's what we're anticipating and candidly, however, in

6   artful the language was with a view toward confirmation, I

7   don't actually know what that means either other than I hope

8   most plans are filed with a view towards confirmation.

9   There's obviously an understanding about what that means.

10         THE COURT: Well, arguably they're supposed to be.

11         MR. KIESELSTEIN: They're supposed to be, Your

12   Honor, they're supposed to be.  But as Mr. Mayor pointed out,

13   not in all of its details.  They haven't signed off on a plan

14   and we haven't agreed to file, you know, a specific plan.  It

15   will be comprehensive in detail though, that I can say.  With

16   respect to the Nellson case, I understood - we knew that that

17   would get turned on us a little that oh, that just shows,

18   you look back at the end and that works just fine.  That's

19   not incentive in our view.  What that case stands for is a

20   recognition perhaps that flexibility ought to be built into

21   these plans on a front end to account for these types of

22   exogenous developments that may, you know, cause someone to

23   miss their targets but yet still have every legitimate

24   entitlement to some payout.  With regard to - I think when

25   you asked Ms. Ceccotti the question, How would you structure

1   it?  I took her answer to be one that's probably better

2   addressed down 70 miles south in the halls of Congress which

3   is, there shouldn't be any triggers for senior executives.

4   There simply shouldn't be incentive plans or retention plans,

5   whatever.  You leave it in the hands of the - in essence, the

6   new board or you build it into your plan of reorg, the

7   management equity plan.  It's sort of a trust me approach.

8   You deliver a good result, you'll get taken care of at the

9   end of the day.  I don't think that that would be a

10  competitive benchmark to establish in bankruptcy where it's

11  hard enough to attract people in any event.  Certainly,

12  that's not the way the world works outside of bankruptcy.

13  So, Your Honor, I think, unless you've got any further

14  questions, those are the few points I wanted to make.

15          THE COURT: I have no questions, thank you.

16          MR. KIESELSTEIN: Thank you.

17          THE COURT: Briefly.

18          MR. HARRINGTON: Very briefly, Your Honor.  I just

19  wanted to address the Nellson Neutraceutical issue.  I guess

20  first and foremost, it's not a final order yet.  That opinion

21  came out last week, but we still have our appeal rights with

22  respect to that order.  And also, Your Honor, we were dealing

23  with an ordinary course bonus program.  So it's not subject

24  to the same standard.

25          THE COURT: So that opinion shouldn't mean anything

1    for the year or two it will take the District Court to decide

2    it?  That's not a criticism of the District Court, but, you

3    know, let me be clear about that.

4          MR. HARRINGTON: Well, Your Honor, also in that case

5    we were dealing with an ordinary course plan.  Judge Sontchi

6    found that that was an ordinary course plan, and we're

7    outside of that context here, so I think that can be

8    distinguished on that basis as well.

9          THE COURT: All right.

10         MR. HARRINGTON: Thank you, Your Honor.

11         THE COURT: Although I will say, while I may end up

12   agreeing with lots of different parts of that opinion, I know

13   I agree with the part in which Judge Sontchi says, I will

14   read 503©)(1) to preclude - or the subject to those

15   requirements plans primarily, which are for the purpose of

16   retention.

17         MR. HARRINGTON: I believe that's consistent with

18   your prior order.

