UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In the Matter of: | ) | Case No.: 06-11202 |
| | ) | |
| | ) | |
| | ) | Wilmington, Delaware |
| DURA AUTOMOTIVE SYSTEMS, INC., | ) | June 28, 2007 |
| et al. | ) | 1:36 p.m. |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:                    MARC KIESELSTEIN, ESQUIRE
                                ROGER J. HIGGINS, ESQUIRE
                                Kirkland & Ellis, LLP
                                200 East Randolph Drive
                                Chicago, IL 60601-6636


                                NEIL BERGER, ESQUIRE
                                Togut, Segal & Segal, LLP
                                One Penn Center
                                New York, NY 10119


                                DANIEL DEFRANCESCHI, ESQUIRE
                                Richards, Layton & Fingers, P.A.
                                One Rodney Square
                                920 North King Street
                                Wilmington, DE 19801


For Debtors'                    DURC A. SAVINI, ESQUIRE
Investment Banker:              Miller Buckfire & Company
                                250 Park Avenue 19th Floor
                                New York, NY 10017


For Second Lien                 TERRI BROWN-EDWARDS, ESQUIRE
Group:                          Potter Andersen & Corroon, LLP
                                Hercules Plaza
                                1313 North Market Street
                                Wilmington, DE 19801

```
APPEARANCES:              (CONTINUED)

                          DAVID ALBALAH, ESQUIRE
                          Bracewell & Giuliani, LLP
                          1177 Avenue of the Americas
                          19th Floor
                          New York, NY 10036-2714


For AlixPartners:         SHELDON TOLL, ESQUIRE
                          Sheldon S. Toll, PLLC
                          200 Town Center, Suite 2550
                          Southfield, MI 48075


For Committee for         THOMAS MOERS MAYER, ESQUIRE
Unsecured Creditors:      DOUGLAS MANNAL, ESQUIRE
                          Kramer Levin Neftalis & Frankel, LLP
                          1177 Avenue of the Americas
                          New York, NY 10036



                          BLAKE CLEARY, ESQUIRE
                          Young, Conaway, Stargatt and
                          Taylor, LLP
                          The Brandywine Building
                          1000 West Street
                          17th Floor
                          Wilmington, DE 19899


For United States         WILLIAM K. HARRINGTON, ESQUIRE
Trustee's Office:         Office of the Trustee
                          884 King Street
                          Room 2207
                          Lockbox #35
                          Wilmington, DE 19899-0035


Audio Operator:           JASON SMITH


Transcribed by:           DIANA DOMAN TRANSCRIBING
                          P.O. Box 129
                          Gibbsboro, New Jersey  08026-0129
                          Office:  (856) 435-7172
                          Fax:     (856) 435-7124
                          E-mail:  dianadoman@comcast.net
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

<u>I N D E X</u>

| ARGUMENT: | PAGE NUMBER |
|---|---|
| By Mr. Keiselstein | 5 |
| Mr. Mayer | 14, 17, 39, 43 |
| Mr. Harrington | 16, 50, 55, 58, 61 |
| Mr. Higgins | 28, 40, 45 |
| Mr. Albalah | 37 |
| Mr. Toll | 52 |
| Mr. DeFranceschi | 57 |
| Mr. Cleary | 59 |
| Mr. Berger | 62 |
| Ms. Cannon-Geary | 63 |

1      (The following was heard in open court at 1:36 a.m.)

2                THE COURT: Good afternoon, all.

3                ALL: Good afternoon, Your Honor.

4           MR. KIESELSTEIN: Good afternoon, Your Honor,

5      Marc Kieselstein, Roger Higgins, Dan DeFranceschi on

6      behalf of the debtors.

7                Your Honor, we did file an amended agenda

8      letter late yesterday afternoon.  We understand the

9      agenda letter may have lack clarity in certain respects

10     for which we apologize, Your Honor, and will work to

11     remedy that going forward.

12               Your Honor, one suggested change on the order

13     of matters today, Mr. Mayer has a personal matter in

14     New York which he would like to get back to as soon as

15     he's able, and we were hoping to take up Items 11, 12

16     and a portion of Item 16, that is the Committee's

17     motion with respect to release of certain information,

18     their motion to shorten notice and the first interim

19     application with respect to Committee professionals,

20     we'd like to take that up directly after Item Number 5,

21     which is the renewed payment motion if that's all right

22     with the Court?

23               THE COURT: That's okay with me.  That's okay

24     with me.

25           MR. KIESELSTEIN: Okay.  I'll just proceed

1    with the agenda then, Your Honor.

2               THE COURT: Okay.

3               MR. KIESELSTEIN: Your Honor, we have a couple

4    of continued matters.  Item 1, motion for

5    administrative expense claim by Teleflex.  That's been

6    continued to the July 24th omnibus hearing.

7               Item 2 is our relief from stay of motion by

8    Atlas Copco.  That has also been continued to July

9    24th.  And, Your Honor, I'd also note that Item 9,

10   which is the lift stay motion by Mr. Fagan.  That has

11   also been continued by agreements to the July 24th

12   hearing.

13              Your Honor, that takes us to the uncontested

14   matters, the first of which is the debtors' motion to

15   enter into a settlement agreement with Nissan North

16   America.  Your Honor, Nissan is one of the company's

17   customers.  We did originally file along with this

18   motion a motion to seal the actual agreement that was

19   being entered into.  At the request of the U.S.

20   Trustee, we withdrew that motion to seal, and filed a

21   redacted agreement.  We understood the Court requested

22   and we provided a copy of the full agreement to the

23   Court, and, again, no objections had been filed, but

24   we're happy to address any questions the Court might

25   have on this motion.

1          THE COURT: Well, not now that I've seen the

2     full agreement.  Now, just as a general matter, I don't

3     think I've ever approved an agreement that I haven't

4     seen the complete version of.

5          I guess you should never say never, but it's

6     hard for me to envision a circumstance in which I

7     would.

8          MR. KIESELSTEIN: Well, understood, Your

9     Honor.  And, candidly in retrospect we should have

10    filed their redacted agreement in addition to the

11    sealed motion, as opposed to in lieu of, so we'll make

12    sure that does not reoccur, Your Honor.

13         THE COURT: Okay.  Now, I have reviewed the

14    agreement, and I have no questions.  Does anyone else

15    care to be heard in connection with this matter?

16         I hear no response.  Okay.  Do you have a

17    form of order?

18         MR. KIESELSTEIN: Yes, Your Honor.  May I

19    approach?

20         THE COURT: Yes.  Now, with respect to the

21    agreement, complete agreement, it's been supplied to

22    chambers, there is no pending motion to seal, is that

23    correct?

24         MR. KIESELSTEIN: That's correct, Your Honor.

25         THE COURT: So, I mean I'm content to return

1     it to you if you'd like.

2            MR. KIESELSTEIN: That's fine.  Thank you very

3     much, Your Honor.

4            THE COURT: That order has been signed.

5            MR. KIESELSTEIN: Thank you, Your Honor.

6            Your Honor, that takes us to Item 5 on the

7     agenda.  This is the debtors renewed motion for

8     approval of a KMIP metric related to delivery of a

9     five-year business plan.  As the Court undoubtedly

10    recalls, Your Honor, our previous motion was denied

11    with respect to this particular metric without

12    prejudice, and we were given an opportunity, which we

13    appreciate, to re-file the motion this time with more

14    evidentiary heft, and we've attempted and endeavored to

15    do that, Your Honor.  And we tried to lay out in great

16    detail, Your Honor, the process that was utilized to

17    build a business plan.  Again, we believe that process

18    was methodical and meticulous.

19           We also specify the intense involvement of

20    senior management in the process of building that

21    business plan.  And, again, as the Court recalls, we

22    originally had strictly operational metrics tied to the

23    KMIP, but at their request or the insistence really of

24    the Creditor's Committee, we converted some of those

25    metrics for the senior most people from operational to

Mr. Kieselstein - Argument                    8

1      process based.  And, again, the reason for that quite

2      logical, the stake holders wanted to see that

3      operational improvements would translate into enhanced

4      recoveries for those holders on an expedited time

5      frame.

6           Your Honor, we're very pleased that we were

7      able to persuade the United States Trustee and the UAW

8      not to object to the renewed motion, and we appreciate

9      their accommodations on that score.

10          Your Honor, we believe that what we filed

11     clearly demonstrates, and when I say, what we filed,

12     I'm talking specifically now about the redacted

13     Flanagan affidavit that was filed last week.  We

14     believe that clearly demonstrates that under the facts

15     and circumstances of this case, that this particular

16     metric delivery of a five-year business plan is

17     justified under Section 503, Your Honor.

18          And let me just take a moment on the Flanagan

19     affidavit.  The original Flanagan affidavit, which was

20     accompanied by a motion to seal was extremely fact

21     intensive and detailed, and included candidly in an

22     abundance of caution in light of Your Honor's comment

23     last month, copy of the business plan itself, as well

24     as specific information related to facilities, facility

25     closure and EBITDA numbers that could be traced to

1    particular initiatives.  And we went in, again, into

2    that level of detail because we wanted to be as

3    responsive as we could to the Court's concerns as set

4    out in the May hearing.

