UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No.  06-11202(KJC)
                                . Jointly Administered
                                .
  DURA AUTOMOTIVE SYSTEMS,      .
  INC., et al.,                 . 824 Market Street
                                . Wilmington, Delaware  19801
                  Debtors.      .
                                . November 28, 2007
. . . . . . . . . . . . . . . . 11:04 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:            Kirkland & Ellis, LLP
                            By:  ROGER J. HIGGINS, ESQ.
                                 MICHAEL B. SLADE, ESQ.
                                 MARC KIESELSTEIN, ESQ.
                            Aon Center
                            200 East Randolph Drive
                            Chicago, IL  60601
                            (Telephonic Appearance by Mr.
                             Kieselstein)


For the Debtors:            Richards, Layton & Finger, P.A.
                            By:  DANIEL J. DeFRANCESCHI, ESQ.
                            One Rodney Square
                            920 N. King Street
                            P.O. Box 551
                            Wilmington, DE 19899


Audio Operator:             Brandon McCarthy


Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (Cont'd.):

For the U.S. Trustee:          Office of the U.S. Trustee
                               By:  WILLIAM K. HARRINGTON, ESQ.
                               J. Caleb Boggs Federal Building
                               844 King Street
                               Suite 2313
                               Lockbox 35
                               Wilmington, DE  19801

For Allied Motor Supply:       Stevens & Lee
                               By:  JOSEPH H. HUSTON, JR., ESQ.
                               1105 North Market Street
                               Wilmington, DE  19801

For Magna Donnelly:            Fox Rothschild LLP
                               By:  ANTHONY M. SACCULLO, ESQ.
                               Citizens Bank Center
                               919 North Market Street
                               Suite 1400
                               14th Floor
                               Wilmington, DE  19801

For JPML, as Agent for         Landis Rath & Cobb, LLP
Second Lienholders:            By:  RICHARD S. COBB, ESQ.
                               919 Market Street
                               Wilmington, DE  19801

For Atwood Acquisitions:       Eckert Seamans Cherin & Mellott,
                                LLC
                               By:  RONALD S. GELLERT, ESQ.
                               300 Delaware Avenue
                               Suite 1210
                               Wilmington, DE  19801

For the Creditors' Committee:  Young Conaway Stargatt & Taylor,
                                LLP
                               By:  M. BLAKE CLEARY, ESQ.
                               The Brandywine Building
                               1000 West Street
                               17th Floor
                               P.O. Box 391
                               Wilmington, DE  19899

For the Creditors' Committee:  Kramer, Levin, Naftalis &
                                Frankel, LLP
                               By:  DOUGLAS MANNAL, ESQ.
                               1177 Avenue of the Americas
                               New York, NY 10036

APPEARANCES (Cont'd.):

| For Certain of the Nine Percent Noteholders: | Ballard Spahr Andrews & Ingersoll, LLP<br>By:  VINCENT J. MARRIOTT, III, ESQ.<br>1735 Market Street<br>51st Floor<br>Philadelphia, PA 19103 |

| For Goldman Sachs: | Pachulski, Stang, Ziehl, Young, Jones & Weintraub, P.C.<br>By:  TIMOTHY CAIRNS, ESQ.<br>919 North Market Street<br>17th Floor<br>P.O. Box 8705<br>Wilmington, DE  19899 |

| For the Second Lienholders Group: | Potter Anderson & Corroon, LLP<br>By:  GABRIEL R. MacCONAILL, ESQ.<br>Hercules Plaza<br>1313 North Market Street<br>Wilmington, DE 19801 |

| For GECC: | Edwards & Angell, Palmer & Dodge, LLP<br>By:  WILLIAM E. CHIPMAN, JR., ESQ.<br>919 North Market Street<br>Wilmington, DE  19801 |

| For GECC: | Winston & Strawn<br>By:  CAREY D. SCHREIBER, ESQ.<br>200 Park Avenue<br>New York, NY  10166 |

| For Atwood Mobile Products LLC: | Hunton & Williams LLP<br>By:  JEFFREY P. BAST, ESQ.<br>1111 Brickell Avenue<br>Suite 2500<br>Miami, FL  33131 |

1            THE CLERK:  All rise.  Be seated.

2            THE COURT:  Good morning.

3            MR. HIGGINS:  Good morning, Your Honor.  Roger

4  Higgins for the debtors.  I have with me Marc Kieselstein, who

5  is on the phone unable to attend today, offers his apologies,

6  my partner Mike Slade and Dan DeFranceschi from Richards,

7  Layton & Finger.

8            Your Honor, what I thought we might do today is I

9  could give you a brief overview of the status of where we are

10  with the objections.  We've been working very hard to resolve

11  the various objections, and I think we've made some substantial

12  progress, since -- really since the objection deadline and also

13  within the last few days.  Also give you an update on the

14  status of the exit facility, and then I would yield the podium

15  to my partner, Mr. Slade, to -- he can take you through where

16  we think we are in terms of preparations for the trial on next

17  Thursday.

18            THE COURT:  Very well.

19            MR. HIGGINS:  Your Honor, without further adieu then,

20  I will turn to the -- and I'm reading essentially from our

21  objection exhibit to our confirmation brief.  With respect to

22  Magna Donnelly, we are engaging in some negotiations with Magna

23  Donnelly.  I think the parties have sold out a little bit --

24            THE COURT:  Excuse me, Mr. Higgins.  Let me ask the

25  phone participants to make sure their phones on are on mute.  I

1  can hear some sounds from the phone connection.  Thank you.

