# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DURA AUTOMOTIVE SYSTEMS, INC., et al.,[1] | ) Case No. 06-11202 (KJC) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) Objection Deadline: September 15, 2008 at 4:00 p.m. |
| | ) Hearing Date: November 25, 2008 at 1:30 p.m. |

## DECLARATION OF ANTHONY C. FLANAGAN IN SUPPORT OF THE FINAL APPLICATION OF ALIXPARTNERS, LLP FOR ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND FOR REIMBURSEMENT OF EXPENSES AS FINANCIAL ADVISORS TO THE DEBTORS AND DEBTORS-IN-POSSESSION FOR THE PERIOD FROM NOVEMBER 7, 2006 THROUGH MAY 12, 2008 AND FOR PAYMENT OF A RESTRUCTURING FEE

Pursuant to Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Anthony C. Flanagan, under penalty of perjury, declares as follows:

1. I am a Managing Director of the firm AlixPartners, LLP ("AlixPartners") which has its principal office at 2000 Town Center, Suite 2400, Southfield, Michigan 48075. I am authorized to make this declaration on behalf of AlixPartners and in support of the application (the "Final Fee Application") of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases for allowance of compensation for services rendered and for reimbursement of expenses as financial advisors to the Debtors for the period from November 7, 2006 through May 12, 2008 and for the payment of a restructuring fee.[2] Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge and the knowledge I have acquired from other professionals at

---

[1] The "Debtors" comprise the entities set forth in the Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Directing Joint Administration of the Debtors' Chapter 11 Cases, entered on October 30, 2006 [Docket No. 68].

[2] Capitalized terms used, but not defined, herein shall have the same meanings as in the Final Fee Application.

AlixPartners, my review of relevant documents, or my opinion based upon my experience, knowledge and information concerning the Debtors' operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth herein. I am duly authorized to submit this declaration.

## AlixPartners' Services and Compensation

2. AlixPartners is an independent firm that provides strategic and financial advisory services in large-scale corporate restructuring transactions. AlixPartners' professionals have extensive experience in providing financial advisory services to financially distressed companies and to creditors, equity holders and other constituencies in reorganization proceedings and complex financial restructurings, both in- and out-of-court.

(a) Compensation Paid and Its Source

3. All services for which compensation is requested by AlixPartners in the Final Fee Application were performed for or on behalf of the Debtors and not on behalf of any committee, creditor, or other person.

4. At all relevant times, AlixPartners has been a disinterested person as that term is defined in section 101(14) of the Bankruptcy Code and has not represented or held any interest adverse to the interest of the Debtors.

5. AlixPartners has received no payment and no promises for payment from any source for services rendered or to be rendered in any capacity whatsoever in connection with the matters covered by the Final Fee Application. There is no agreement or understanding between AlixPartners and any other person other than the Managing Directors of AlixPartners for the sharing of compensation to be received for services rendered in these cases.

(b) <u>Fee Statements</u>

6. A detailed fee and expense statement was attached to each of the previously filed Monthly Fee Applications. The Final Fee Application contains detailed fee and expense statements describing the time spent by each professional for the Interim Fee Period. Detailed fee statements for prior periods is attached to the respective Interim Fee Applications. To the best of AlixPartners' knowledge, this Final Fee Application complies with sections 330 and 331 of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Guidelines adopted by the Office of the United States Trustee, Del. Bankr. L.R. 2016-2, and the Administrative Order.

7. The detailed fee statements and the summary of professionals in the Final Fee Application, as well as other fee statements and fee applications filed previously with the Court, reflect that in certain instances AlixPartners used independent contractors to perform services for the Debtors. Each of the independent contractors used by AlixPartners in these cases filed a Bankruptcy Rule 2014 statement in these cases. AlixPartners' standard practice is to charge for an independent contractor's services at the AlixPartners' rate for a professional of comparable skill and experience, which rate typically exceeds the compensation provided by AlixPartners to such independent contractor.