19         THE COURT: It is.  It is.  All right.  I'm prepared

20   to make my ruling.  As we said during the argument, it just -

21   there are just so many permutations of circumstances and of

22   proposed plans.  Parties continue to be creative, and I don't

23   necessarily view all those creative efforts as end runs

24   around or attempted end runs around what Congress wanted.  I

25   view them largely as efforts to try to fit into the box that

1  Congress has built, and there are so many interests involved.

2  I do think it's important, if not dispositive, but at least

3  important that the process that's been described here with

4  the negotiations takes place, and I think that can sometimes

5  weigh in favor of determining that when constituencies like

6  those here who are in support of the relief that's been

7  requested favor it, that there's been some important and

8  meaningful vetting of the interests involved.  On the other

9  hand, I agree - I do agree with the UAW here that there

10  shouldn't be - and the debtors also said, there shouldn't be

11  a per se rule that per se triggering events like the

12  development of a business plan or filing of a Chapter 11 plan

13  - of a confirmable Chapter 11 plan should or shouldn't mean

14  anything one way or the other.  I suppose there's a reason

15  why the parties have agreed to leave the evidentiary record

16  in the hands of an affidavit, and it's not that it's a bad

17  affidavit, but it makes for a very thin evidentiary record, I

18  will say.  So, in applying a 503©)(3) standard, which I will

19  apply here, it seems to me that the record supports - and

20  there is unanimity even if it was earlier decided over

21  objections, that the Tier Two payments can be approved, and I

22  would be willing to do that, but I don't think on this record

23  the debtor has demonstrated that the Tier One payments, as

24  they've been structured, at least the first 50 percent of

25  them, are necessary under the facts and circumstances of this

1   case.  Now, I say that being fully mindful of the efforts of

2   the debtors' management that are required to pull a company

3   of this size successfully through a Chapter 11 proceeding in

4   an industry which is facing the challenges that it's facing

5   are substantial, and my ruling today is in no way a comment

6   on the quality or quantity of those efforts.  I simply feel

7   that on this record, I'm constrained to make that decision.

8   Now, what does that mean?  Well, what it means is, the debtor

9   wants to present a final order approving the Tier Two

10  payments.  I will sign it.  It means also that the decision

11  denying the relief that's requested with respect to Tier One

12  is without prejudice for the debtor to come back with a

13  redesigned plan and/or, you know, maybe a little later when

14  the plan's been - when the business plan's been produced and

15  the Committee can come forward and say, We've reviewed it in

16  detail, and we like it, and we think it can form the basis of

17  a plan.  That, I think, would weigh more heavily toward

18  approving such a payment.  I don't know what to say in terms

19  of giving any guidance about whether the filing alone of a

20  Chapter 11 plan is enough.  On this record, I don't think it

21  is.  All right.  Are there any questions?

22       MR. KIESELSTEIN: Your Honor, I'm loathed to ask

23  Your Honor where it is you think we've come up short in terms

24  of a Chapter 11 plan.  Obviously, the business plan we'll

25  deliver will presumably form - or will form the basis for the

1   Chapter 11 plan.  We know what that business plan says, and

2   we expect we can come back in very short order with the

3   comfort level you're seeking with respect to the business

4   plan metric.

5           THE COURT: You know, I guess, maybe the same

6   dynamic would apply, and I'm not going to make a pre-ruling -

7           MR. KIESELSTEIN: Sure.

8           THE COURT:  - when the plan is filed.  I mean if

9   the plan is filed and, you know, the Committee is either a

10  co-sponsor or the debtor can say at the disclosure stage that

11  the Committee is onboard, you know, and it represents an

12  arrangement that's been made, you know, with the major

13  constituencies, you know, maybe I would feel differently, and

14  the look back - Because I know that efforts have to be

15  undertaken in order to get there, the look back scenario

16  doesn't trouble me.  I've approved it before in at least one

17  other case - because I, you know, I understand that dynamic,

18  but I tend to agree with the objectors here that it's just

19  not enough under these circumstances and on this record.

20          MR. KIESELSTEIN: Well, the irony, Judge, I guess,

21  is, you know, we find ourselves a bit between a rock and a

22  hard place.  These process milestones were - we were content

23  with the metrics we had before, Your Honor.

24          THE COURT: I know.

25          MR. KIESELSTEIN: And these process metrics were a

1   requirement by other constituencies to measure our progress

2   given the facts that they knew and the context that we were

3   operating in because we also understood that in a vacuum it's

4   not necessarily a meaningful act.  So, having gone there, we

5   feel a little bit like we're being, you know, punished for

6   cooperating in that extent because it does leave a void.