5         At the same time, Your Honor, we recognize

6    that the Court understandably is not overly fond of

7    motions to file documents under seal, we decided once

8    we knew that we would not have objection from the UAW

9    or the United States Trustee's Office that we would

10   withdraw the seal motion and file a redacted affidavit

11   that candidly contained probably 98 percent of the

12   information that was in the original, but did not have

13   the actual business attached.  Did not specify

14   particular EBITDA returns on particular business

15   initiatives, and did not address plan closures yet to

16   be announced.

17        I want to be very clear, Your Honor, that our

18   decision to withdraw the Flanagan -- original Flanagan

19   affidavit and the seal motion had nothing to do with

20   our chetrums with the Creditors' Committee regarding

21   the release or non-release of certain EBITDA

22   information.  And while those things were proximate in

23   time, they were not proximate in cause, and Mr. Higgins

24   will address that motion shortly, I hope.

25        And the USD's request, Your Honor, that also

1    played a role in withdrawing the original seal motion

2    and filing a redacted affidavit that would be in the

3    public domain for anyone to see.

4            We would, as it has become our standard

5    practice, proffer the Flanagan affidavit into evidence

6    with the Court's permission.  I'm happy to, you know,

7    summarize the affidavit if the Court would like.  I'm

8    happy to read the affidavit in its entirety, though

9    that doesn't seem like an efficient use of people's

10   time.

11           THE COURT:  Highlights would be helpful.

12           MR. KIESELSTEIN:  Your Honor, Mr. Flanagan's

13   affidavit spoke about the process of building the

14   business plan, and also spoke to the involvement of

15   senior management in the business plan.

16           Mr. Flanagan laid out that there were several

17   phases o the building of the business plan.  Phase I

18   was a detailed review of the company's operation and

19   required us to establish baseline monthly performance

20   forecast.  To develop those forecast, senior management

21   and AlixPartners implemented a bottoms up planning

22   methodology for each plant, divisional and corporate

23   center, identified key cost drivers at the plant level,

24   head counts, overhead, important forecasting

25   assumptions including increases that were projected and

1    raw material prices, labor cost, trends in industry

2    growth or lack thereof, and foreign exchange rates.

3           We obtained data from each plant to develop

4    detailed estimates and forecasts for sales volume on a

5    part by part basis, look at the sales price per part,

6    the direct labor and material cost, the scrap cost and

7    the plant overhead and indirect cost centers, revenues

8    and volumes.  That was Phase I.

9           Phase II was a strategic review of business

10   operations.  Again, senior management and AlixPartners

11   in conjunction developed detailed business improvement

12   initiatives that when implemented would substantially

13   improve profitability.  These initiatives address

14   legacy costs on a plant by plant basis, optimization of

15   the manufacturing footprint, a review of corporate and

16   divisional costs, working capital opportunities and

17   appropriate customer negotiation strategies.

18          Phase III, Your Honor, again with senior

19   management in consultation with AlixPartners involve

20   making the important strategic decisions that were

21   refined and incorporated into the business plan that

22   was delivered, including the impact of customer

23   negotiations as they were unfolding, potential

24   divestitures, the impact of footprint optimization, the

25   rationalization of non-core unprofitable or

1     uncompetitive produce lines, and the focus on

2     transition production in the most efficient way

3     possible to low cost countries and best in cost

4     facilities.

5          As the Court is well aware, many of these

6     initiatives are now underway or scheduled for

7     implementation during the remainder of 2007, and the

8     early part of 2008.

9          Mr. Flanagan's affidavit lays out that the

10    Tier 1 participants were instrumental in motivating

11    plant level managers and employees to actively

12    participate and cooperate with AlixPartners in the

13    business plan formation process, and in reviewing and

14    challenging where appropriate information received from

15    each plant.

16         Similarly on Phase II and III, again, there

17    was substantial input, an integral involvement by

18    management in those phases.  In particular, the

19    affidavit speaks of the move of certain mechanical

20    assembly and metal products to the Matamoros, Mexico

21    facility.   The original affidavit spoke about the

22    amount of EBITDA that would be garnered as a result of

23    that.   The revised affidavit does not speak to that,

24    but it is substantial.  Similarly, moves of certain

25    parts relating to cable assemblies, certain

1    consolidation of business relating to seat assemblies,

2    divisional and SG&A consolidation, all of those items

3    are covered in Mr. Flanagan's affidavit in detail, and

4    the involvement of the senior management Tier 1

5    participants are laid out as well.

6         With the vestiges is also discussed, as well

7    as the involvement of the Tier 1 participant's

8    involvement in the successful negotiations with stake

9    holders and ongoing negotiations with customers.

10        Your Honor, that would be my summary of Mr.

11   Flanagan's affidavit.

12        THE COURT:  Thank you.  I have read the

13   papers including the affidavit.  Does anyone else wish

14   to be heard in connection with this matter?

15        MR. MAYER:  Yes, Your Honor.  Tom Mayer for

16   Kramer Levin for the Unsecured Creditors' Committee.

17        We proffered -- we filed a statement in

18   support of the debtors' motion.  We proffered as

19   evidence the affidavit of Mr. Brent Williams, which is,

20   I believe, attached as 13, 14 on the Court's docket.

21   Mr. Williams is present in court today.  I would like

22   to proffer his affidavit as evidence, and if anybody

23   wishes to cross-examine him, they can do so.  I can

24   give you a very short summary of what it says, if the

25   Court would like?

1                THE COURT:  If you would.

2                MR. MAYER:  What the affidavit says is that

3      the requirement for a business plan as a condition to

4      the payment of the first 25 percent of management

5      bonuses was the Committee's idea, it wasn't the debtor'

6      idea, that the debtor presented a business plan to the

7      Committee, and that although Chanin does not endorse

8      the numbers in that business plan in the words in the

9      last paragraph of the affidavit, the business plan

10     developed by the debtors was comprehensive, provided a

11     high level of detail in discussing the structuring

12     initiatives, and the quality of the work product

13     exceeds that of similar products Mr. Williams has seen

14     in similar cases.

15                Mr. Williams has testified before this Court

16     in numerous other cases.  If the Court wishes, I could

17     put him on the stand to qualify him as an expert, if

18     you think that's necessary.

19                THE COURT:  I find that --

20                MR. MAYER:  The bottom line, we think it's a

21     good piece of work, and we think the debtors -- the

22     management earned their 25 percent.

23                THE COURT:  All right.  Thank you.

24                MR. KIESELSTEIN:  Your Honor, I thank Mr.

25     Mayer for his statements and the Committee's support on

Mr. Harrington - Argument                    15

1    this.  Your Honor, I would also note the Court had

2    requested that Mr. Flanagan be available in the

3    courtroom.  Unfortunately, Mr. Flanagan, due to the

4    summer travel nightmare that's now in full swing, and

5    in particular with regard to Northwest where pilots are

6    tending sometimes not to show up for flights, he is

7    marooned in Detroit.  He is on the phone if the Court

8    had any questions it wished to address, and he

9    apologizes, as do we, for his inability to get here.

10              THE COURT:  That's okay.  We'll get to that

11    in a second.  Let me just ask first whether anyone else

12    cares to be heard?

13              MR. HARRINGTON:  Your Honor, for the record,

14    William Harrington from the Office of the United States

15    Trustee.

16              Very briefly, Your Honor, cognizant of the

17    Court's comments at the last hearing, while we do still

18    think the delivery of a business plan is an

19    inappropriate metric, we do think the debtors with the

20    Flanagan affidavit, and with the statement in support

21    with William's affidavit filed by the Committee have

22    met their evidentiary burden to meet the metric that

23    Your Honor had discussed at the last hearing.  So we

24    did not file papers in connections herewith.

25              THE COURT:  Thank you.

Mr. Mayer - Argument                          16

1          MR. HARRINGTON:  Thank you, Your Honor.

2          THE COURT:  Anyone else care to be heard?

3     Does anyone else care to examine either Mr. Flanagan or

4     Mr. Williams?

5               I hear no response.

6               All right.  In light of the additional

7     support having been offered, and in the absence of

8     objection, I'm prepared to approve the relief that's

9     been requested.

10          MR. KIESELSTEIN:  Thank you, Your Honor.  May

11    I approach?

12          THE COURT:  You may.  Thank you.

13               (Pause in proceedings.)

14          THE COURT:  The order has been signed.

15          MR. KIESELSTEIN:  Thank you, Your Honor.

16    Your Honor, Mr. Higgins has the heavy lifting for the

17    balance of the agenda.  Thank you.