2      MR. HIGGINS:  All right, Your Honor.  With respect to

3  Magna Donnelly, we have been engaging in some dialogue with

4  them to resolve their issue.  It's not per se a plan objection

5  issue, but more of a commercial dispute and how plan

6  confirmation might implicate that.  I think the parties have

7  got some distance to go, a little further than I think I was

8  otherwise anticipating.  I know that -- I had spoken with

9  counsel for Magna Donnelly today.  They're going to be looking

10 for a hearing.  He characterizes it as an emergency hearing to

11 lift the stay.  You know, I think that, you know, the open

12 question is to when Your Honor would like to hear that.  We

13 would prefer that that be heard after the 6th of December.

14 We've got -- rather got a lot on between now and then.  I know

15 that we do have a hearing on --

16     THE COURT:  All right.  Let me ask the representative

17 from CourtCall please to terminate the confirmation of the

18 person that the noise is coming from.

19     COURT CALL OPERATOR:  Yes, Your Honor.  I've muted

20 down the line.  He won't be able to make noise.

21     THE COURT:  Thank you.

22     COURT CALL OPERATOR:  Certainly.

23     MR. HIGGINS:  Your Honor, what we would suggest is

24 that we do have the hearing on December 13th so that motion, to

25 the extent it needs to go forward, could go forward on the

1  13th, and we'd be happy to, you know, not object to -- on the

2  basis of timeliness if -- since today is really the last day to

3  file motions for that hearing.

4          With respect to the Internal Revenue Service, Your

5  Honor, we believe that that is resolved.  We're just working

6  through the language with the IRS.  We haven't got final

7  sign-off there, but we believe that that will be taken care of

8  long before confirmation.

9          With respect to Allied Motor Products, Your Honor,

10 this one there is -- there are sort of two issues going on

11 here.  One is Allied is in particular concerned with the status

12 of its contract with Atwood and whether that contract was

13 assigned, properly assigned, or whether that assignment was

14 refused.  That is rather a discreet legal issue.  Allied is --

15 has a motion up for December the 6th.  We are engaging in a

16 process with them and a dialogue with them and with Atwood to

17 see what we could do to have that perhaps heard on the 13th.

18 Obviously, it's Allied motion and I don't have any authority to

19 say that it will be moved to the 13th, but that's our -- that's

20 our goal.

21         With respect to Allied's plan confirmation objection,

22 that's solely related to whether their contract is going to be

23 rejected pursuant to the plan supplement.  We have no intention

24 at this time of doing so, and so believe that -- you know, when

25 these conversations have ultimately concluded, we believe that

1    we'll be able to resolve that particular plan objection.

2            With respect to Karl Storrie and Davie Bovee, these

3    are two former senior executives of the company.  They have got

4    a plan objection based upon their motion for an administrative

5    expense status for their two individual claims.  That motion

6    will be heard on 12/13, so we are putting some language into

7    the confirmation order that hopefully will be satisfactory to

8    both sides.  We're distributing that today, and we expect that

9    that will be resolved prior to confirmation as well.

10            I'll take the next two together, Robert Bosch and

11   Oracle.  There are, again, some commercial disputes regarding

12   in one case a trademark agreement -- that's with respect to

13   Robert Bosch -- and with respect to Oracle, the cure amounts

14   regarding the contract to be assumed.  We are engaged in

15   discussions with both and expect to have those things -- those

16   matters resolved prior to confirmation.

17            With respect to Toyota, we have -- there is a series

18   of individual leases and the cure amounts.  I think we've

19   identified the leases.  I don't know that we're completely done

20   on resolving the cure amounts, but we expect that that will be

21   done, again, long before confirmation.

22            That brings us to Atwood Mobile Products, Your Honor,

23   and Insight Equity, LLP.  Their -- notwithstanding their

24   involvement with the Allied Motor Products issue that we just

25   -- that I just discussed with Your Honor, they also have --

1  Atwood has an objection based upon plan feasibility, this

2  having to do with the Atwood working capital adjustment.  Their

3  papers and our confirmation brief discuss the -- to at least

4  some degree the substance there.  I think both parties agree

5  that resolving this working capital adjustment is an issue that

6  is not related to confirmation, that that will be resolved in

7  due course through the dispute resolution arbitration process

8  outlined in the APA.  Hopefully, it'll be sooner rather than

9  later.  However, with respect to their plan objection regarding

10  feasibility, we are, I think, in agreement in principle that

11  based upon due diligence that Atwood is currently performing

12  that we should be able to resolve that objection and, to the

13  extent that it is resolved, we will document that in the

14  confirmation order.

15         That brings us, Your Honor, to the U.S. Trustee.  The

16  U.S. Trustee has three particular objections.  The first one is

17  regarding releases.  We've engaged in some further discussions

18  with the U.S. Trustee, Mr. Harrington, over the last few days.

19  We did not understand until this week that it was not the scope

20  of the release itself, as to what was being released or to the

21  exculpation, what was being exculpated.  It was more the U.S.

22  Trustee was looking at who was being exculpated or who was

23  being released in these consensual -- the consensual release or

24  the limited exculpation.  We're engaging in some discussions,

25  but I believe that that will be a legal issue that will go

1  forward on the confirmation hearing.

2         As to the second issue, which is regarding

3  substantive consolidation, I can speak to both the U.S. Trustee

4  and counsel for the nine percent subordinated noteholders.