## The Requested Success Fee

A. The Success Fee is Reasonable, Based on Comparable Market Rates and
Based on AlixPartners' Substantial Contributions to the Success of These Cases

8. The Engagement Letter dated November 6, 2006, and approved by the Court in the Retention Order dated December 21, 2006, provides that, in addition to hourly fees, AlixPartners shall be entitled to an additional Success Fee of $2,100,000 if the Debtors are successfully reorganized and a chapter 11 plan of reorganization is confirmed. AlixPartners' activities were instrumental in driving an extremely successful outcome in these cases despite a

very difficult credit market and a challenging business environment for the automotive parts sector. As described in the Final Fee Application, AlixPartners was involved in many facets of the Debtors' bankruptcy restructuring, including, without limitation, leading customer negotiations, managing the Debtors' treasury function, developing a detailed business plan, assisting in obtaining an extension of the DIP financing and assisting in obtaining sufficient exit financing to permit Debtors to exit from bankruptcy.

9. Based on my experience and understanding of AlixPartners' competitors and industry counterparts, AlixPartners' peer firms negotiate the size of a success fee as part of their overall compensation package for an engagement. Therefore, AlixPartners, and firms like it, rely upon the negotiated performance or success fee when accepting work, and their clients engage their services after considering a success fee as a portion of compensation to be earned. Inasmuch as success fees are a normal part of AlixPartners' fee structure, both within and outside of bankruptcy, approval of the Success Fee is appropriate to assure comparable compensation for comparable services. Success or performance fees are routinely a part of the way financial advisors like AlixPartners are compensated.

10. Importantly, AlixPartners generally receives a success fee for successful work in their restructuring engagements. Indeed, AlixPartners has been awarded both hourly fees and comparable incentive bonuses in over seventy engagements in and out of bankruptcy between 1994 and 2007, with at least twenty-six of those bonuses exceeding $3 million and at least eight exceeding $5 million. Further, this range of success fees applies to restructuring services provided both in and out of bankruptcy, as demonstrated by the chart below reflecting the assets, billable fees and success fees in several of AlixPartners' previous restructurings:

# AlixPartners Success Fee Analysis

| Client[2] | Jurisdiction & Case No. | Company Assets ($M)(at date of filing, except Calpine) | Billable Fees ($K) (Avg. Hourly Rate; only billable fees)[3] | Success Fee ($K) (Avg. Hourly Rate, total fee) |
|---|---|---|---|---|
| *Auto Parts* | | -- | $18,345 | $5,700 |
| Avado Brands | N. Dist. Of Dallas #04-34555 | $228 | $4,455 | $1,301 |
| Cable & Wireless | Dist. Of Del. #03-13711 | $50 | $6,553 ($358.91) | $3,000 ($523.22) |
| Calpine | S. Dist. Of NY #08-60200 | $18,950. | $46,571 ($377.53) | $6,000 ($426.17) |
| *Communications* | | -- | $16,631 | $8,505 |
| Dana | S. Dist. Of NY #06-10354 | | $43,600 ($444.00) | $4,000 ($485.22) |
| DirectTV Latin America | Dist. Of Del. #03-10805 | $809 | $3,291 ($320.82) | $2,500 ($564.53) |
| | | | | |
| *Engineering* | | -- | $12,237 | $3,758 |
| Exide Technologies | Dist. Of Del. #02-11125 | $2,073 | $17,014 ($405.71) | $3,000 ($477.24) |
| Hayes Lemmerz Int'l | Dist. Of Del. #01-11490 | $2,811 | $14,269 | $1,500 |
| Hilex Poly | Dist of Del. #08-10890 | | $8,772 ($587.64) | $500 ($922.58) |
| *Medical* | | -- | $4,747 | $11,908 |
| Mirant | N. Dist. Of TX #03-46590 | $20,574 | $21,702 ($363.10) | $4,000 ($430.03) |
| New World Pasta | Mid. Dist. Of PA. # 04-02817 | $300 | $12,399 ($504.70) | $5,500 ($728.58) |

---

[2] A number of AlixPartners' engagements were outside of bankruptcy: these clients' names are italicized and described by industry for confidentiality reasons.