7          THE COURT: No, and I, you know, again, as with

8   respect to company's management, you know, what the Committee

9   and the Second Lien Holders have done here is the right thing

10  and what the debtor has done is the right thing.  It just

11  doesn't on this record meet the Code requirement, at least in

12  my view.  I will tell you, if I could write one opinion that

13  would just set a framework for all of these things, I'd set

14  everything else in my life aside and just do it.  But, you

15  know, there's so many permutations and so many different

16  circumstances that one just doesn't get it done.  I wish I

17  could give you more guidance.

18         MR. KIESELSTEIN: No, I appreciate what you did give

19  me, Your Honor.  I would ask one other clarifying question.

20  The EBITDA metrics, those are separate, obviously, and

21  distinct benchmarks that we think we've made our case for -

22         THE COURT: I think you have.  I think they past

23  muster, but I'm not going to - As with many things, I'm not

24  going to - without the debtor asking for it, approve pieces.

25  I mean I just - I say, the relief you can have or not have,

1   but how you want to come back to me with parts of it is up to

2   you.

3          MR. KIESELSTEIN: Well, we would certainly propose

4   coming in with an order modifying our proposed order that

5   says, as to the EBITDA metrics, those thresholds are

6   approved.  The others are denied without prejudice, and then

7   at least people are incented and know what they're working

8   toward with regard to EBITDA.

9          THE COURT: I would be willing to approve such an

10  order on this record.

11         MR. KIESELSTEIN: Okay.  That's all I've got, Your

12  Honor, thank you.

13         THE COURT: Okay.

14         MR. KIESELSTEIN: If that's all on this matter,

15  there was one other matter I wanted to mention briefly before

16  we concluded, Your Honor.

17         THE COURT: All right, let me ask whether anyone

18  else cares to be heard or has a question in connection with

19  the incentive motion before we leave it.  Okay.

20         MR. KIESELSTEIN: Your Honor, as I indicated, we did

21  give a preview of the business plan to both the Unsecured

22  Creditors Committee and the Second Lien Holder Committee last

23  week: Tuesday, to the Unsecureds; Wednesday, to the Second

24  Lien Holders.  There were published reports, Your Honor, of

25  an unusual, say we say, spike, at least in our view unusual,

1  spike in the price of certain of the debtors' securities late

2  on Wednesday insofar as we can tell.  We're obviously looking

3  into that, Your Honor.  We obviously want to treat material

4  non-public information appropriately.  We expect all the

5  constituencies to do the same.  To the extent that we have

6  concerns that that may not be happening, Your Honor, we

7  obviously may be back before this Court.  I don't want to

8  really say anything more about it, but since it's gotten

9  press notice, I thought it bears at least a mention, and we

10  may have further activity on that down the road.

11        THE COURT: All right, well, you know where to find

12  me.

13        MR. MAYOR: Your Honor, Tom Mayor for the Creditors

14  Committee.  We support what Mr. Kieselstein said to the

15  extent existing bondholders were picked off by people who had

16  information.   Those were our creditors who were taken

17  advantage of, and we would support the debtors' efforts to

18  get to the bottom of that.  Thank you.

19        (The remainder of this page is intentionally left

20  blank.)

21

22

23

24

25

1        THE COURT: All right, thank you.  Anything further

2   for today?

3        MR. KIESELSTEIN: Nothing further, Your Honor.

4        THE COURT: That concludes this hearing.  Court will

5   stand in recess.

6        (Whereupon at 12:17 p.m., the hearing in this

7   matter was concluded for this date.)

8

9

10

11

12

13

14

15

16

17

18        I, Elaine M. Ryan, approved transcriber for the

19   United States Courts, certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter.

22

23   /s/ Elaine M. Ryan                    June 1, 2007
     Elaine M. Ryan
     2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221