18          THE COURT:  I'm sure he's up to it.

19          MR. HIGGINS:  Good afternoon, Your Honor,

20    Roger Higgins for the debtors.

21               The next items on the agenda are items number

22    11 and 12, and these are motions by the Committee, and

23    I would yield the podium to counsel for the Committee.

24          MR. MAYER:  Thank you, Your Honor.  Tom Mayer

25    for the Committee again.

Mr. Mayer - Argument                    17

1           Your Honor, technically there is a -- we

2     filed a motion asking for the hearing to be set today

3     on this matter, and Your Honor has signed that order.

4     So unless the Court has questions, I will proceed

5     directly to the meat of the argument.

6           THE COURT:  You may proceed.

7           MR. MAYER:  Your Honor, on May 22, the

8     debtors made a presentation of an initial version of

9     their business plan to the Committee's financial

10    advisors and the Committee's financial advisors gave

11    the Committee a presentation at approximately 5:00 p.m.

12    on May 22.

13          My understanding is that paper, or more

14    accurately email transmissions of these materials went

15    to the second lien debt holders in the afternoon of May

16    22.  I'm not sure when on the morning of May 22, a

17    presentation was made to the second lien debt holders

18    -- May 23rd, I'm sorry, Wednesday, May 23rd.

19          At approximately 2:00 p.m. on May 23rd,

20    large, relatively large blocks of bonds started to

21    trade and the price of the bonds started to move

22    upwards dramatically, and that's in Exhibit C to our

23    papers.  Debtors are commencing an investigation into

24    the nature of the trading, which is something that the

25    Committee welcomes.  We were going to provide the

1    debtors with the information they requested of us.

2    There may be little glitches along the way in terms of

3    privilege, but I have on my Committee two bond holders,

4    each of which has assured me and will execute an

5    affidavit that it has not traded at all since becoming

6    a member of the Committee.

7         I have three indentured trustees, and we will

8    get their communications, but they tend not to trade.

9    I have two trade creditors who don't own bonds.  I have

10   the United Auto Workers of America, which last I looked

11   did not trade bonds, and the PDGC, which does not trade

12   bonds.  So as far as the Committee is concerned, as far

13   as I know, none of my members were in the market at

14   all, period, during the relevant period.

15        The people who were selling bonds during that

16   period were people that we represented, they are the

17   beneficiaries of the unsecured creditors and lease

18   laborers.  And the bonds had commenced a dramatic

19   movement upwards.

20        We received inquiries from creditors about

21   what was going on, why are the bonds going up.  We have

22   been unable to answer those inquiries.  We believe,

23   based on what we know, we have reason to believe that

24   the information from the May 22, May 23 presentation

25   have leaked into the marketplace and certain people

1    know them, and certain people don't.  And we went to

2    the debtors as early as May 31, and said, we really

3    think you ought to put out a redacted version of the

4    business plan it contained.  We didn't ask for a full

5    blown disclosure.  We understood there were things in

6    the business plan that had competitive issues.  And

7    after some initial back and forth, which was promising,

8    the debtors came back and basically said no.  And we

9    spent a couple of weeks trying to figure out why the

10   answer was no.

11           And I stand here today, Your Honor, because

12   we continue to believe there is an informational

13   disparity that needs to be remedied.  And in terms of

14   the substantive reason why not to put a very small

15   amount of information out in the public record.  We've

16   never been given a substantive reason why that's a bad

17   idea.  Nobody has come to us and said, if these five

18   numbers are released, bad things will happen, customers

19   will have an advantage, competitors will have an

20   advantage, these five numbers will damage the company's

21   business, they will damage the estates.  We have never

22   been given a concrete reason of that sort.

23           The debtors basic response has been, we don't

24   have to make this information public, we don't want to

25   make this information public, we're not going to make

1    this information public.

2            And, Your Honor, I've read the debtors'

3    response that was filed last night, and I think a lot

4    of it is a red herring.  The debtors make a big deal

5    about regulation G of the security, and the security's

6    laws requiring full blown correlation of what's

7    disclosed to GAAP.

8            Your Honor, there are projections that are

9    used all the time in M&A transactions and proxy

10   statements that don't tie back.  But I don't have to

11   argue those, I don't have an expert in court today to

12   do that.  I would ask Your Honor to take judicial

13   notice that the standard form required in this district

14   requires a debtor who files a Chapter 11 petition to

15   make 12 months of operating projections available as a

16   matter of public record, and there is no Red G

17   (phonetic)tie back to GAAP.

18           Every month this debtor files a monthly

19   operating statement.  There are no monthly GAAP

20   statements.  There are all sorts of times in Bankruptcy

21   Court, Your Honor, when debtors file projections and

22   non-GAAP numbers, and to the extent Red G applies,

23   there is boilerplate, which a corporate lawyer cranks

24   out.  It is not a disability to making information

25   available when it makes sense to do so.  And given the

1    history of the trading in this case, and the extremely

2    limited disclosure that we have asked for, and the fact

3    that bankruptcy is generally viewed as a fish bowl, and

4    that these numbers are going to be released in two to

5    three months anyway, we continue to see no reason why

6    these numbers, these five numbers cannot be put on a

7    public record so that everybody has a more level

8    playing field.

9                 THE COURT:  What's --

10                MR. MAYER:  Yes, Your Honor.

11                THE COURT:  Let's put aside for the moment

12   potential security law violations, to put aside for the

13   moment who carries the burden in determining what the

14   Court should do, and let me ask a couple questions

15   starting with your last comment.

16                MR. MAYER:  Uh-huh.

17                THE COURT:  If they're going to be released

18   in two or three months anyway, and if what the debtor

19   alleges is true, and that is, whatever spike has

20   occurred has now corrected itself, why does it need to

21   be disclosed now?

22                MR. MAYER:  Because, Your Honor, what do I

23   tell the bond holder who calls me and says, why have

24   the prices run up?  Should I buy?  Should I sell?

25                I'm not in business to tell them whether to

1        buy or sell.

2                  THE COURT:  Exactly.

3                  MR. MAYER:  But what do I tell them though.

4        Do I tell them I can't tell you anything?  Do I tell

5        them that the debtor has no obligation to tell him what

6        other people apparently know?

7                  THE COURT:  Well, first of all, do you know

8        the answer to the question?

9                  MR. MAYER:  Whether he should buy or sell?

10       No.  If I knew that, Your Honor, I wouldn't be a

11       lawyer.

12                 THE COURT:  So why would you answer that

13       question in any event.

14                 MR. MAYER:  No.  The point is, Your Honor, I

15       would like to have -- be able to direct him to limited

16       disclosure so that he has at least a chance to see what

17       other people have apparently already seen and acted on.

18                 THE COURT:  But, see, how do you know what

19       they've seen?  I understand that there are

20       circumstances --

21                 MR. MAYER:  I don't know for a fact.

22                 THE COURT:  -- which may point in a certain

23       direction, but how do you know?

24                 MR. MAYER:  I don't know, Your Honor, and

25       perhaps at the end of the investigation that the

1    debtors have started, we may end up with that

2    knowledge.  But I don't see any prejudice.

3           And I agree with you, the question of burden

4    of who has the burden of going forward is an

5    interesting one.  We did originally expect to do this

6    in the context of a sealing motion on it would be the

7    debtors' burden to prove that there are good reasons to

8    keep the information sealed, the debtor withdrew the

9    motion, so the unsealing fell on empty air.  We were

10   forced to move on an expedited basis for disclosure of

11   this information.

12          But, Your Honor, again, in my view, and

13   perhaps I'm wrong about this, and the Court will

14   instruct me, more information is a benefit, not a

15   detriment and given that this is exactly the kind of

16   information that the debtor is going to make available

17   to the public, and there appears to be a reason to have

18   it out.

19          The answer that, well, I don't want to show

20   anybody this information at this time without any link

21   to a real world damage, I don't understand that.

22          THE COURT:  Well, I guess another way of

23   asking the question is, does the debtor or the

24   Committee or the Court or anyone else have a duty to

25   see that trading goes on at it should?  I mean what

1    connection is there between those who wish to trade and

2    the other constituents in the case?

3            MR. MAYER:  But, Your Honor, the people who

4    currently hold bonds, whether they wish to trade or

5    not, are entitled to information under Section 704(a)7.

6    The Bankruptcy Code has provisions providing for the

7    disclosure of information, that it isn't just under

8    Section 1125.  The debtor is not allowed to sit mute

9    and not tell people things.

10           I think this is an appropriate matter for the

11   Court to intervene and allow this information to be put

12   into the public.  704(a)7 has --

13           THE COURT:  Well, would you agree --

14           MR. MAYER:  -- a trope in favor of

15   disclosure.

16           THE COURT:  -- would you agree that it's not

17   uncommon for the debtor to develop a business plan on

18   its own or in conjunction with other constituencies to

19   form the basis for a plan of reorganization?

20           MR. MAYER:  Yes, absolutely, Your Honor.

21           THE COURT:  Okay.  And normally, until the

22   plan and disclosure statement are filed, that's not

23   information that's made public, is it?