5  There both raise the issue as to whether our -- we have carried

6  the burden of proof in terms of the standards set forth under

7  Owens Corning.  Your Honor, I am happy to report that both the

8  U.S. Trustee and the nine percent subordinated noteholders have

9  agreed that the overwhelming consent by the affected classes,

10 plus the proffer in the Flanigan affidavit, have -- from their

11 perspective have satisfied our burden, and Mr. Slade will talk

12 a little bit more about how we would go forward on that.  But

13 in terms of the objections, we believe that they have been --

14 that they have been resolved.

15        In terms of the U.S. Trustee's last grounds for

16 objection, this regards the split between Classes 3A and 3B.

17 The U.S. Trustee raised two separate grounds.  One was unfair

18 discrimination pursuant to Section 1129(b).  The other ground

19 was how the classification occurred under Section 1122(a) and

20 with -- at least raised 1122(b), but we don't believe that to

21 be germane because we're not proceeding under Section 1122(b).

22        I believe the U.S. Trustee has agreed that based upon

23 the overwhelming consent by both Classes 3A and 3B that he is

24 not going to go forward with his unfair discrimination argument

25 under Section 1129(b).  We are -- he is planning at this point

1  to go forward with his objection under Section 1122(a) on the

2  grounds that our -- that we have not carried our burden of

3  proof as to the reasons for splitting those two classes, and --

4  although I will say that discussions are still ongoing between

5  the -- between the parties.

6          Turning to the second lien group, Your Honor --

7  discussions with counsel for the second lien lenders last

8  evening, we believe that they will withdraw their objection.

9  We have agreed we'll put some language into the confirmation

10 order, yet to be negotiated, but put some language into the

11 confirmation order that will postpone resolution of the

12 interest issue, as to whether it's the stated rate or base

13 rate, to the hearing scheduled for January 24th.  We'll set a

14 date, you know, five or seven days prior to that for which they

15 can -- by which they can file their response to our

16 confirmation brief, and we can -- to the extent to which it's

17 not resolved prior to that, we can address it in our -- at that

18 time.  I think that will help simplify proceedings on Thursday.

19         With respect to the nine percent holders, Your Honor,

20 obviously the big issue there is the ex clause.  That's going

21 to be argued on the Monday afternoon hearing in the adversary

22 proceeding.  From there, of course, stems their section 1129

23 unfair discrimination issue.  Obviously, the outcome of the

24 hearing on December the 3rd, on Monday, will largely determine

25 how that -- that particular objection goes forward.

1       As I said before, the burden of proof on the -- or,

2  excuse me, on the substantive consolidation issue, that has

3  been resolved as I previously mentioned.

4       The other issue in terms of demand for an equity

5  program, Mr. Slade will discuss that, and the -- regarding

6  feasibility, I think that remains unresolved and the nine

7  percent holders are pressing their objection regarding the

8  releases and the exculpation, and we'll be prepared to go

9  forward on that -- on those grounds as well.

10      Your Honor, there are about 15 or 17 or so individual

11  pro se objections.  The only issue that's raised by I think

12  three of them, as I recall, regarding the "unfairness of the

13  demand for an equity program," as Mr. Slade will discuss, we've

14  -- we have a declaration and expert report to support the need

15  for an equity program.  We'll be prepared to go forward on that

16  -- on those grounds.  Other than that, there are no particular

17  discreet legal issues raised with respect to confirmation for

18  any of those -- any of those objections, and we would ask the

19  Court to rule on those at confirmation.

20      That really concludes our status at this time, where

21  we are with the various objections.  As I said, we're

22  continuing to work with those that are outstanding.  Hopefully,

23  narrow the scope of issues even further between now and the 6th

24  of December.

25      Your Honor, I'd like to update the Court, brief the

1  Court, on where we are with the exit facility.  As Your Honor

2  will recall, we have entered into an -- the debtors have an

3  entered into an engagement letter with Goldman and Barclays.

4  This was not a commitment letter that one would normally have

5  seen in past years.  Clearly the credit markets have been in

6  turmoil really since midsummer.  That is a situation that has

7  not improved over time and, if anything, has continued to

8  deteriorate, and, as I was briefed by Dirk Savini this morning,

9  he said that he characterized this as perhaps the worst in

10 recent memory that the various experts have seen.  And so I

11 think that over -- that is very much the context in which these

12 exit facility participations are being sought.  Having said

13 that --

14        THE COURT:  And what if by time of confirmation an

15 exit facility has not been arranged?

16        MR. HIGGINS:  Well, Your Honor, I -- what I -- I was

17 going to give you the process, but I'll sort of go to the

18 afters before the befores, in that the -- where we believe

19 we'll be on 12/6 is that we will have a fully negotiated credit

20 agreement where we will -- the final orders will be due to

21 Goldman Sachs on the 7th of December.  This is a very fully

22 fleshed out exit facility where we have, obviously, the lenders

23 identified, Barclays and Goldman, that are undertaking these

24 efforts to market.  Clearly before we have -- get a

25 confirmation letter from Goldman and Barclays, we will need to

1  have the orders.  That will occur on 12/7, and we expect that

2  -- we're confident that we will have an engagement -- excuse me

3  -- a commitment letter soon thereafter.

4         But I wanted to brief the Court, if I may, a little

5  bit on some of the efforts that are -- had been ongoing over

6  the past weeks and are continuing to ongo (sic).