[3] For those entries without average hourly rates in the "Billable Fees" and "Success Fee" columns, AlixPartners was unable to obtain that information.

| Regal Cinemas | Mid. Dist. Of TN #01-bk-11313 | $1,919 | $3,487 | $1,350 |
| --- | --- | --- | --- | --- |
| Remy International | Dist. Of Del. #07-11481 | | $1,200 | $1,000 |
| Sunterra | Dist. Of Maryland #00-5-6931-JS | $1,058 | $14,582 | $4,250 |
| Transportation | | -- | $6,296 | $5,329 |
| Umbro Int'l | | -- | $3,404 | $3,700 |
| Dura Automotive | Dist. Of Del. #06-11202 | | $27,658 ($442.00) | $2,100[4] |

11. In short, success or performance fees are a normal part of compensation for financial advisory firms such as AlixPartners. In addition, the Success Fee was part of an overall compensation package resulting from arms-length negotiations between the Debtors and AlixPartners. I believe the compensation package is consistent with those available throughout the market.

B. AlixPartners Contributed to the Success of the Cases

12. The services of AlixPartners were important to the effective administration and progress of the Debtors' restructuring. AlixPartners' services removed a significant burden from the Debtors' management so that those resources could be expended managing and restructuring the Debtors' operations. Activities such as customer pricing negotiations, cash management and forecasting, business plan development, claims and distribution management, and managing and addressing constituency information requirements, to name a few, were essential in achieving the outcome for the Debtors. In addition AlixPartners' activities were critical to securing exit financing from multiple sources, which enabled the Debtors to exit from Chapter 11.

---

[4] Subject to court approval.

13. The Final Fee Application summarizes numerous areas where the AlixPartners team contributed in making this an extremely successful outcome. However, to be even more specific, we have addressed five areas to discuss further and to quantify the benefit to the estate. These areas are as follows:

(a) <u>Customer Pricing Negotiations</u>

14. AlixPartners was instrumental in increasing EBITDA (and cash) in an estimated amount in excess of $95 million dollars from 2007 to 2011, as a result of price increases AlixPartners and the Debtors negotiated with Debtors' customers.

(b) <u>Claims Resolution</u>

15. AlixPartners' claims work directly resulted in a substantial reduction of claims against the Debtors. Bankruptcy claims against the estate totaling $2.036 billion were filed in these cases. This number was reduced to $1.834 billion due to withdrawals, stipulations and plan adjustments. Of the $1.834 billion in claims, $1.263 billion is bank related. This left $571 million in claims related primarily to trade vendor and tax related claims.

16. AlixPartners analyzed the pool of claims and filed multiple declarations in support of numerous court hearings to reduce the trade vendor and tax related claims. The net impact to the estate from these court hearings was to reduce the claims pool by an additional $474 million (83% of the total trade vendor and tax related claims pool of $571 million). The benefit to the estate of $474 million in reduction in claims was a cash savings of $181 million related to reduced secured, administrative, priority and unsecured claims. Additionally, the estate benefited by having the unsecured claims pool reduced by 78% from $375 million to $82 million.

(c) <u>Atwood Working Capital</u>

17. AlixPartners was instrumental in obtaining value for the Debtors' in connection with the sale of Atwood. The Atwood purchase agreement included a provision for an adjustment to the purchase price based on the final working capital. Insight, which purchased Atwood, submitted an original balance sheet showing a $35 million decline in working capital and asserted that Dura owed Atwood $35 million. AlixPartners worked closely with the company to develop a strategy to challenge Insight's position, and was intimately involved in the extensive negotiations that followed for the next four months. Ultimately, the matter was consensually resolved by a settlement that included a cash payment to Insight of $6.9 million.