24           MR. MAYER:  That is correct, Your Honor.

25           THE COURT:  Okay.  And -- but you think it

1    should be different here because some information, we

2    don't know what, may have been leaked to some, we don't

3    know who, and based upon which such information some

4    may have acted?

5              MR. MAYER:  Yes, Your Honor, especially since

6    the response that we simply don't want to release it at

7    this time seems to me to be an inaccurate response.  It

8    certainly did persuade my clients.

9              THE COURT:  Well, maybe they're hard men and

10   women, I don't know what to say.

11             MR. MAYER:  I guess maybe they are.

12             THE COURT:  Let me approach it another way.

13             One impression I had, and nobody argued this

14   is that releasing the information that the Committee

15   wants released would be equivalent of my sitting and

16   listening to an expert witness who gave an opinion but

17   gave no other information about how the expert arrived

18   at the opinion, what methods were used, what

19   assumptions were made in connection with making the

20   opinion.  And from the Court's standpoint in that

21   situation, the opinion would be of virtually no use to

22   me if it came in that form.

23             And it seems to me that the same can be said

24   about the release of the very limited information that

25   the Committee now seeks.

1    MR. MAYER:  Well, Your Honor, we tried to

2    keep it limited to avoid any conceivable argument that

3    what we were asking for was competitively sensitive or

4    commercially sensitive, because it's exactly these

5    numbers that people tend to focus on when the

6    disclosure statement comes out.

7         I understand the argument that they have to

8    be caveated and that nobody wants to expose anybody to

9    exposure under the security clause, as indicated.  I

10   don't view those arguments particularly seriously

11   because this sort of information does get released.

12        If you had a motion, for example, to assume a

13   lease and show adequate assurance of future performance

14   based on projections, those projections would be made

15   available and suspect they would be made public.

16        And the detail -- the background and the

17   assumptions and the qualifications, many of which might

18   indeed involve commercially sensitive matters, would be

19   redacted, but the basic information would be made

20   public.  That's all we're asking for here.  And we

21   think that it's a public good for this information to

22   be out, and that it's a public detriment for it to

23   remain under seal.

24        THE COURT:  Tell me what good would be served

25   by releasing this information?

1          MR. MAYER:  I think that the more creditors

2     know about the company they have, the more they can

3     make their own decisions, including decisions about

4     whether to buy, sell or hold.  And I think that maybe

5     it is not part of the Committee's job to make sure that

6     people are not disadvantaged, but I'm reluctant to get

7     there.  Perhaps you gave tell me that it isn't, in

8     which case I will tell my constituents that I misjudged

9     what our duties were, and we won't worry about it

10    anymore.

11          THE COURT:  Well, I don't know that you've

12    made a misjudgment, but you may be able to convey that

13    back to your clients, whatever the Court decides.

14          All right.  Thank you.

15          MR. MAYER:  Thank you, Your Honor.

16          MR. HIGGINS:  Good afternoon, Your Honor.

17    Roger Higgins for the debtors.

18          Counsel for the Committee has said that they

19    just want the -- these five EBITDA numbers to be

20    released without any context, without any supporting

21    documentation, without even a Pro Forma income

22    statement, Pro Forma balance sheet, anything that would

23    normally be seen.

24          And I think that the reaction is that if that

25    information were to come out in that kind of vacuum,

1    you know, God forbid that anybody should attempt to try

2    and trade on that, because there's no context.  Those

3    numbers are virtually meaningless.

4           And, indeed, we look to when this motion was

5    filed, and indeed when the objection was filed last

6    week, we spent some time working with our financial

7    advisors, Mr. Tony Flanagan, who is on the phone, and

8    also with our investment banker, Mr. Durc Savini who is

9    here in the courtroom, looking very seriously at this,

10   and looking at the issue of whether one could release

11   those five numbers into the marketplace, and whether

12   they would be meaningful.  And I think that Mr. Savini

13   would be prepared to testify that indeed they would not

14   be, and they would be --

15          THE COURT:  I don't think you have to go too

16   much farther to convince me of that proposition.

17          But here's my question.  Is there a form, can

18   the figures be released in such a context with

19   sufficient information that the debtor wouldn't feel as

20   if it's in violation of any securities laws, or in such

21   way that it would not hamper its ongoing plan

22   discussions?

23          THE COURT:  The answer to that, Your Honor,

24   is no, we don't.  We think it would be -- let me divide

25   that into a couple of pieces.  Number one, I'd like to

1    make the observation that EBITDA numbers that Mr. Mayer

2    is asking us to release are now historical numbers.

3    Those numbers have continued to be refined, as have all

4    parts of the  business plan as that business plan model

5    is periodically run based upon new information coming

6    in.

7              And that, obviously, that process is going to

8    continue on up until the time we file our disclosure

9    statement, and even quite frankly, beyond that, of

10   course.  But at the time of the disclosure statement,

11   that will be a snapshot of that business model then,

12   whether that's at the end of July or early August,

13   whatever the time frame is.

14             If we take numbers, these numbers now, and

15   put them out into the -- even if we were, you know,

16   surround them with a proper contextual information, you

17   would have one set of numbers from late June, another

18   set of numbers in July of August, and they may or they

19   may not compare, they may or may not be the same.

20             THE COURT:  But isn't any public filing only

21   a snapshot?  I mean isn't that true of any public

22   filing?

23             MR. HIGGINS:  I agree, Your Honor, but here

24   there's a critical difference.  One is, we do not take

25   the securities law issues lightly.  We believe that,

1    and again, we do not have securities laws experts here

2    either, but at least on our initial look we believe

3    that in order to give those numbers and that

4    information the proper context, you're going to end up

5    with a report or a disclosure that looks an awful lot

6    like the financial projections that will be part of the

7    disclosure statement in a few weeks.  And that's a

8    process that's ongoing now.  We do not have, quite

9    frankly, Your Honor, a set of financial projections

10   that we could turn around and file in ten minutes, or

11   in, you know, tomorrow or on Monday.  The company and

12   its advisors would literally have to stop what they're

13   doing or draw resources away from what they're doing to

14   sit down and develop those financial projections.

15        We've got a time line for developing our

16   disclosure statement, drafting it, liquidity analysis

17   evaluation.  Of course, that valuation is based on the

18   financial projections model.  All of these matters are

19   in process as we speak.

20        We've got the equity rights offering where

21   we're in discussions with various back stop parties.

22   We're in the midst of the Atwood sale.  There are many

23   many fronts on which the debtors and their advisors are

24   pushing right now.  To put together a meaningful set of

25   financial projections at this time in a very short

Mr. Higgins - Argument                    31

1  order that would fulfill what we believe to be the

2  securities laws requirements would take a considerable

3  efforts.  That's number one.

4           And, number two, in Section 1125(e) creates a

5  good faith safe harbor for debtors who file financial

6  projections in their disclosure statements.  And so the

7  standard form that Mr. Mayer was referring to from the

8  local rules of this jurisdiction which indeed we will

9  following when we finally file our disclosure

10 statement, is drafted with Section 1125(e) in mind.

11          If those financial projections are published

12 today or disclosed today, they will not have the safe

13 harbor of 1125, therefore requiring the company to

14 comply with securities laws, and also opening up the

15 company, its senior management and its advisors to

16 potential liability under those securities laws.

17          Liability that they would not be subject to

18 with those same financial projections or updated

19 financial projections filed with the disclosure

20 statement in a few weeks time.

21          And I think for all of those reasons, and we

22 can adduce many more that were eluded to in our

23 objection in which we could have Mr. Savini and Mr.

24 Flanagan testify to, there are many reasons why it

25 would not be proper at this time for the debtors to be

1    required to file a set of financial projections.  And a

2    set of financial projections that, quite frankly, will

3    contain numbers that are different, as we said before,

4    than the numbers to which Mr. Mayer is referring and

5    which were included in their preliminary May 31st

6    business plan.

7                THE COURT:  Thank you.

8                MR. HIGGINS:  And, Your Honor, I did want to

9    add one other thing is that, and I wanted to go back to

10   something because I think you had eluded to this with

11   Mr. Mayer is, at the end of the day, releasing these

12   numbers, releasing these financial projections is not

13   going to solve the problem.

14               If members of his constituency were harmed

15   back on May 23rd, 24th, whenever those prices began to

16   rise, because they were selling, that's a fact that

17   happened in the past.  And releasing these financial

18   projections today will do nothing to redress those

19   creditors harms, the harm incurred by those creditors.

20   Nor will they prevent future harms from happening.  So

21   if there's a release of information today, and then

22   there's a subsequent release of information, that

23   release of information today will not solve any problem

24   in the future.

25               So this is really a solution that would be,

1    quite frankly, ineffective.  The creditors who are

2    harmed when the prices went up are still going to be

3    have whatever damage they may have incurred regardless

4    of what we do today.