7         THE COURT:  All right.

8         MR. HIGGINS:  We have a -- we developed a term sheet,

9  and that was signed on the 4th of November.  We immediately

10 thereafter began documenting the credit agreement to the exit

11 facility.  We expect that to be done by the end of this week

12 and have that posted on Interlinx for the various prospective

13 lenders by Monday of next week, for them to -- as part of the

14 due diligence process for these prospective loan participants.

15        On November 15th and 16th, the company and Goldman

16 and Barclays and the company's advisors met with credit rating

17 agencies.  This step is being taken so that we can broaden the

18 pool of potential participants so that the -- those

19 participants who require ratings on the debt will have those

20 ratings.  We expect to have those ratings sometime this week.

21 That will allow those potential participants to go to their

22 creditor committees well in advance of the 12/7 deadline for

23 orders, and we're hopeful that that will expand the pool of

24 potential participants.

25        We have done -- the debtors, and in particular Miller

1  Buckfire in conjunction with Barclays and Goldman, have done

2  some extensive pre-marketing efforts really since the beginning

3  of November, late October, as we were in negotiations with

4  Barclays and Goldman over the engagement letter.  Mr. Savini

5  has informed me that Miller Buckfire has met with in -- well in

6  excess of 40 potential participants.  There have been numerous

7  one-on-one meetings over the course of time.  Copious materials

8  have been given to these various participants, including a so

9  called bank book, which is a very extensive analysis of the

10 exit facility and of the company that was developed by Miller

11 Buckfire in conjunction with and distributed through the --

12 Goldman and Barclays, and that is ongoing today.  And I'm happy

13 to report that today there is a meeting with the banks on the

14 retail side where there is a -- literally, as Mr. Savini put it

15 to me today, a room full of participants in the -- that are

16 present to the bank meeting.  The company is quite gratified,

17 and Mr. Savini is quite hopeful and confident that we will be

18 able to get a substantial number of orders here over the next

19 week or so.

20       The -- today's meeting was originally scheduled for

21 some days earlier, prior to Thanksgiving, and, quite frankly,

22 was postponed until today because of the credit markets and the

23 disturbances and instability in those credit markets, and so

24 there needs to be a period clearly between this meeting that's

25 happening today that we had hoped would happen a few days

1    earlier and the day on which the orders are to be -- the

2    deadline for submitting orders to Goldman for parties to do due

3    diligence.  That period will be, really, the next nine days.

4    That's five or six business -- full business days for this due

5    diligence.  And again, as I indicated before, we expect that

6    there will be substantial orders on 12/7 and shortly

7    thereafter.

8            It's on this basis, Your Honor, that the debtor is

9    prepared to go forward on the -- on Thursday the 6th, with

10   confidence that we will -- reasonable confidence that we will

11   have a commitment letter in hand, mindful of the fact that

12   having an exit facility in place and being able to consummate

13   that exit facility is a condition precedent not only to plan

14   effectiveness or consummation of the plan, but also to the

15   funding of the backstop agreement or the backstop by the

16   backstop party, and so all of these things have to come

17   together on the effective date.  There are also a number of

18   other issues that have to come together between confirmation

19   and the effective date, not the least of which is the --

20   ascertaining the exact number of senior noteholders who will be

21   receiving stock and ensuring that as a condition to the amended

22   backstop agreement that the number of shareholders will be less

23   than 300 such that the company will no longer be a publicly

24   reporting company as of the effective date.

25           And, Your Honor, we view it as very important that we

1  go forward on the 6th.  In view of the looming deadline for the

2  DIP facility on 12/31, we would like to ensure that the plan

3  does go effective well in advance of that -- as far in advance

4  of the 12/31 date as is humanly possible.  We are also mindful

5  of the ten-day appeal period and how those -- that series of

6  dates fits together.

7          THE COURT:  I have to express a sentiment that I

8  assume you expected to hear from me today, and that is while I

9  understand that the debtor is pushing forward, and I -- I don't

10  know how best to describe the process, but it's -- I understand

11  that it's almost a controlled chaos in terms of the number of

12  things that counsel and the professionals and the other

13  constituents all have to deal with.  Things are constantly

14  rolling forward, and I know that in part the debtor hopes or

15  has perhaps created a momentum that almost equates to an

16  inevitability when it comes to confirmation, and this is

17  something that constituents -- some constituents in 11s often

18  try to resist unsuccessfully.

19          And I understand that much happens between

20  confirmation and effective date and that there are conditions

21  here, but it doesn't seem to me to make any sense in light of

22  what you've just described to me to hold a confirmation hearing

23  prior to the time when you know you have the exit financing.  I

24  mean, I'll have the confirmation on the following Monday.  If

25  you think you're going to know on the 7th whether you're going

1  to get the money, I'll have the hearing on the 10th.  You know,

2  I'll make whatever accommodation that I can possibly make in my

3  calendar to keep you within your time frames, although less

4  comfortably than you might have liked.

5        It just -- I mean, we're not talking about a couple

6  of bucks.  We're talking about an exit facility in excess of

7  $400 million.

8        MR. HIGGINS:  That is correct, Your Honor.  In view

9  of your -- the sentiments you just expressed, Your Honor, might

10  I inquire in terms of your availability I think on the Monday,

11  Tuesday and Wednesday of next week?  I would, when I yield the

12  podium to Mr. Slade, like to confer with my client and -- about

13  which day might be the best day that week, on the 10th, 11th

14  and 12th.