(d) <u>Letters of Credit</u>

18. AlixPartners was instrumental in preventing draws on letters of credit, and the resulting defaults. The timing of the Debtors' need to exit from bankruptcy was driven by many factors, one of which was a $17.8 million Letter of Credit ("L/C") that Debtors had provided to Travelers Insurance ("Travelers") in support of future workers' compensation insurance claims. This L/C was originally set to expire on December 31, 2007, and Travelers had the right to draw on the L/C at any time. A draw on the L/C would have created an immediate default under the Debtors' postpetition financing facility and would have had a devastating impact on the Debtors' liquidity and their chances of emerging from bankruptcy.

19. AlixPartners' personnel negotiated extensively with Travelers and Bank of America ("BofA"), the issuer of the L/C, during the month of December 2007 to avoid a draw on the L/C. Because the L/C was supported by the collateral that was pledged under the DIP loan agreements, the L/C could not be extended beyond the due date of the DIP agreements. The original DIP loan agreements expired on December 31, 2007. As a result of AlixPartners negotiations, Travelers agreed not to require BofA to fund the L/C as long as an extension was

issued by BofA prior to its expiration. This provision allowed the L/C not to be drawn even though BofA was not authorized to extend the L/C until the evening of December 31, 2007.

20. AlixPartners successfully negotiated with holders of L/Cs two additional times; (i) when the Debtors' DIP facility was first extended until January 31, 2008; and (ii) when the Debtors' DIP facility was further extended until June 27, 2008. In both instances, after extensive discussions with AlixPartners, Travelers agreed to delay drawing on the L/C and to issue their draw request subject to the ability to extend the L/C. In the end, the L/C was never drawn. AlixPartners spearheaded similar discussions with another insurance company that held a L/C of just over $1 million.

    (e) European Factoring of Accounts Receivable and Repatriation of Cash from Europe

21. AlixPartners identified and worked closely with the European factoring source that provided over $80 Million of cash for exit financing. Without these proceeds, the Debtors would not have had sufficient liquidity to exit from bankruptcy. AlixPartners leveraged its contacts with various factoring institutions and initiated discussions with such institutions on the Debtors' behalf. Eventually, after months of working with the various factors, COFACE agreed to factor up to €50 million (approximately $75 million) of receivables in Germany and Czech Republic and GE Factofrance factored an additional $20 million of receivables. During the second quarter of 2008, AlixPartners personnel regularly met with COFACE and their attorneys and provided substantial due diligence information to them to assist with the factoring efforts.

22. In early May, Blackport agreed to provide approximately $50 million of term loan financing that would be committed directly to the Debtors' European operations. AlixPartners was instrumental in developing and explaining the collateral package to support the term loan and to assist in the negotiations of the intercreditor agreement between COFACE and Blackport.

Once the exit financing proceeds were obtained directly in Europe, the cash needed to be repatriated to the U.S. for Debtors' use in paying off the DIP financing. Many complex laws, particularly in Germany, restrict the ability of a subsidiary to upstream cash to a parent company in the United States. AlixPartners worked closely with the attorneys from Baker McKenzie to understand these laws and apply them to the financial information of the various legal entities in Europe, and to create and implement a plan for each entity to determine how those funds would be up-streamed and eventually repatriated to the United States.

23. In summary, based on my experience, the Success Fee is in line with those awarded throughout the market for similar services rendered. Furthermore, AlixPartners' services directly resulted in substantial and tangible value added to the Debtors' estates through the efforts described above, and ultimately contributed significantly to the successful resolution of these cases. Based on the foregoing, I believe the Success Fee is reasonable and should be awarded in full.

*The remainder of this page was left intentionally blank.*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

ALIXPARTNERS, LLP

Executed on October 17, 2008

By: *Anthony C. Flanagan*
Name: Anthony C. Flanagan
Title: Managing Director