5            And I think for that reason alone, you know,

6    and particularly and even more so in context of the

7    other concerns that the debtors have, is why these

8    numbers should not be released at this time, and

9    certainly not in the form that Mr. Mayer is asking for.

10           THE COURT:  Well, let me ask this, the

11   Committee, through its position today asserts that none

12   of its members were at fault with respect to the

13   leakage of any information or the use of it.

14           The Second Lien Group has filed a response

15   which has said basically the same thing.  What steps

16   has the debtor taken so far, even if it hasn't

17   identified any possible source of that, if there was

18   leaked information, to, I guess, recheck whatever

19   procedures are within their control concerning

20   confidentiality?

21           MR. HIGGINS:  What we have done is to work

22   with the second lien lender's counsel, Mr. Flaschen,

23   and with Mr. Mayer, Committee counsel such that each of

24   respectively with their constituents will produce a

25   report based upon communications, emails, other

1    evidentiary material as to whether any of their members

2    may or may not have been involved in any leakage

3    release or misuse of information.

4         There will also gather affidavits from each

5    of their members, Committee and the Second Lien Group.

6    And at that point, probably a couple weeks from now or

7    three weeks, whenever the processes are done by both

8    the Committee and the Second Lien Group, we'll have

9    those reports and only then can we decide what next to

10   do.  I mean clearly that's a very preliminary step, and

11   we've been moving very cautiously because, you know,

12   the debtors' prime responsibility here is to get these

13   estates through Chapter 11, get a confirmed case, that

14   is job one here.  And we cannot allow an investigation

15   of this kind to become a sideshow that starts to look

16   like the main focus.

17        Having said that, we do take our

18   responsibilities to investigate this incident, I think

19   is perhaps the most neutral way of describing our

20   matter, very seriously.  And as such, we have sent

21   letters to each of counsel for the Committee and

22   counsel to the second lien lenders.  Copies of these

23   letters were attached to our objection laying out the

24   preliminary steps for this investigation.  Once we got

25   those reports in hand, we can then report to the Court,

1    or take such other action as we see fit at that time.

2    And, you know, quite frankly, Your Honor, I think at

3    this point we have to determine, A, whether any

4    information was leaked or misused, obviously as you

5    point out and I think the facts and circumstances show

6    there is certainly a strong -- a strong suspicion or

7    more that information may have gotten out into the

8    marketplace.

9            But even if it did, we still don't know

10   exactly what information that was.  Was it just EBITDA

11   numbers?  Was it EBITDA numbers plus something else?

12   Were there revenue numbers?  Were there assumptions?

13           We simply don't know.  And if we were looking

14   to level the playing field in the marketplace in terms

15   of information, we'd have to -- under Mr. Mayer's

16   theory, we would have to have the exact match or very

17   nearly the exact match of information that was leaked,

18   misused, released, whatever, into the marketplace in

19   order to ensure that everybody had access to that

20   information.  If we are to make a precipitated

21   disclosure now, we will either under inclusive or we'll

22   be over inclusive.  One would suspect that five EBITDA

23   numbers with nothing else might rather be under

24   inclusive.  And, you know, again raising questions as I

25   mentioned before of what EBITDA numbers do we release?

Mr. Albalah - Argument                           36

1          The ones that the model shows now?  Do we release the

2     ones the model showed four weeks ago which are, if they

3     were released, the numbers that would have been traded

4     on?  I think these are all open questions.  These are

5     all questions that could lead to a great deal of second

6     guessing in a context where the debtors and their

7     advisors and senior management would not be able to

8     avail themselves of the Section 1125(e) safe harbor.

9                    THE COURT:  Thank you.

10                   MR. HIGGINS:  Thank you.

11                   THE COURT:  Does anyone else care to be heard

12    in connection with this matter?

13                   MR. ALBALAH:  Good afternoon, Your Honor.

14    May it please the Court, David Albalah of Bracewell and

15    Giuliani on behalf of the Second Lien Group.

16               As you know that the debtor last month

17    brought to this Court's attention on the record that

18    there may have been an allegation of unusual trading

19    activities.  And then the Committee filed the pleading

20    suggesting, implying innuendo, it's hard to be sure

21    that the culprit may have been the Second Lien Group.

22    Predictably the press picked that up and it's been

23    reported throughout the country.

24               Frankly, I think this Court, and I think the

25    members of the Second Lien Group deserve to have a

1    complete and accurate record of this matter.  The

2    simple fact is the members of the Second Lien Group

3    have done nothing wrong.  And I appreciate Your Honor's

4    reading the pleading that we filed yesterday and noting

5    that is our position.  The members categorically deny

6    the baseless, and they are baseless, because there are

7    no specific facts, there's no evidence other than

8    implications and innuendo that there were any leaks or

9    improper trading on the part of the restricted members

10   of the Second Lien Group.

11        These members are, as Your Honor, well knows,

12   they are sophisticated investors and managers.  They

13   have impeccable professional reputations and they

14   understand and appreciate fully the securities laws.

15        We're not in the business of pointing fingers

16   or perpetuating innuendos.  We noted in the pleading

17   that it could be other members.  But the fact of the

18   matter is, to even suggest that would be irresponsible,

19   it would be counterproductive.  I rise on behalf of the

20   members simply to say in clear and uncertain terms that

21   they have done nothing wrong whatsoever.

22        If the Court has any questions, I'd be happy

23   to entertain them, otherwise, I have nothing further.

24        THE COURT:  I do not.  Thank you.

25        MR. MAYER:  Just one point of clarification,

1          Your Honor, and I can approach, if you wish.

2                    Mr. Higgins?

3                    At the beginning of this case, this debtor

4          filed six month cash flow projections.  They're not

5          covered by Section 1125(e), they never are.  If you

6          want I have here the form that is used, it happens to

7          be for the Meridian Automotive Systems case, but I

8          believe it's standard in this District, and I have the

9          first monthly report filed by this company.  It

10         contained cash flow projections not covered by Red G.

11         They don't tie back with disclosure statement, they're

12         cash flow projections.  Cash flow projections are made

13         public.

14                   If you wish, I'm happy to hand it up so the

15         Court can take judicial notice.

16                   THE COURT:  Not necessary.

17                   MR. MAYER:  Thank you, Your Honor.

18                   MR. HIGGINS:  Your Honor, Roger Higgins for

19         the debtors.  Two very brief points.  One is, I want to

20         make absolutely clear on the record that the debtors

21         are not pointing figures at anybody or anyone

22         individual or group of individuals or group of entities

23         with respect to the events surrounding this May 23rd

24         trading issue.

25                   THE COURT:  Yes.

1          MR. HIGGINS:  We simply don't know.  We may,

2     and we reserve the right to conduct third party

3     discovery.  Whether we do it now or upon the receipt of

4     reports from the Second Lien Group and the Committee,

5     we have not made any decisions.  But certainly, you

6     know, we are going to pursue this to the best of our

7     abilities.

8          Second, as to initial operating reports and

9     the monthly operating reports referred to by Mr. Mayer,

10    that is mixing apples and oranges.  Cash flow

11    projections are not non-GAAP financial information.

12    They are a very specific set of non-GAAP financial

13    information looking strictly of how cash flows through

14    the system, which is obviously very important for a

15    Chapter 11 debtor.

16          What Mr. Mayer is asking for is quite

17    something else which is financial projections that go

18    to the potential value of the company, how it's

19    operating, it's profit margins and other data that

20    really should not released at this time.  Thank you,

21    Your Honor.

22          THE COURT:  Thank you.

23          I'm prepared to make my ruling, and will not

24    order the release of the information that's been

25    requested, and this is why.

1          The debtor has asserted and apparently it's

2     not disputed that whatever information may have leaked

3     was likely to have been leaked over a month ago.  And

4     that the trading activity, unusual, I'll call it

5     trading activity has corrected itself.  In any event,

6     the debtor asserts, and, again, it doesn't seem to be

7     controverted that the numbers have changed.  And that's

8     not unusual assuming that negotiations, planned

9     negotiations are ongoing.

10          I am convinced that disclosing the limited

11     information that's requested, while it might be

12     pleasing to some of the Committee members or others,

13     can't be considered meaningful unless there would be

14     other information to put into an appropriate context,

15     even though generally there is a general understanding

16     of what EBITDA is.

17          Trading of debt, public trading of debt

18     occurs in many of the cases I see.  But as a general

19     proposition, I consider it ancillary to the

20     administration of the Chapter 11, and that's not to say

21     that it does not have its, or could not have its effect

22     on the administration of the 11, but there's nothing in

23     the record here that tells me one way or another that

24     it is or that it does or that it will, or that it's

25     likely to.

1              The kind of information that the Committee

2      seeks to have released is not normally released except

3      primarily, again, in the context of the Chapter 11,

4      with a disclosure statement in the plan to those

5      constituents who have a right to vote on the plan.