15        THE COURT:  Well, the 10th is completely open.  That

16  is the short answer to that one.  The 11th -- the 11th actually

17  is a -- right now I just have one status hearing listed in the

18  afternoon which I assume if it's the one I'm thinking of,

19  Nancy, I could either move easily or it would take a very brief

20  period of time.  So Tuesday is fairly open.  I have end of the

21  day issues with previous commitments starting at 5:00 and

22  involving the use of this courtroom, and I guess we could try

23  to work around that.  Wednesday the 12th -- okay, I have four

24  hearings, but I will tell you I'll bet in at least three of

25  them and maybe all four, I haven't seen the agendas yet,

1   there's probably not a lot going on.  So, I could either

2   compress them or move them so that we would have the greater

3   use of that day, if it were necessary, so -- and I have another

4   commitment during the day, which I would pass up on if I had

5   to.

6         MR. HIGGINS:  All right, Your Honor.  If I could beg

7   the Court's indulgence, what I would do, propose to do, is to

8   yield the podium to Mr. Slade, consult with my client and come

9   back with some proposals.

10         THE COURT:  Okay.

11         MR. HIGGINS:  All right.  Thank you, Your Honor.

12         MR. HUSTON:  Your Honor, could I be heard?

13         THE COURT:  Yes.

14         MR. HUSTON:  Good morning, Your Honor.  May it please

15   the Court, Joseph Huston of Stevens & Lee on behalf of the

16   objector and administrative claim movant, Allied Motor Supply.

17   Not intending to argue either our objection or our motion, I

18   thought the Court should understand where we are in this, and

19   especially in light of the commentary about the exit financing

20   and about the subject scheduling.

21         Allied was a supplier, continues to be a supplier, to

22   the Atwood company, and it supplies motors and motor parts.

23   It's a relatively small company.  In March of 2007, it had

24   successfully negotiated a series of important amendments to its

25   agreement with the debtors, such that the contract was then

1  assumed, and what was very important at that point in time was

2  that in order to achieve price points that made sense for both

3  parties, and in reliance on the assurances of both the debtor,

4  the debtor Atwood, and the proposed purchaser that they would

5  be going forward, we shifted a lot of production to China at no

6  inconsiderable expense, very important.

7          The nature of the business is such that there is

8  about a six month lag time between the purchase of raw

9  materials and production of inventory for sale to the company.

10  The -- we were concerned during the sale process about how we

11  were going to be paid, because there were just ordinary course

12  of business receivables that were being generated, and so, Your

13  Honor, in the sale order -- actually, we had a limited

14  objection to the sale order.  There was a specific paragraph

15  that said Dura, Atwood, would pay for everything up to the

16  closing and then Atwood would -- new Atwood would pay for

17  everything post-closing, and that was fine.  The sale closed.

18  We were assured that everything was hunky-dory, and then a

19  couple of months ago, actually about 45 days ago, somebody on

20  the business side at the purchaser, new Atwood, said we're

21  terminating your contract, and one of the important provisions

22  in that contract was is that there was a very, very long

23  termination and notice period because of that six-month lag.

24          We believe, and I believe the debtors agree with us,

25  that the language of the purchase agreement is such that this

1 contract had to be taken by the purchaser, but the purchaser

2 has taken -- Atwood has taken the position that, no, it had the

3 right to reject that, and, in fact, as a procedural matter, it

4 went through the motions of saying five days before the closing

5 date we reject the Atwood contract.  We never had notice of

6 that.

7            We have pressed -- our motion for the allowance of an

8 administrative claim is teed up for -- the hearing date was

9 teed up as December the 6th because we think that in the event

10 -- it's very important to us that we know where we stand.  It

11 is very important to us in light of what we've just heard about

12 that in the event that we are incorrect, the debtor is

13 incorrect, that our assumed contract was not taken by the

14 purchaser, then if the debtor rejects, as it may have the right

15 to, the contract, then that's going to be an administrative

16 claim against the estate because the contract has already been

17 assumed, and if they don't have exit financing they don't have

18 sufficient liquidity to pay our claim.  We're extremely

19 concerned about that, and I would think that the inability to

20 pay that claim -- and I can't tell you today what it is because

21 we have this unknown carry on the investment, the significant

22 investment, we've made in China, but the inability to pay the

23 administrative expense means that the -- I think means that the

24 plan can't be confirmed.

25            Now we've had assurances from the debtor, and we are

1  in constant contact with them, that they have plenty of

2  liquidity, that, you know, it's not a big -- you know, it's not

3  a huge issue, and I think -- it's not a $400 million issue.  It

4  may not even be a $400,000 issue, but it is an issue that I

5  think has a chance to go to the issue of confirmation.  So if

6  Your Honor is putting off confirmation until the 11th or 12th

7  or something like that, we think that this issue should be

8  decided sooner rather than later, and we've even offered -- we

9  understand that there's a hearing next Monday at 1:30, and the

10 sense I had was --

11            THE COURT:  An oral argument.

12            MR. HUSTON:  My sense was that that matter may

13 settled.  I may be wrong about that.  We've even offered to go

14 then at the tail end of that if that suited everybody's

15 calendars.  But I really think that this is an issue that

16 should be decided sooner rather than later, and I think it is

17 actually a fairly simple issue of what does the -- what does

18 the asset purchase agreement say.  It's a contract

19 interpretation.  It's not -- I don't think it's factually --

20 factually burdensome.  It's a question of did they have the

21 right to reject -- did the purchaser have the right to redline

22 and "reject the contract" or no.