6              And there's nothing in this record that tells

7      me there's a reason why that information, apparently

8      not finalized, should be released to the public.  And

9      to the extent that some creditors feel as if they need

10     this information to level the playing field.

11             I feel no motivation to address that goal,

12     especially in the absence of a record which tells me

13     that failure to release the information creates some

14     unfairness or some other impropriety in connection with

15     the Chapter 11 process.  That's not to say that some

16     information to that extent may not exist, but it's not

17     been asserted here on the record before me.  So for

18     these reasons I am going to deny the relief that's been

19     requested, and will ask counsel to confer and submit a

20     form of order that embodies that ruling.  All you need

21     do, however, is refer to the -- just generally to the

22     statements that I've made on the record today, but you

23     need not try to embody them in the order itself.

24             Are there any questions?

25             Okay.  Now, you can go back and tell them

1    that the Judge said no.

2              MR. MAYER:  Your Honor, if it please the

3    Court, I have a funeral to attend back in New York, and

4    I would therefore ask that our fees be considered next,

5    if it's possible.

6              THE COURT:  Certainly.

7              MR. MAYER:  I don't believe anybody has filed

8    an objection and the fee auditor has signed off and I'm

9    here to answer any questions.

10             THE COURT:  Okay.  Give me the number on the

11   agenda?

12             MR. MAYER:  I'm sorry, it's number 16, I.

13             THE COURT:  Okay.

14             MR. MAYER:  Yes, Your Honor, it's 16, I.

15   It's the first monthly application for compensation and

16   for reimbursement of expenses.

17             THE COURT:  Okay.  The -- can you address the

18   fee examiner's comments?

19             MR. MAYER:  I believe we have responded to

20   the fee examiner's comments, and we have taken over

21   $4,000 in reductions as requested by the fee examiner.

22             THE COURT:  All right.  Let me locate that.

23             Okay.  So the fee binder is -- okay, I'll

24   find it.

25             MR. MAYER:  I'm sorry, Your Honor, maybe my

1    colleague can assist both of us.

2              Your Honor, I have the fee auditor's final

3    report.  If you wish, I can hand it up.

4              THE COURT:  I'd like to find mine

5    specifically in the binder.  I'll get there.  Just give

6    me a moment.

7              (Pause in proceedings.)

8              MR. MAYER:  Thank you, Mr. DeFranceschi.

9    It's on page 16, it's Item IV, on page 16 of the agenda

10   right above Item Number 17.

11             THE COURT:  Yes, I have it.  I'm trying to

12   find the place in the fee binders where it exist.

13             (Pause in proceedings.)

14             THE COURT:  Okay.  The fee examiner

15   recommended a reduction of $5,630.50 in compensation,

16   and $1,052.67 in expenses.

17             MR. MAYER:  I believe we took each of those

18   reductions, Your Honor.  Yes.

19             THE COURT:  Okay.  All right.  The papers did

20   not indicate that.  I did review that part of it, and

21   happen to agree with the fee auditor, and I'm prepared

22   to award the fee that's been recommended.

23             MR. MAYER:  Thank you very much, Your Honor.

24             THE COURT:  You're welcome.

25             MR. MAYER:  With that, my colleague, Mr.

1    Mannal, and our local counsel, Mr. Blake Cleary are

2    here.  May I ask that they cover us for the balance of

3    the --

4              THE COURT:  All right.  Please accept my

5    condolences.

6              MR. MAYER:  Thank you very much, Your Honor.

7              MR. HIGGINS:  Your Honor, Roger Higgins for

8    the debtors.  There will be a single consolidated order

9    for all of the fees that we could hand up at the end of

10   going through the process with each of the

11   professionals.

12             THE COURT:  Very well.

13             MR. HIGGINS:  Your Honor, that brings us to

14   Item Number 8 on the agenda, Items Number 6 and 7

15   having been -- orders having been entered there.

16             This is the motion for the entry of a

17   protective order regarding the confidential information

18   memorandum and the Tracy affidavit under seal.

19             We did submit to chambers on Monday  a

20   resolution of -- or, excuse me, a certificate of

21   counsel regarding this matter with an amended order.

22   We agreed after consultation and discussions with the

23   U.S. Trustee that we would file a redacted version and

24   serve out a redacted version of the Tracy affidavit

25   which we did obviously.  And we will talk more as we

1    get to the underlying outward sale and second plan

2    motion itself, but we believe that the Tracy affidavit

3    unredacted was critical and necessary to carry the

4    burden of proof under Section 503(c)3.

5            So we would ask that that order be entered at

6    this time.

7            THE COURT:  Does anyone else care to be heard

8    on this matter?

9            I hear no response.

10           I've reviewed the submissions and I have

11   concluded that the relief requested is warranted, and

12   I'm prepared to sign an order.

13           MR. HIGGINS:  All right.  Thank you, Your

14   Honor.

15           If I may approach, Your Honor?

16           THE COURT:  You may.  Thank you.

17           MR. HIGGINS:  Your Honor, that brings us to

18   Item Number 10, which is, indeed the substantive motion

19   at issue here.

20           All right.  Sorry, Your Honor.  That does

21   bring us to Item Number 10, which is the substantive

22   motion at issue.  This is the debtors' motion for entry

23   of an order authorizing the Atwood Sale Incentive

24   Program.  We did file a form of amended order that was

25   agreed to with the United States Trustee, and I believe

1    that we have resolved the United States Trustee's

2    issues that raised in his objection, one, that the

3    order state clearly that the relief being granted was

4    under Section 503(c)3, and number two, that the facts

5    and circumstances test Section 503(c)3 have been

6    satisfied.

7            The U.S. Trustee agreed with us, and that he

8    believed as we do that the information contained within

9    the Tracy affidavit in the sealed version is sufficient

10    to justify the Atwood Sale Incentive Plan under the

11    facts and circumstances of these Chapter 11 cases.

12            I would proffer the sealed affidavit into

13    evidence.  We can rely on that or I can give you a

14    quick overview of the facts.

15            THE COURT:  Overview would be helpful.

16            MR. HIGGINS:  All right.

17            THE COURT:  For the record.

18            MR. HIGGINS:  And, also, Your Honor, Mr.

19    Tracy is in the courtroom available to answer questions

20    as needed.

21            THE COURT:  Thank you.

22            MR. HIGGINS:  Mr. Tracy, if he were to

23    testify would state that the Atwood Mobil Products

24    Division is a company that has approximately $330

25    million in revenues, and an EBITDA -- and that company

1    is being currently marketed for sale, partly for

2    liquidity purposes, partly to reduce the outstanding

3    DIP loans.  And that sale process is underway.

4         Mr. Tracy, if he were to testify would state

5    that he perceived the need for a sale incentive plan

6    for certain key senior managers who have been named in

7    the affidavit.  These senior managers are key to -- to

8    the company, the company's sales efforts in terms of

9    dealing with and interacting with perspective buyers,

10   due diligence, and essentially the entire sales

11   campaign.

12        And as Mr. Tracy stated in his affidavit and

13   as he would be prepared to testify, there could be an

14   issue with regard to the motivation of these senior

15   managers, particularly in the circumstance where a

16   strategic buyer were to be -- become the stocking

17   horse, or to become closely involved in the ultimate

18   auction.  And the reason -- as opposed to say, a

19   financial buyer.  And the reason for that is that the

20   strategic buyers would be buying the Atwood business to

21   fit within its -- an existing stable of other

22   presumably related businesses looking to take advantage

23   of synergies, efficiencies that could quite frankly

24   involve the jobs of those seven individuals.

25        Financial buyers, the concern is a lot less.

1   That said, still there needs to be in Mr. Tracy's view

2   a strong motivation incentive placed with these seven

3   people so that we can extract, the debtors can extract

4   the highest or best offers and the most value out of

5   this transaction that is possible.

6          In developing this program, Mr. Tracy worked

7   closely with the company such that it was developed on

8   a straight line basis, that there would be a minimum

9   award of .75 times the individual's salary at a level

10  of 5.5 times of EBITDA, all the way up to eight times

11  EBITDA for a 200 percent times salary bonus.

12         Clearly, the debtors believe that the

13  realistic sales figures, projected sales figures would

14  be somewhere within that range.  Certainly we would

15  love to see it be higher rather than lower.  And Mr.

16  Tracy, were he to testify, would state that this

17  program is directly designed to ensure that these

18  managers work with a single focus on yielding the last

19  dollar out for the benefit of the debtors' estates.

20         THE COURT:  Thank you.  Anyone wish to

21  examine Mr. Tracy?

22         I hear no response.

23         Anyone else wish to be heard in connection

24  with this motion?

25         I hear no response.  Oh, U.S. Trustee.

1          MR. HARRINGTON:  I'm sorry, Your Honor, I

2    didn't mean to move so slowly.