23            THE COURT:  Well --

24            MR. HUSTON:  We would be prepared to go forward at

25 the time that you currently have scheduled for -- you know, the

1 December 6th, 1:30 time.

2          THE COURT:  I understand, and I guess until someone

3 asks me to put it off it's still on, although I guess one

4 reaction I have, Mr. Huston, to your comments is, you know, if

5 it's a $400,000 issue and the debtor has exit financing, I

6 don't necessarily see immediacy to having to make the decision.

7          MR. HUSTON:  And that's a big if, and that's a big if

8 I was not aware of --

9          THE COURT:  I'm not locking into anything, but I take

10 it in part you agree with me that it's best to know about the

11 financing first before moving forward.

12          MR. HUSTON:  Absolutely.

13          THE COURT:  Thank you.

14          MR. HUSTON:  Thank you.

15          MR. HIGGINS:  Your Honor, Roger Higgins for the

16 debtors.  In view of Your Honor's comments, I would ask that

17 this motion be moved to the 13th, after whatever day we

18 ultimately have our confirmation hearing on that we deal with

19 the merits of this -- of Allied's motion in terms of the

20 interpretation of the order, of the Atwood sale order, and the

21 Atwood asset purchase agreement over the issue of whether that

22 contract was assigned or the assignment was refused, that that

23 could be dealt with at the hearing on the 13th, and we can -- I

24 think that the Court's comments regarding feasibility speak for

25 themselves in terms of -- in terms of Allied Motor.

1        MR. BAST:  Excuse me, Your Honor?

2        THE COURT:  Yes.

3        MR. BAST:  This is Jeffrey Bast.  I'm counsel for

4  Atwood Mobile Products, LLC, which was the purchaser.  While I

5  disagree with the characterizations from counsel for Allied as

6  to the circumstances involving this issue, we certainly have no

7  problem with going forward on the 13th as well.

8        MR. HUSTON:  Your Honor, I may be swimming upstream

9  here, but I press my point that this is a matter that -- it is

10 a discreet matter.  If we know about exit financing -- if we

11 know about exit financing, that just changes who may have to

12 pay for it or whether there are sufficient funds, but it seems

13 to me that if there is an administrative claim that could be of

14 a significant amount which results in a shortfall, we should

15 know about that in connection with confirmation rather than

16 after confirmation.

17       THE COURT:  Well, then it seems to me then that what

18 we ought to do is push it to whatever date we choose for

19 confirmation and then see where the debtor is on exit facility

20 at that point.

21       MR. HUSTON:  We can live with that.

22       THE COURT:  And then we'll decide whether I need to

23 get into the merits at that point or whether given the fund

24 availability we can put it off to another time.

25       MR. HUSTON:  Very good.  We can live with that very

1  well --

2          THE COURT:  All right.  Are you okay with that, Mr.

3  Higgins?

4          MR. HIGGINS:  Yes, Your Honor.  Thank you.

5          THE COURT:  All right.

6          MR. HIGGINS:  And --

7          MR. SACCULLO:  Sorry, Your Honor, briefly, in quite a

8  similar interruption, Anthony Saccullo of Fox Rothschild on

9  behalf of Magna Donnelly.  I believe the debtors' counsel has

10 already given Your Honor at least some background about where

11 we are with our objection and certainly foreshadowed the fact

12 that Your Honor may well have a motion for relief from the

13 automatic stay presented to Your Honor between now and the

14 confirmation hearing.

15          One thing that I did want to point out, our objection

16 to the confirmation process and our motion for relief from the

17 automatic stay present very similar issues to one another, Your

18 Honor.  Essentially we have patent litigation that was brought

19 in the Eastern District of Michigan by the debtors

20 post-confirmation.  We want the ability to assert

21 counterclaims, affirmative defenses and any other claims that

22 we may have in that litigation.  Two things, I guess, would

23 stop us from doing that.  Prior to the confirmation and prior

24 to the effective date, we would have the automatic stay.

25 Post-confirmation we would have the terms of the plan -- the

1 injunctions, exculpations and everything else that would

2 prevent us from doing that.

3          While there are two separate things that would stop

4 us from, you know, arguing those claims, Your Honor, I believe

5 the arguments against the impact of those are very much the

6 same.  We have the same basic justification for why we should

7 begin really from the automatic stay and the same basic

8 justification for why we should be carved out from the releases

9 and the injunctions and everything else in the plan.  It may

10 make sense, Your Honor, to hear all of that at the same time to

11 put the issues once before the Court, instead of twice.

12          THE COURT:  Well, if you object to confirmation they

13 would be before the Court, would they not?

14          MR. SACCULLO:  Correct, Your Honor.  The only issue

15 that I have is if we then push off the motion for relief from

16 the automatic stay to another day other than the confirmation

17 hearing that just means essentially plowing the same ground

18 twice.

19          THE COURT:  Well, I guess it would depend on what was

20 decided in connection with confirmation.

21          MR. SACCULLO:  That could be very true, Your Honor.

22 Certainly, just for the sake of, you know, judicial economy, we

23 wanted to pose the option to Your Honor of perhaps hearing the

24 motion for relief from the automatic stay on the same day as

25 confirmation so that the whole thing can be heard at one time.

1          THE COURT:  Well, I guess my option -- my preference

2     would be, I think, to be in the direction in which the debtor

3     is headed, and that is let's deal with the issues that are

4     central to confirmation, and to the extent without prejudicing,

5     my words, not the debtors, prejudicing the rights of other

6     parties, to have at sometime after confirmation disposition of

7     those issues, and that -- I say that without prejudice to

8     anyone to argue what should be considered at confirmation.  I

9     don't know.  If you're going to file a motion, I would say file

10    your motion.  If you want expedited treatment, I'll consider

11    it.  But those are my views.  In any event, the statute says

12    you get a hearing in 30 days whether anybody else likes it or

13    not.