3          THE COURT:  Don't  dottle.

4          MR. HARRINGTON:  For the record, William

5    Harrington from the Office of the United States

6    Trustee.

7          Your Honor, our primary concern with respect

8    to this motion and the reason why we filed our

9    objection was with respect to the legal standard that

10   was referenced in the motion originally filed.  We have

11   resolved that issue that not only, I think just to

12   clarify slightly what debtors' counsel had said, that

13   not only is the plan covered under 503(c)3, but also

14   that the individual is covered under the plan, because

15   there was some reference in the motion that such

16   individuals were insiders and therefore not covered by

17   the plan.  But it was our contention, and the debtor

18   did agree with us, to resolve the objection that these

19   individuals were covered under 503(c) and the language

20   contained in 503(c)3 which includes managers and

21   officers.  It's not limited to strictly insiders.

22         With respect, Your Honor, to the economics of

23   the plan or the metrics set forth in the plan, we did

24   do an analysis and believe that this is an incentive

25   plan and not a pretension plan, and therefore covered

Mr. Harrington - Argument                    50

1      under 503(c) because the UAW and the Committee both

2      supported the validity of the metrics, we take no

3      position with respect thereto.  Thanks, Your Honor.

4              THE COURT:  All right.  Does anyone else care

5      to be heard?

6              I hear no response.  I have reviewed the

7      unredacted version of the Tracy affidavit, and the

8      submissions, and agree with the parties that 503(c)3 is

9      the applicable section of the code by which the relief

10     requested must be measured.

11             There is some necessarily favor of retention

12     in this incentive plan, but not primarily for the

13     purpose of retention.  I agree that it is primarily

14     more in the nature of an incentive plan.  The Tracy

15     affidavit was detailed, complete and actually very

16     persuasive.  And in addition, in the absence of

17     objection and for all these reasons, I'm prepared to

18     approve the relief that the debtor has requested here.

19             MR. HARRINGTON:  Your Honor, I have a form of

20     order and a black line, if I may approach?

21             THE COURT:  Yes.  Thank you.

22             (Pause in proceedings.)

23             THE COURT:  That order has been signed.

24             (Pause in proceedings.)

25             MR. HARRINGTON:  Your Honor, that brings us

1       now to the fee applications.  The United States Trustee

2       has asked me if we could move directly to the fee

3       application, first interim fee application of

4       AlixPartners, that is Item Number 17 on the agenda and

5       page 16 -- on page 16.

6                   THE COURT:  Yes, that's fine.  Give me a

7       moment to get the papers.

8                   Okay.

9                   MR. TOLL:  Good afternoon, Your Honor.

10      Sheldon Toll for AlixPartners.

11                  There was an objection by the United States

12      Trustee to this application raising various matters,

13      the most significant of which appears to be the

14      allegation that AlixPartners overstaffed this

15      engagement, and therefore there should be an

16      unspecified reduction of fees for this overstaffing.

17                  THE COURT:  Although the fee auditors was

18      very specific and suggested reductions.

19                  MR. TOLL:  Yes.  Well, the AlixPartners has

20      accepted the reductions requested by the fee auditor.

21                  THE COURT:  Okay.

22                  MR. TOLL:  I'm just addressing the subsequent

23      objection by the U.S. Trustee on the overstaffing

24      issue.

25                  THE COURT:  Okay.

1          MR. TOLL:  And Mr. Harrington and I have

2     discussed the matter.  We had a conference call with m

3     client, Mr. Flanagan, today, which lasted almost an

4     hour.  And while we didn't resolve the matter on the

5     merits, procedurally, Mr. Harrington and I have agreed

6     that the U.S. Trustee will have a reservation of rights

7     on the issue of overstaffing until the time of final

8     compensation, whenever that is, and AlixPartners, on

9     its part, will agree on this record that in the event

10    at the time of final compensation that this Court were

11    to rule that some or all of the fees that have been

12    awarded on an interim basis are due to overstaffing

13    which is impermissible, then AlixPartners would agree

14    to disgorge such sums as would be necessary to, you

15    know, rectify the overpayment, the alleged overpayment.

16          THE COURT:  Okay.  And is it anticipated that

17    a separate order will be entered, or will that be part

18    of the omnibus order with the understanding simply

19    remaining part of the record?

20          MR. TOLL:  Well, I would suggest that it just

21    remain part of the record.  But if Mr. Harrington were

22    to request a separate order, the Court would request a

23    separate order, we would be glad to do that.

24          MR. HARRINGTON:  Your Honor, William

25    Harrington for the record.  I don't think we need a

1    separate order.  If we could just drop a footnote that

2    subject to the reservation of rights put on the record,

3    that's certainly fine for me.

4         THE COURT:  Okay.  Well, if counsel can --

5    you can handwrite that notation if you'd like, that's

6    fine with me.

7         I would simply ask that -- I've also reviewed

8    specifically the issues raised by the fee auditor, and

9    wanted to reiterate that AlixPartners should take to

10   heart the types of comments that were made, and

11   hopefully will avoid having to draw those same

12   objections in the future.

13        MR. HARRINGTON:  Thank you.

14        THE COURT:  All right.  Thank you.

15        MR. TOLL:  Your Honor, I'm actually trying to

16   juggle two hearings right now, and I wonder if I -- I

17   have no further objections to the rest of the fee ap,

18   and I'm wondering if I can be excused.

19        THE COURT:  I give you up to Judge Sontchi.

20        MR. TOLL:  Thank you, Your Honor.

21        THE COURT:  With my compliments.

22        MS. BROWN-EDWARDS:  Your Honor, Terri Brown-

23   Edwards.  I actually need to go back to that hearing as

24   well.  Do you mind if I excuse myself, and that my co-

25   counsel stay for a while if he so chooses.

1              THE COURT:  I also give you up to the good

2      hands of Judge Sontchi.

3              MS. BROWN-EDWARDS:  Thank you, Your Honor.

4              THE COURT:  You're very welcomed.

5              MR. HARRINGTON:  Your Honor, just as a minor

6      housekeeping detail, what we propose is to hand up an

7      omnibus order for all of the professionals other than

8      AlixPartners and E&Y, E&Y being continued, I believe,

9      until the August 1st hearing, and the AlixPartners

10     order could be handed up under certificate of counsel

11     to take into account the issues put onto the record.

12             THE COURT:  That's fine with me.

13             MR. HARRINGTON:  Your Honor, if we can turn

14     now to Item Number 13, which is --

15             THE COURT:  I would just say that if -- I

16     should have -- this applies to anything that's going to

17     be submitted under cert following today's hearing, I

18     will be out of the office July 4th through July 11th.

19     I'll be in Monday and Tuesday of next week.  But to the

20     extent anybody needs an order signed before my

21     departure, I'd ask that you try to have it in by

22     Monday, if you could.

23             MR. HARRINGTON:  Of course, Your Honor.

24             That brings us to Item Number 13 which is the

25     first interim fee application request for Kirkland and

1    Ellis.

2            The fee auditor did file an audit report that

3    deduct certain amounts.  I wanted to point out that the

4    fee auditor did withdraw its original final report, and

5    resubmit a corrected report.  There was some arithmetic

6    and clerical errors in there.  The numbers that are

7    reflected in the fee auditor's report that was filed, I

8    believe, on Monday, are the numbers that both the fee

9    auditor and K&E agree.

10           THE COURT:  Which show for compensation,

11   3,966,008.50?

12           MR. HARRINGTON:  Yes, Your Honor.

13           THE COURT:  And for expenses, 134,870.13?

14           MR. HARRINGTON:  That is correct, Your Honor.

15           THE COURT:  Okay.  Now, again, with respect

16   to the expenses, particularly air fare and the meals, I

17   take it steps will be taken to address those types of

18   issues?

19           MR. HARRINGTON:  We have done so, Your Honor,

20   we were -- as soon as we discovered them.  In fact,

21   some of those were ones that during the process of

22   review we discovered ourselves, and took out, and we've

23   taken steps to deal with those issues.

24           THE COURT:  Very well.  I have no additional

25   questions.

1           MR. HARRINGTON:  Okay.  Thank you, Your

2    Honor.

3           That brings us to Item Number 14, which is

4    Richards Layton & Finger application, and I would yield

5    the podium to Mr. DeFranceschi.

6           THE COURT:  Okay.

7           MR. DEFRANCESCHI:  Your Honor, I believe

8    there was a final report filed by the fee auditor, and

9    as I understand it, we've reached agreement with

10   everything that the fee auditor has requested.

11          THE COURT:  Okay.  And that's for

12   compensation, 187,001.50, and for expenses 24,713?

13          MR. DEFRANCESCHI:  That sounds correct, Your

14   Honor.

15          We've run the order form by the fee auditor

16   and have agreement with him on the numbers that are on

17   there.

18          THE COURT:  Okay.  And I'll make the same

19   comment with respect to avoiding situations which will

20   draw the same type of objection in the future.