14         MR. SACCULLO:  Thank you very much, Your Honor.

15         THE COURT:  Okay.

16         MR. SLADE:  Good morning, Judge.  Mike Slade on

17    behalf of the debtors.  Your Honor, the -- getting the consent

18    of not only all the affected classes, but the unaffected

19    classes and the U.S. Trustee, the substantive consolidation,

20    meaning that that issue essentially goes away, will

21    substantially minimize the evidence that we intend to present

22    at the confirmation hearing.

23         Basically there are just a couple of issues on which

24    we intend to present evidence.  One is feasibility.  Another is

25    classification and unfair discrimination with respect to the

1  treatment of the folks that are receiving stock and the folks

2  that are receiving cash and also the people that are

3  participating in the rights offering and those that are not.

4  And the third issue is the management incentives plan.

5        We have three witnesses that we intend to call.

6  They've all submitted expert reports that were attached to our

7  confirmation brief filed last week.  And my plan, unless Your

8  Honor has a different situation in mind, was to present their

9  direct testimony by proffer, and I've spoken with Mr. Marriott

10  about that and he has no objection.  So if there are other

11  parties that would insist that the debtors present the life

12  direct testimony of our three witnesses I guess I'd like to

13  know that now so that I can prepare and have them ready to

14  testify on direct, but otherwise the debtors' proposal would be

15  to proffer the direct testimony of these three witnesses and

16  then have them available here for the live cross examination by

17  any party who would like to cross them.

18        THE COURT:  All right.  If called to testify live,

19  how long would you anticipate the direct examination would

20  take?

21        MR. SLADE:  Quite honestly, Your Honor, I'm not

22  positive because there are a number of issues that were -- that

23  these individuals opined on, and depending on whether or not

24  we're able to resolve these objections -- for example, the

25  Atwood and the Allied objections related to feasibility,

1  whether we need to reserve for the working capital adjustment

2  or for Allied's claim, if those are resolved -- those are

3  fairly fact-intensive issues that the expert might have to

4  spend a little bit of time explaining, but if those go away

5  then we wouldn't touch them.  I would say if I called them to

6  testify live direct, I would say certainly less than an hour

7  for each of them on direct.  It's hard to know how much less.

8          THE COURT:  I understand.

9          MR. SLADE:  I don't know what the parties have in

10  mind for cross examination.

11          THE COURT:  It gives me some universe.

12          MR. SLADE:  Sure.

13          THE COURT:  All right.  What else?

14          MR. SLADE:  That's essentially all, Your Honor.  We

15  will -- we're preparing a pretrial memorandum for Your Honor in

16  the format that I understand you typically accept it.  My plan

17  was, we're working on it, and I was hoping to circulate it to

18  the parties tomorrow for their comments and any additional

19  things that they would like to add.  So our hope was to get it

20  to Your Honor on Monday.  Perhaps we might be able to even push

21  that back a couple of days since we're pushing the confirmation

22  hearing.

23          THE COURT:  Okay.  So, it was otherwise due this

24  Friday.  You'd like at least to the 3rd --

25          MR. SLADE:  Correct.

1          THE COURT:  -- and perhaps longer.  Well, the 3rd's

2    okay with me if we're going with confirmation on the 10th or

3    later.  Does anyone have any --

4          MR. SLADE:  We'll make that happen, Judge.

5          THE COURT:  Does anyone have any issues with that?

6    Okay.

7          MR. SLADE:  And that memorandum will identify the

8    witnesses, their anticipated testimony and the exhibits that we

9    will be introducing.

10         THE COURT:  I was going to say -- I was going to ask

11   about documentary evidence.  What kind of volume should I be

12   expecting?

13         MR. SLADE:  Not a terribly large volume, Judge.  I

14   would say a binder.  Does Your Honor prefer it in hard copy or

15   on a CD?

16         THE COURT:  In a binder, and I'd like two sets.

17         MR. SLADE:  Absolutely.

18         THE COURT:  All right.  Okay.  I see Mr. Higgins is

19   still out.  Let me ask if anyone else wishes to be heard.

20         MR. MARRIOTT:  Just briefly, Your Honor.  Vince

21   Marriott of Ballard Spahr on behalf of certain of the nine

22   percent holders.  I didn't want the sort of details of the

23   evidence that the debtor intends to put on to sort of obscure

24   the substance of our -- the objections to the plan that we plan

25   to press.  The debtor is correct that we are not going to press

1 the substantive consolidation objection.  I mean, candidly,

2 substantive consolidation -- whether there's a substantive

3 consolidated (sic) or not really doesn't affect whether my

4 clients are going to get paid or not, and given the

5 overwhelming vote in favor of the plan, it seemed that that had

6 become a technical issue that ought not to clutter the

7 nontechnical issues that we still see in the case.

8          The three objections that we will be pressing, first

9 is the unjust discrimination objection, the 1129(b), which, as

10 debtors' counsel indicated, really is driven by the ex clause

11 issue.  Our basis for claiming unjust discrimination is that

12 the debtors do not have any fair basis to not distribute to us

13 the new common stock.  So that's the first.

14          The second is feasibility, and the feasibility

15 objection really is going to be driven, as Your Honor has

16 identified, by whether or not they have exit financing, and

17 they will or they won't.