21          MR. DEFRANCESCHI:  Absolutely, Your Honor.

22          THE COURT:  All right.  Thank you.

23          MR. DEFRANCESCHI:  Thank you.

24          THE COURT:  I have no additional questions.

25          MR. HARRINGTON:  Your Honor, that brings us

Mr. Cleary - Argument                    57

1    to Item Number 15, which is the interim fee application

2    request for Baker and McKenzie.  I understand that

3    counsel for Baker and McKenzie is on the phone.

4              THE COURT:  All right.

5              MS. BABICH:  Yes, Your Honor.  This is Laurie

6    Babich with Baker and McKenzie.

7              THE COURT:  Good afternoon.

8              MS. BABICH:  Good afternoon.  Your Honor, the

9    fee auditor also filed a report with respect to Baker

10   and McKenzie's fee application, and we have agreed to

11   all of the fee auditor's reductions.  And to follow up

12   on what you said, we've also taken steps to make sure

13   with respect to expenses that we don't run into some of

14   the issues that the fee officer had.

15             THE COURT:  Very well.  I'm prepared to

16   approve the figure as adjusted.

17             MS. BABICH:  Thank you, Your Honor.

18             MR. HARRINGTON:  Your Honor, that brings us

19   to Item Number 16, which is the interim fee application

20   request for the Committee, and I would yield to counsel

21   for the Committee.

22             THE COURT:  All right.

23             MR. CLEARY:  Good afternoon, Your Honor, may

24   it please the Court, Blake Cleary, Young, Conaway,

25   Stargatt and Taylor.

Mr. Cleary - Argument                    58

1        Agenda Item Number 16 is the fee application

2    request for the Official Committee members, its

3    professionals and one member of the Committee.

4        As Your Honor has already noted, there was

5    fee auditor reports to each of those, and I believe

6    there were no objections to the issues raised in those

7    fee auditor reports.

8        And so each professional has consented to the

9    requests that have been made forth in the fee auditor

10   reports.

11       I can go forward with specifics.  The first

12   one is my firm, Young, Conaway, Stargatt and Taylor,

13   there was an inadvertent error in one of the fee

14   applications, and a request to clarify some other

15   previous reductions.  Those were made, clarifications

16   were made and so I don't believe there's any issues

17   with respect to that.

18       Your Honor has already covered the Kramer

19   Levin fee application.  The Chanin Capital Partners'

20   fee application, the fee auditor did not some issues

21   with the expenses.  I believe those have been agreed to

22   by Chanin Capital Partners, and obviously they will

23   heed the recommendations going forward with respect to

24   those issues.

25       THE COURT:  Yes.  I'm curious about the

1    Townsend Hotel.  Where is that?

2              MR. KIESELSTEIN:  Your Honor, that is -- the

3    closest -- how do I put this, it's one of the nicer

4    hotels within a reasonable driving distance.  There is

5    headquarters up in Farmington Hills.

6              THE COURT:  I guess they must know that.

7              MR. KIESELSTEIN:  Everyone zeros in on that

8    hotel, Judge.

9              THE COURT:  All right.

10             MR. CLEARY:  Thank you.

11             And then the final one, Your Honor, is an

12   expense reimbursement request from an individual member

13   of the Committee, and there were some explanations

14   there that were made, and the fee auditor had no

15   objection to that Committee member's request for

16   reimbursement as well.

17             THE COURT:  And that was an minimal amount.

18             MR. CLEARY:  Your Honor, I think there might

19   have been one more that I missed.  I'm not sure where

20   it's listed on the agenda.

21             THE COURT:  Give me a name.

22             MR. CLEARY:  Bennett Jones.  They were a law

23   firm the Committee retained a special Canadian counsel.

24   There was a fee auditor report, it appears at Docket

25   Number 1249.

Mr. Harrington - Argument                60

1          THE COURT:  Yes.  And the fee auditor didn't

2    recommend any reductions.

3          MR. CLEARY:  Correct.

4          THE COURT:  And I have no additional

5    questions.

6          MR. CLEARY:  Thank you, Your Honor.  I don't

7    know if Your Honor has any other further questions.

8          THE COURT:  I do not.

9          MR. CLEARY:  Thank you, Your Honor.

10         MR. HARRINGTON:  Your Honor, for the record,

11   the Bennett Jones quarterly fee application was Item

12   Number 21 on the agenda on page 21.

13         That brings us to the Miller Buckfire interim

14   fee application.  The fee auditor filed a report.  The

15   fee auditor in Miller Buckfire agree to certain expense

16   reductions, and they have -- they're as equally mindful

17   as every other professional regarding oversight of

18   expense requests.

19         THE COURT:  Very well.

20         MR. HARRINGTON:  Your Honor, that brings us

21   to Item Number 20, which is the Togut, Segal and Segal

22   interim fee application, and I believe that counsel for

23   the Togut law firm is on the phone.

24         THE COURT:  Okay.

25         MR. BERGER:  Yes, Judge, Neil Berger, Togut

Ms. Cannon-Geary - Argument                61

1    Segal and Segal.  Thank you for permitting me to appear

2    by phone today.  The fee auditor filed his final report

3    for our application and requested a reduction of

4    expenses of $24.83 for meals.  We're sensitive to that,

5    and we'll watch that going forward.  Otherwise, the fee

6    auditor has no objection to our fees, and no objections

7    were made to our application.

8              THE COURT:  Very well.  And I have no

9    additional questions.

10             MR. BERGER:  Thank you, Judge.

11             MR. HARRINGTON:  That brings us, Your Honor,

12   to Item Number 22, which is the Deloitte Tax LLP

13   interim fee application.  I understand that counsel for

14   Deloitte Tax was also counsel for Deloitte & Touche is

15   also on the phone.

16             MS. CANNON-GEARY:  Your Honor, this is Irene

17   Cannon-Geary in-house counsel, appearing

18   telephonically, and thank you for allowing me to do so

19   on behalf of Deloitte Tax LLP, and Deloitte and Touche,

20   LP.

21             In the case of Deloitte Tax LLP, the fee

22   auditor filed a report which we responded to making

23   some voluntary reductions, and we accept the

24   recommendations of the fee auditor's final report with

25   respect to Deloitte Tax LLP, and likewise are mindful

Colloquy                           62

1    of the admonition for the fee auditor going -- and the

2    Court going forward.

3                THE COURT:  All right.  I have no additional

4    questions on Deloitte Tax.

5                MS. CANNON-GEARY:  Thank you, Your Honor.

6                With respect to Deloitte and Touche LLP,

7    which I believe is the next docket item.

8                THE COURT:  It is.

9                MS. CANNON-GEARY:  Likewise, there was an

10   initial response provided to us by the fee auditor, to

11   which we responded.  And likewise, Deloitte and Touche,

12   LLP, the independent auditors for the debtors have

13   accepted the recommendations of the fee auditor with

14   respect to reductions as to fees and expenses, and we

15   will seize going forward, and to avoid any such issues

16   relative to the particular recommendations that were

17   made.

18               THE COURT:  All right.  Thank you.

19               MS. CANNON-GEARY:  Thank you, Your Honor.

20               MR. HARRINGTON:  Your Honor, that concludes

21   the fee applications.  I have a form of order, if I may

22   approach --

23               THE COURT:  Yes.

24               MR. HARRINGTON:  -- as to all the

25   professionals other than AlixPartners.

1            THE COURT:  AlixPartners, okay.

2            Mr. Smith, anything to add before I --

3            MR. SMITH:  No, Your Honor.

4            THE COURT:  All right.  I want to thank you

5    for the services you performed here.  They've been very

6    helpful to the Court.

7            MR. SMITH:  You're very welcome, Your Honor.

8    May I be excused if this concludes the fee matters?

9            THE COURT:  You may.

10           MR. SMITH:  Thank you, Your Honor.

11           MR. HARRINGTON:  And, of course, Your Honor,

12   this order also excludes Ernst and Young.

13           THE COURT:  That order has been signed.

14           MR. HARRINGTON:  Thank you, Your Honor.  That

15   concludes the matters that are up for hearing at this

16   time.

17           THE COURT:  Very well.  That concludes this

18   hearing.  The court is adjourned.

19           MR. HARRINGTON:  Thank you, Your Honor.

20           MS. CANNON-GEARY:  Thank you, Your Honor.

21           (Proceedings concluded at 2:58 p.m.)

22                           *  *  *

23

24

25

1              **C E R T I F I C A T I O N**

2

3              I, Ritajean Wioncek, court approved

4      transcriber, certify that the foregoing is a correct

5      transcript from the official electronic sound recording

6      of the proceedings in the above-entitled matter.

7

8

9      _____     July 4, 2007

10     RITAJEAN WIONCEK

11     DIANA DOMAN TRANSCRIBING

12

13

14

15

16

17

18

19

20

21

22

23

24

25