18          And then the third is a fair and equitable objection,

19 which really doesn't merely go to the management equity program

20 but more generally goes to whether or not the debtors will

21 carry their burden on evaluation of this company that leaves

22 $500 million out of the money, and that really is the fair and

23 equitable -- speaking globally, the nature of our fair and

24 equitable objection.  The management equity piece is a

25 component of that, but so is whether the debtors are able to

1  carry the burden of evaluation of this business, where they

2  have valued it, and which leaves nothing for the nine percent

3  noteholders.

4          So that's what we see as sort of the order of battle

5  for the confirmation hearing.

6          THE COURT:  Do you intend to present either witnesses

7  or other evidence, Mr. Marriott?

8          MR. MARRIOTT:  Our case will be testing whether the

9  debtors have met their burden through cross examination.  I do

10  not plan on having my own witnesses, Your Honor.

11          THE COURT:  All right.  Thank you.  does anyone else

12  care to be heard?  All right.  Mr. Higgins, are you ready to

13  come back about dates?  Do you need a little more time?  What's

14  the status?  And just let me -- for the pretrial memo, by say

15  the close of business, five o'clock, on Monday the 3rd?

16          MR. SLADE:  Yes, we'll do that, Judge.

17          THE COURT:  Okay.

18          MR. HIGGINS:  Your Honor, if I could have a recess of

19  about ten minutes?  I'm having a little bit of trouble getting

20  hold of my client.

21          THE COURT:  Certainly.

22          MR. HIGGINS:  All right, thank you, Your Honor.

23          THE COURT:  All right.  Court will stand in recess.

24                          (Recess)

25          THE CLERK:  All rise.  Be seated.

1          MR. HIGGINS:  Your Honor, Roger Higgins for the

2    debtors.  I've consulted with our client, and we will be

3    prepared to go forward on Monday morning, the 10th, we'd be

4    happy to start as early as the Court desires.

5          THE COURT:  9:30.

6          MR. HIGGINS:  9:30 it is, Your Honor.  We will send

7    out notice accordingly.

8          THE COURT:  Now, let me ask this.  What, if anything,

9    else would be left for the 6th, anything?  Are we --

10         MR. HIGGINS:  No, Your Honor.  That would be it.  As

11   long as Allied Motors gets heard on the 10th as well, as we

12   discussed, then that would be it.

13         THE COURT:  Okay.

14         MR. HIGGINS:  All other matters are bound over for

15   the 13th.

16         THE COURT:  Okay.  That's fine.  Anything else in

17   connection with confirmation or December 10th?

18         MR. HIGGINS:  I believe not, Your Honor.

19         THE COURT:  Does anyone else care to be heard in

20   connection with that?  Okay.  Can I jump back to the 3rd at

21   1:30 --

22         MR. HIGGINS:  Yes, Your Honor.

23         THE COURT:  -- oral argument.  How much time do the

24   parties anticipate will be needed?

25         MR. HIGGINS:  We've not had any discussions with

1  counsel for the subordinated notes, but I would imagine perhaps

2  two hours, but I defer to counsel.

3      MR. MARRIOTT:  I don't imagine it would be more than

4  that, Your Honor.  As significant as that issue may be in this

5  case, it's not particularly difficult for either side to lay

6  out their argument.  So I would think two hours would be fine.

7      THE COURT:  Okay.  And how much reading material will

8  I be receiving in connection with that?

9      MR. HIGGINS:  Your Honor, we have already sent the

10  materials to chambers with a notice of the completion of

11  briefing.  I believe there are about 13 or 14 items, of which

12  about half of them are the substantive pleadings, or the

13  substantive briefings.  There are -- I stand corrected.  There

14  will be nine.  There will be opening briefs, answering briefs

15  and reply briefs for each of the debtors, counsel for the nine

16  percent holders and also for U.S. Bank, the senior notes

17  indenture trustee.

18      THE COURT:  Okay.  Bear with me for just one moment.

19                        (Pause)

20      THE COURT:  Well, today is Wednesday.  All right.  I

21  would also ask, and not to bring everybody back, but anyone who

22  wishes to listen is welcome to join by phone.  This may be --

23  we could just have a five minute status update on confirmation

24  to the extent anything is -- further has developed between

25  today and then.

1          MR. HIGGINS:  We will be happy to do so, Your Honor.

2  We'll give you an updated status on where all the objections

3  are, and we'll make that -- we'll send notice of that out, too,

4  as well so that all parties

5          THE COURT:  Okay.  And again, I don't want to spend a

6  lot of time on that, but just to the extent there are further

7  developments.

8          MR. HIGGINS:  Perhaps we could do that first before

9  we go to oral argument.

10          THE COURT:  Okay.  That's a great idea.  And anyone

11  who wants to join by phone only for that purpose is very

12  welcome to do so.  Okay.  Anything further?

13          MR. HIGGINS:  No, Your Honor.

14          THE COURT:  All right.  Thank you all.  That

15  concludes this hearing.  Court will stand in recess.

16                    * * * * *

17              C E R T I F I C A T I O N

18          I, DENISE M. O'DONNELL, court approved transcriber,

19  certify that the foregoing is a correct transcript from the

20  official electronic sound recording of the proceedings in the

21  above-entitled matter, to the best of my ability.

22

23  /s/ Denise M. O'Donnell

24  DENISE M. O'DONNELL

25  J&J COURT TRANSCRIBERS, INC.        Date: December 4, 2007